**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,

Plaintiff,

-against -

CHRISTIE'S, INC.,

Defendant.

---------------------------------------------------------x

Case No.:

## VERIFIED COMPLAINT FOR REPLEVIN

Plaintiff PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA, alleges as follows for his complaint against defendant CHRISTIE'S, INC.:

## NATURE OF ACTION

1. This is a replevin action against the auction house Christie's for recovery of stolen artwork, *Saint Sébastien* by Spanish renaissance "Old Master" Doménikos Theotokópoulos, widely known as El Greco. The painting is owned by the Estate of King Carol II of Romania (the "Estate"), the last parliament-confirmed Romanian king, who was forced into exile in 1940 by assignation plots from Hitler and his Romanian henchman, Dictator Ion Antonescu. Plaintiff Prince Paul Philippe of Romania is Carol II's grandson and principal heir through Paul's diseased father, Prince Carol Mircea of Romania.[1]

2. Prince Paul brings this action on behalf of the Estate based on the extraordinary circumstances described, *infra*, on a temporary basis while he petitions the New York County Surrogate's Court for appointment as the Estate's ancillary administrator.

[1] As a member of the former Romanian royal family, Prince Paul is entitled to use the honorific title "Prince" out of respect for his family history. Of course, Romania is no longer a monarchy, and Prince Paul supports Romania's republican form of government.

3. Christie's obtained possession of *Saint Sébastien* from an unknown consignor who instructed Christie's to sell the painting at auction. *Saint Sébastien*, however, was stolen from Carol II in November 1947, when Carol II's second born son Michael, then the puppet king of Romania's Soviet-dominated government, loaded *Saint Sébastien* and other valuable items into two boxcars attached to the Orient Express, the contents of which were unloaded, and secretly stored for decades, in vaults at Swiss bank UBS in Zurich.

4. In fact, during and immediately after World War II, Michael stole many paintings from his father Carol II's collection. Telegraph records show that Hitler's ambassador to Romania approved Michael's transport of paintings by train to his mother, Princess Helena of Greece, who was then living in Italy. This theft of Carol II's property culminated in November 1947, when Michael transported *Saint Sébastien*, another El Greco masterpiece, *Canon Bosio*, and other assets to his UBS vault in Zurich.

5. Knowing that he had no right to his father's paintings, Michael kept the paintings secret until Carol II died in 1953 and Carol II's wife, Princess Elena (born Lupescu), became deathly ill in 1976. Thereafter, when his father and stepmother were no longer able to object, Michael sold both *Saint Sébastien* and *Canon Bosio* to the New York art dealer Wildenstein & Co. Even though it knew that Michael had stolen the paintings from Carol II, Wildenstein resold *Canon Bosio* to the Kimbell Museum in Fort Worth, which renamed it *Portrait of Dr. Francisco de Pisa*, and *Saint Sébastien* to an unknown buyer in the 1976.

6. In February 2025, *Saint Sébastien* resurfaced in New York as one of the "Old Master" paintings to be sold at auction by Christie's. When the Romanian government intervened and asserted an ownership claim, however, Christie's voluntarily withdrew the painting from

auction. These events are reported in a February 6, 2025 article in *The Art Newspaper*, "Christie's pulls El Greco work from sale after Romanian government intervenes," which is attached as Exhibit 1. *See also* Exhibit 2 (February 9, 2025 article in the *New York Times*, "An El Greco is Pulled From an Auction as Romania Objects."

7. Romania has no valid claim to the painting. On March 29, 1985, Romania commenced an action in this Court against Wildenstein seeking the return of *Saint Sébastien* and *Canon Bosio*, *Socialist Republic of Romania v. Wildenstein*, 85 Civ. 2435 (DNE) (SDNY) (the "Romania's 1985 New York Action"). Romania repeated failed to comply with discovery, and on February 20, 1986, the case was dismissed with prejudice pursuant to Federal Rule of Civil Procedure 37(b)(2(C). In the early 1990s, after Romania's communist government was deposed, Romania's new government filed a Rule 60(b)(6) motion to reopen the case against Wildenstein and vacate the prior dismissal *with prejudice*. In a March 11, 1993 decision annexed as Exhibit 3, this Court denied that motion decision, holding:

> throughout history, governments change when political systems are altered or when the regime in power falls out of favor. Such a change in government, or the fact that a former regime pursued a different litigation strategy than would the government currently in power, does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion.

*See Socialist Republic of Romania*, 147 F.R.D. 62, 66 (SDNY 1993) (Exhibit 3).

8. Accordingly, any ownership claim Romania had to the *Saint Sébastien* was extinguished under the doctrines of res judicata and issue preclusion.

9. Prince Paul learned on February 6, 2025 from media reports that *Saint Sébastien* was in New York. As set forth in more detail, *infra*, Christie's decision to stop the sale raises a distinct likelihood that the consignor will remove the painting from New York.

## THE PARTIES

10. Plaintiff Prince Paul of Romania is a citizen of the United Kingdom and Romania who currently resides in France.

11. Defendant Christie's, Inc. is a New York corporation with its principal place of business in New York City.

## JURISDICTION AND VENUE

12. This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action where the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of a State and citizens or subjects of a foreign state.

13. Venue is proper under 28 U.S.C. § 1391(b)(1) because defendant Christie's resides in this district and 28 U.S.C. § 1391(b)(2) because the property that is the subject of this action is situated in this district.

## BACKGROUND

### A. The Romanian Royal Family's Collection of Old Masters.

14. By the late 19th century, Romania's first King, Carol I, had amassed an impressive collection of "Old Masters" paintings, including the *Saint Sébastien*. The collection was maintained at Castle Peleş, a magnificent neo-renaissance castle in the Transylvanian foothills. Carol I commissioned his librarian, Leon Bachelin, to prepare a catalog, which was published in 1898 as "Tableaux Anciens de la Galerie Charles 1st."[2] The catalog includes the entire collection and assigns a number, now known as a Bachelin no., to each painting.

[2] The Romanian name "Carol" is sometimes translated into English or French as "Charles."

15. The art collection passed to the succeeding monarchs, Ferdinand I pursuant to Carol I's will and to Carol II pursuant to Ferdinand I's will. Carol I's will left the collection to the "Romanian Crown," which Romanian kings interpret to mean their personal property. When Carol II became the last Romanian king to be ratified by the Romanian parliament on June 6, 1930, a codicil to Ferdinand I's will provides that all his property:

> *will belong to the future King*: to return to *my successor to the Romanian throne from my Family…*

Exhibit 4 (Ferdinand's codicil) (emphasis added).

16. Carol II's art collection included nine masterpieces by El Greco, including *Saint Sébastien* and *Canon Bosio*. When Wildenstein organized an exhibition of El Grecos in Paris in 1937, Carol II lent his nine El Grecos to the exhibition. To recognize Carol II's contribution, the exhibition circulated a note listing the nine paintings, describing them as King Carol's "personal property." *See* Exhibit 5 (Note about El Grecos, 1937 Paris exhibition).

17. Carol II never abdicated but was forced to live in exile from September 1940 until his death in Portugal in April 1953. Thus, although Nazi-aligned dictator Ion Antonescu appointed Michael as puppet king, Michael did not acquire any legitimate right to Carol II's property, including the art collection, until Carol II's death. In 1955, the Portuguese court presiding over Carol II's estate case applied intestacy rules to allocate a 37.5% share of the estate to each of Carol II's two sons, Michael and Prince Paul's father, and the remaining 25% share to Carol II's widow, Princess Elena. *See* Exhibit 6 (1955 decision in Carol II's estate case).

**B. The Theft.**

18. During World War II, the Nazis rewarded Michael for his collaboration by allowing him to transport some of the paintings from Carol II's collection out of the country. Telegrams

from Hitler's ambassador to Romania, Manfred Freiherr von Killinger, authorized Michael to use armored boxcars to transport paintings to Florence, Italy, where Michael's mother lived. *See* Exhibit 7 (Killinger 1943 and 1944 top secret telegrams).

19. In 1944, after Stalingrad and D-day, Michael concluded that it was a matter of time before Nazi Germany would be defeated. He courageously conspired with Russian agents to overthrow Antonescu. Overnight, Romania's armies switched sides, marching west to fight the Germans from their previous push east against the Soviets. The Soviets occupied Romania, starting their decades-long domination of Romania. The new communist government nevertheless allowed Michael to keep his title of king for a few years, no doubt in recognition of his role in changing Romania's allegiance from the Nazis to the Allies.

20. In December 1947, Michael was forced to abdicate. Before he left Romania, however, on the evening of November 12, 1947, Michael and his staff loaded two boxcars with valuable assets, including *Saint Sébastien* and *Canon Bosio*, at the train station near Castle Peleş. The boxcars were attached to the Orient Express and were unloaded when the train arrived at Geneva, where Michael's aide-de-camp, Jacques M. Vergotti, supervised the unloading and transferred possession of everything to Arthur Lang, the director of Swiss bank UBS in Zurich. *See* Exhibit 8 (Excerpts of Vergotti Dep.) at 45:6 – 46:4.

21. About one year later, in December 1948, Mr. Lang prepared an inventory of the investments he had made on behalf of Michael as well as the "most important items in safe deposit." *See* Exhibit 8 (Vergotti Dep.) at 32:1 – 33:19); Exhibit 9 (inventory). Item numbers 105 and 106 on the inventory referd to the *Saint Sébastien* and *Canon Bosio*, respectively. *Id*. 33:2-10.

**C. Michael Hides the Paintings for 30 Years.**

22. When Michael's father, Carol II, was alive, Michael knew that he could not sell any of the paintings because Carol II considered them to be his personal property. In December 1949, a Professor of Fine Arts at the University of Michigan wrote to Carol II to inquire about a painting in his collection by the 17th century Spanish artist Alonso Cano. Carol II responded by explaining that his collection was now in the possession of the communist regime:

> It would be a pleasure to give you the information regarding the painting of Alonso Cano which is in *my collection*. I'm sorry to say that the Royal painting collection has remained in the country and as all our belongings has been confiscated or better said robbed by the communistic regime. After latest news the best things have been taken to Moscow so as to augment still the Soviet's wealth.

Exhibit 10 (December 26, 1949 – January 5, 1950 exchange of letters) at Carol II's January 5, 1950 letter, first page (emphasis added).

23. Thus, during his father's life, Michael let Carol II believe that his precious art collection had been confiscated by the communist regime. In fact, Michael had stolen 42 of the paintings and was hiding them in a UBS vault in Zurich. As time passed, it became apparent to Romania that the paintings were missing. Lists of the paintings were published in Romanian newspapers, such as the example annexed as Exhibit 11. The *Canon Bosio* and *Saint Sébastien* are included in that list as items 32 and 37, respectively.

24. After Carol II's death in 1953, his widow Princess Elena continued to live in Portugal for another 24 years and Michael continued to conceal the paintings during that time.

**D. In 1977, Michael's Secretly Sells *Saint Sébastien* and *Canon Bosio* to Wildenstein, Who Resells Them.**

25. In early 1977, Carol's widow, Princess Elena, became ill and eventually died in

June. With the risk of objections from Carol II and Princess Elena eliminated due his death and her illness, Michael sold two of the El Grecos, *Saint Sébastien* and *Canon Bosio*, to Wildenstein. Wildenstein promptly resold *Canon Bosio* to the Kimbell Art Museum in Fort Worth for $3 million. In an April 14, 1977 letter, Wildenstein confirms that it had acquired the painting from Michael:

> On the enclosed invoice you will note that the last owner is described as "private collection, Switzerland" as we had promised *the wife of King Carol and Prince Michael* that their names would not be mentioned.

Exhibit 12 (April 14, 1977 letter and enclosed invoice from Wildenstein to the Kimbell Museum) (emphasis added).

26. In fact, Michael misrepresented to Wildenstein that all of Carol II's living heirs, including Princess Elena who was still alive albeit on her death bed, approved of the sale of *Canon Bosio* and *Saint Sébastien*. Based on those misrepresentations, which Wildenstein passed on, the Kimbell identified the provenance of *Canon Bosio* as:

> purchased by King Carol of Romania …; by descent to his nephew, King Ferdinand …; by descent to his son King Carol II of Romania …; *his heirs*; (Wildenstein & Co., New York); purchased by Kimbell Art Foundation.

*See* Exhibit 13 (August 25, 2020 screenshot of Kimbell webpage describing provenance of *Canon Bosio*, renamed as *Portrait of Dr. Francisco de Pisa*) (emphasis added).

27. Michael's representation that Carol II's "heirs" sold the paintings to Wildenstein was false and made in bad faith. Michael concealed the sale from his older brother, Prince Paul's faither, Carol Mircea, who was just as much an heir of Carol II as Michael pursuant to the 1955 Portuguese decision and subsequent decisions in the United Kingdom and France recognizing and enforcing the Portuguese decision. Had Prince Paul and his father known of the sale, they would

have asserted their ownership rights, which would have either blocked the sale or forced Michael to share the proceeds.

28. Wildenstein also resold *Saint Sebastian* shortly after acquiring it from Michael, but the identity of that purchaser is unknown. Both paintings were lent to a 1982 exhibition of El Greco paintings called "El Greco of Toledo," which opened between April 1 and June 6, 1986 at the Prado in Madrid and then travelled to several museums in the United States, including the Kimbell. Consistent with the Kimbell's website, the catalogue for that exhibition describes the provenance of *Canon Bosio*, aka *Portrait of Dr. Francisco de Pisa*, as:

> King Carol I of Rumania, Royal Palace, Sinaia; King Carol Il of Rumania; *heirs of Carol Il*; acquired by the Kimbell Art Museum in 1977.

Exhibit 14 (Excerpts from the "El Greco of Toledo" catalogue) at p. 2 (emphasis added).

29. The catalogue attributes the ownership of *Saint Sébastien* to an anonymous "private collection." *Id*. at p. 3. And only an abbreviated provenance is supplied: "Royal Palace, Bucharest." *Id*.

**E. Romania's Failed Lawsuits to Obtain Possession of the Stolen Paintings.**

30. Over the decades, Romania has commenced four separate lawsuits attempting to obtain possession of the paintings Michael stole during World War II and shortly thereafter. Each of those lawsuits were dismissed. One year before commencing 1985 New York Action described, *supra*, at ¶ 7, the Romania's communist government commenced a parallel federal action in Texas seeking to obtain possession of the *Canon Bosio* from the Kimbell Museum, *Socialist Republic of Romania v. Kimbell Art Foundation*, Civil Action No. 84-176K (N.D. Tex.) ("Romania's 1984 Texas Action").

31. Discovery was taken jointly in those two actions; for example, Michael's aide-de-camp, Jacques Vergotti, was deposed in both actions on April 23, 1985. *See* Exhibit 8 (Vergotti Dep.). In 1986, both actions were dismissed with prejudice, the New York action for Romania's repeated failure to comply with its discovery obligations and the Texas action as untimely under the harsh Texas 2-year statute of limitations that commences on the date of the theft.

32. In the early 1990s, the fledgling noncommunist government filed two new lawsuits to obtain possession of the paintings (in addition to filing an unsuccessful Rule 60(b)(6) motion in the 1985 New York Action described, *supra*, at ¶ 7). The first new lawsuit was filed in New York state court on May 30,1993 against Michael, *Romania v. Former King Michael* (NY Sup. Ct. NY Co.) ("Romania's 1993 New York Action"), which was dismissed on *forum non conveniens* grounds on July 15, 1994 and affirmed by the First Department Appellate Division on February 16, 1995. *See Romania v. Former King Michael*, 212 A.D.2d 422 (1st Dept. 1995).

33. Ten days after filing its 1993 New York Action, Romania's new noncommunist government filed a similar action against Michael in Switzerland, *Romania v. Michel de Roumanie*, No. JTPI/13039/96 (16th Chambre, Pourvoir Judiciaire, Tribunal de Première Instance) ("Romania's 1993 Swiss Action"). On September 6, 1996, the Swiss appellate court affirmed dismissal of Romania's action based on lack of jurisdiction and inadmissibility because Romania's claim should have been brought in Romania. *See* Exhibit 15 (Sept. 6, 1996 Swiss appellate decision).

34. Because Romania's 1985 New York Action, which sought possession of both *Canon Bosio* and *Saint Sébastien*, was dismissed with prejudice, Romania's claim of ownership over those paintings is barred under the doctrines of res judicata and issue preclusion.

Undoubtedly, that is why Romania has not brought its claim of ownership in New York court. Although the press reports that Romania is asserting its claim of ownership in the Paris Judicial Tribunal, Prince Paul has not been able to confirm that, and his French lawyers believe that a French court is unlikely to consider such a claim to fall within its jurisdiction or admissibility.

35. Romania's substantive arguments that it owns the stolen paintings also fail. Those arguments rely on Carol I's will transferring his art collection to the "Romanian Crown." Unlike other European monarchies, however, the Romanian monarchy did not distinguish between the personal property of a Romanian monarch and the property of the Crown in the sence of "property of the Romanian people." This is reflected by the conduct of both Carol II and Michael, both of whom considered the paintings to be their personal property. As an illustration, Michael opposed Romania's Swiss Action as follows:

> King Carol I did not decide that the paintings would belong to the Romanian State … *but to the Crown personified by the King*.

Exhibit 15 (1996 Swiss decision at 20) (translated to English in the text) (emphasis added).

**F. Romania is Not an Adequate Alternative Forum.**

36. Romania is not a practical alternative forum because the property subject to this action, El Greco's *Saint Sébastien*, is in New York, not Romania. This case therefore must be decided in New York.

37. In addition, Romania would not be a fair or objective forum. For over the past 100 years, Romania has been waging a mean-spirited campaign against Prince Paul's side of the former royal family to prevent them from obtaining their rightful inheritance as Carol II's heirs. This family dispute arose when King Ferdinand objected in 1919 to Carol II's (then Crown Prince Carol's) first marriage. Ferdinand's objection was based on geopolitical politics, whereas Crown

Prince Carol's position was based on true love. Furious that his son was not following his orders to abandon his wife, Ferdinand arranged an annulment of the marriage in absentia – neither Carol nor his wife cooperated or participated in the purported annulment.

38. Carol eventually succumbed when Ferdinand threatened to disinherit him, causing Carol to leave his wife and newborn child, Prince Paul's father, in Paris. When Carol returned to Romania, Ferdinand forced him to marry Princess Helen of Greece. Shortly thereafter that loveless marriage produced another son, Michael. Carol then started a life-long relationship with Elena Lucescu, who became the true love of his life, his companion for over 28 years and his third and final wife in exile in Portugal.

39. As a result of this messy family dispute, Paul's father was unfairly branded "illegitimate" during the first half of the 20th century and alleged to be unentitled to inherit. The 1955 Portuguese decision rejected that allegation, however, holding that Paul's father was the legitimate first-born son of Carol II, regardless of whether the annulment in absentia was valid or not. *See* Exhibit 6 (Portuguese decision). The European jurisdictions where Carol II had assets, including the United Kingdom and France, then acknowledged the binding nature of the Portuguese decision and distributed those assets according to that decision. Michael consistently objected, but his objections were repeatedly rejected.

40. After Ceausescu was overthrown in 1989, Prince Paul, his father, and Michael returned to Romania. Within a few years, Romania sided with Michael's side of the family, awarding them hundreds of millions of dollars in properties and assets, including the spectacular Castle Peleş. In contrast, the efforts of Prince Paul and his father to recover their inheritance met with procedural obstacles and delays. In 2010, the European Court of Human Rights ruled that

Romania's failure for 19 years to recognize the binding nature of the 1955 Portuguese decision violated the human rights of Paul's father, who had died four years earlier. Finally, in 2012, Romania's highest court, the High Court of Cassation and Justice acknowledged that the 1955 Portuguese decision was binding in Romania and that Paul and his father were King Carol II's heirs.

41. Prince Paul expected the High Court's 2012 decision to finally break the log jam preventing him from recovering his fair share of Carol II's inheritance. He was sadly mistaken. In 2016, Romania indicted Paul and several co-defendants for intentionally applying to recover Carol II's communist-confiscated property, even though they knew that Paul had no valid claim to those properties. The indictment was ludicrous on its face because it alleged that Paul was not a member of the former royal family, and hence not a legitimate heir of Carol II, which was directly contrary to the 1955 Portuguese decision as well as the subsequent decisions of courts in the United Kingdom, France, and, ironically, Romania's High Court of Cassation and Justice in 2012. It was also contrary to the thorough due diligence report prepared by one of Romania's leading lawyers, Robert Roşu, who concluded that Paul's claims to the properties were meritorious.

42. Alternatively, the indictment charged that even if Paul was Carol II's legitimate heir, Carol II's properties had been validly confiscated under the Nazi-regime of dictator Ion Antonescu and therefore did not fall within scope of post-communist statutes authorizing recovery of communist-confiscated property. The idea that a European Union member state would base a criminal indictment on the validity of Nazi confiscation orders during World War II, even though such orders were nullified in post-war Romania legislation and the 1947 Peace Treaty of Paris, should be an international scandal.

43. Not surprisingly, the court of first instance, the Braşov Court of Appeal, acquitted Paul and most of the defendants of the serious charges in June 2019. The prosecution appealed, however, and manipulated the purportedly random system of panel assignment to guarantee that the appeal would to be assigned to a three-judge panel known as the "black panel" based on its record of convicting government political opponents regardless of the facts or legal issues.

44. After the indictment, Prince Paul directed his efforts to regain his rightful inheritance outside of Romania. In 2019, he reopened Carol II's Portuguese estate proceeding. In August 2020, he convinced the famous French police department in charge of recovering stolen art to impound two El Grecos and another Old Master stolen by Michael during World War II. In October 2020, the Portuguese court appointed him as administrator of Carol II's estate.

45. It was no coincidence, therefore, that in December 2020, the High Court of Cassation of Justice overturned the June 2019 acquittals and convicted Prince Paul and most of his co-defendants, including Paul's lawyer, Robert Roşu, of serious crimes based on Paul's alleged bad faith attempt to recover Carol II's properties to which the defendants knew Paul had no right. The December 2020 convictions, however, were not supported by any written decision or analysis. Four months later, in April 2021, the High Court of Cassation and Justice issued a 703-page impenetrable decision that took days or weeks for anyone to begin to understand. The grounds for the decision, however, were simple, albeit disguised in obtuse legalese: Paul and the other defendants knew that he was not entitled to Carol II's former properties because they knew (i) Paul wasn't a member of the former royal family and therefore not a legitimate heir of Carol II; and (ii) even if Paul was Carol II's heir, the properties were validly confiscated by the *Nazis* and therefore did not fall within the scope of the laws to return *communist-confiscated* properties to their owners.

The point about the Nazi-confiscation was supported by a November 1941 unsigned decision of a special committee of the High Court of Cassation and Justice in November 1941, which was purportedly rendered under a special law enacted by fiat by dictator Antonescu for the purpose of confiscating Carol II's properties while he was in exile. The document does not appear in any of Romania's official archives.

46. Because Paul was in Portugal attending to his duties as administrator of Carol II's estate when the convictions were announced, Romania was unable to arrest him. Paul traveled to France, where he was born and grew up, and reported his presence to the Ministry of Foreign Affairs. Romania issued a European Arrest Warrant and an INTERPOL diffusion for Paul's arrest.[3]

47. In contrast, Paul's lawyer Robert Roşu was in Romania when the convictions were announced, so he was arrested and started serving a five-year prison sentence. There was an international outcry, however, from bar associations and other groups of lawyers over Roşu's conviction for apparently doing his job as Paul's lawyer in advancing good faith arguments that Paul was entitled to the properties.

48. The 703-page decision justifying the convictions finds that Roşu's arguments were not made in good faith, but with knowledge that Paul was not Carol II's legitimate heir and the Nazis validly confiscated the properties in 1941. Facing continuing international controversy, the High Court of Cassation and Justice vacated Roşu's conviction in November 2021, explaining four

[3] An INTERPOL "diffusion" has the same effect as the more familiar INTERPOL "Red Notice," which is to alert all INTERPOL National Central Bureaus that the subject is wanted and to cooperate with local police departments to arrest and apprehend the subject. The difference is that a "diffusion" is unilaterally issued by an INTERPOL member whereas a "Red Notice" is issued by the INTERPOL central authority after verifying that the member state's request for a Red Notice is justified.

months later that Roşu's arguments were, in fact, made in good faith, even if they were mistaken.

49. Of course, the lack of criminal intent was always obvious, and equally applied to Paul and the other defendants, since Paul's status as Carol II's heirs had been definitively established in every European court that considered the issue, from the 1955 Portuguese decision to the 2010 decision of Romania's High Court of Cassation and Justice. Yet even though the Romanian criminal procedure code required the High Court to consider whether its rational applied to other defendants, it did not do so, leaving the convictions of Paul and the other defendants in place despite the lack of criminal intent.

50. Subsequent international events have seriously undermined the integrity of the Romanian convictions. In June 2022, French police arrested Paul, but he was detained for only a few days and then released on his own recognizance without bail. He opposed Romania's extradition request on the ground that his underlying conviction violated his human rights, due process, and the rule of law. In November 2023, the Paris Court of Appeal refused to extradite him and that decision was subsequently affirmed by the French Supreme Court. *See* Exhibit 16 (Decision of Paris Court of Appeal); Exhibit 17 (French Supreme Court decision). Before the Paris Court of Appeal ruled on Romania's extradition request, Prince Paul successfully challenged the INTERPOL diffusion, which resulted in a decision by INTERPOL vacating the diffusion and instructing its National Central Bureaus not to cooperate with local police to arrest or detail Paul. The decision concluded that Paul's Romanian conviction appeared to be politically motivated, violated his rights, and was contrary to INTERPOL's rules and regulations. *See* Exhibit 18 (INTERPOL decision).

51. In April 2024, after Paul was mistakenly assured that it was safe to travel to Malta,

he was arrested in Malta on the same Romania-issued European Arrest Warrant. In August 2024, the Maltese appellate court rejected Romania's extradition request. The decision cites significant human rights abuses that are currently pending before the European Court of Human Rights on Prince Paul's application challenging his Romanian conviction. *See* Exhibit 19 (Maltese extradition decision).

52. Over the last four years, two of Prince Paul's co-defendant have also successfully defended against Romania's efforts to extradite them, despite the narrow grounds on which a EU member state may refuse a European Arrest Warrant. Not a single EU member state have honored the Romanian-issued European Arrest Warrant for Prince Paul or any of his co-defendants.

53. These extraordinary circumstances establish that Romania has been pursuing a campaign to deprive Prince Paul and his side of the former royal family of their inheritance rights for over 100 years. Prince Paul's criminal conviction in December 2020 is the latest, and most despicable escalation in that campaign. These circumstances establish that Romania is incapable of providing a fair or objective forum for any disputes involving Prince Paul.

**CLAIM FOR RELIEF**
**(Replevin)**

54. Prince Paul repeats and realleges each of the allegations set forth in paragraphs 1 through 53.

55. The Estate of Carol II (the "Estate") is the owner of *Saint Sébastien*, which was stolen from Carol II on November 12, 1947 when Carol II's second-born son, Michael, directed that the painting be loaded into a boxcar, attached to the Orient Express, and then transferred to a vault in the Swiss bank UBS in Zurich, where it remained for the next 30 years.

56. In early 1977, Michael sold *Saint Sébastien* to the New York art dealer Wildenstein,

falsely representing that he was acting on behalf of all the heirs of Carol II. Wildenstein then resold the painting to a third party whose identity is unknown.

57. *Saint Sébastien* has now resurfaced at Christie's in New York City, where it was to be auctioned for the benefit of currently unknown consignor before Christie's decided to postpone its sale.

58. Accordingly, because *Saint Sébastien* was stolen from Carol II in 1947, the Estate has superior title to the painting than either Christie's or the anonymous consignor.

59. Christie's is in possession of the painting.

60. On February 9, 2025, Prince Paul has demanded on behalf of the Estate that Christie's return *Saint Sébastien* to the Estate. Christie's has not responded, which is equivalent to a refusal to return the painting to the Estate. *See* Exhibit 20 (February 9, 2025 demand).

61. Alternatively, demand for the return of the painting is not required due to futility or because the consignor did not obtain possession lawfully or because the consignor is aware of the Estate's claim of ownership over the painting.

62. Prince Paul has standing to bring this action temporarily on behalf of the Estate because there is currently no New York administrator of the Estate and the extraordinary circumstances set forth in this Complaint justify Prince Paul in commencing this action. Prince Paul will expeditiously apply to the New York County Surrogate's Court to be appointed as the New York administrator for the Estate, at which time his status as the Estate's New York administrator should be deemed valid *nunc pro tunc* to the filing of this Complaint.

**JURY DEMAND**

63. Plaintiffs demand a jury on all issues that may be tried by jury.

WHEREFORE, Prince Paul Philippe of Romania demands, on behalf of the Estate of Carol II, as follows:

(i) A Writ of Replevin directing the Marshall to seize and impound *Saint Sébastien* from Christie's;

(ii) A temporary restraining order and preliminary injunction to assure that *Saint Sébastien* will not be moved out of New York during the pendency of this action.

(iii) An order directing Christie's to disclose the identity and contact information of the anonymous consignor so Prince Paul may demand *Saint Sébastien's* return to Carol II's Estate from that consignor;

(iv) An award of costs, including attorneys' fees and expenses in bringing this action; and

(v) such other relief as this Court deems just.

Dated: February 9, 2025

THE GRIFFITH FIRM

*/s/ Edward Griffith*

By: ____________________

Edward Griffith
77 Sands Street
Brooklyn, New York 11201
(646) 645-3784 (mobile)
eg@thegriffithfirm.com

*Counsel for Plaintiff Prince Paul Philippe of Romania on behalf of the Estate of King Carol II of Romania*

**VERIFICATION**

I, Prince Paul Philippe of Romania, declare under penalty perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: February 9, 2025
Paris, France

Paul Prince of Romania

PAUL PHILIPPE OF ROMANIA