# NEVILLE DE ROUGEMONT

ADVOGADOS

ROSEMARY A.N. DE ROUGEMONT  
PEDRO E. FELIZES  
RUI PARENTE

LUIS CUNHA MATOS  
LUIS FARINHA

SUITE C4  
CITY CLOISTERS  
188-194 OLD STREET  
LONDON EC1V 9FR

RUA TOMAS RIBEIRO  
NO.54-FOURTH FLOOR  
1000 LISBOA  
PORTUGAL

TELEPHONE: 071-490 4656/4696   TELEPHONE: 01-352 7618  
TELEX: 918573 LEGIS G                       TELEX: 62911 NDRLIS P  
FAX: 071-490 4417                              FAX: 01-352 7619

YOUR REF:                   OUR REF:

## AFFIDAVIT

I Rosemary Antoinette Neville de Rougemont, Solicitor of the Supreme Court of Justice of England and Wales and a practicing Advocate of the Portuguese Bar, senior partner of the firm Neville de Rougemont and Advogados, Sociedade de Advogados with offices in London at 188-196 Old Street, London EC1V 8BP and in Lisbon at Rua Tomas Ribeiro, No. 54 - 4th Floor, Lisbon 1000, make OATH and say as follows:

1. I am bilingual in the English and Portuguese language and am conversant in both legal systems as warrant my professional standing above stated.

2. I have studied and translated the copy of the Judgment (Exhibit 1) passed by the 1st Section of the 2nd Civil Court in the District of Lisbon in the case matter no. 5711 of the year 1954 - Bundle 234/4, to the best of my ability and in a manner that might readily be understood by both common and civil lawyer alike, the result being a translation (Exhibit 2) which conforms to the precepts of literal translation as well as adhering to concepts of comparative law.

SWORN at 109 Old Street EC1  
in London  
this 13th day of July 1993

Rosemary de Rougemont

Before me.................. C.B. Bender  
Solicitor/Commissioner for Oaths

ASSOCIATED OFFICE  
ALGARVE: CARMEN ANDRADE E SILVA, PRACA LUIS DE CAMOES No 14, FIRST FLOOR, 8600 LAGOS, PORTUGAL. TEL: 082-761663 FAX: 082-761499

THE COMMON GENERAL SECRETARIAT OF THE
JUDICIAL COURTS IN LISBON

### CERTIFICATE

- AMERIGO ARAGAO DE ALMEIDA, deputy clerk of the Common General Secretariat:
- I certify that the file of the ordinary action that Mircea Grigore Lambrino brought against Princess Elena of Romania and others, at the 1st Section, 2nd Civil Division of the Lisbon Courts under no. 5711 year 1954, file 234/4 exists in the General Archive of the Law Courts in Lisbon.
- on page 132 of the file there is the sentence with the following content:

Regarding the procedure: Mircea Grigore Lambrino, married, owner, with residence on 1 Chaneze Street, 3rd floor, Paris, France, brought the present ordinary action against:
a) Princess Elena of Romania, widow, owner, living in Villa Marisol, 4 Algrave Street, Estoril, Cascais District; and
b) His Majesty Michael of Hohenzollern, former King of Romania and his wife, Princess Ann de Bourbon-Parma, owners, with residence in Ayot House, Ayot, St. Lawrence, Welwyn (Horts), England, pleading the followings: on April 4th 1954 died in Portugal in his house in Estoril, His Majesty King Carol II of Romania, leaving as a widow the defendant, Princess Elena of Romania, who was his third wife. From his marriage with princess Elena of Greece, which has been undone by divorce resulted a son, the present defendant, His Majesty King Michael of Romania. The two defendants are his legitimate heirs, according to the inheritance administrator's statements, on the occasion of the inventory that is at its third section of the eighth Civil Court in Lisbon. King Carol of Romania, while being the heir prince, married for the first time Ioana Lambrino, in Odessa, on August 31st 1918. But the Romanian Government, led by pure dynasty reasons and without any valid, legal or moral basis, decided the annulment of this marriage. The Heir Prince of Romania did not submit this annulment and continued leaving with his wife, that he considered legitimate, this life in common ending in August 1919 when the

1

prince was summoned to fulfil his military duties. The plaintiff is the result of this marriage, being born in Bucharest, Romania, on January 8th 1920, at about five months after his parents actually got separated. The fact that in his birth certificate is registered only his mother's name is because the Romanian Government prevented that in this document appears his father's name, despite the latter's firm wish, out of the same political reasons that led to the annulment of the marriage. The plaintiff is the legitimate son of the late King Carol, even if the annulment of his parents' marriage is taken into consideration. The king admitted in writing and in a manner without any ambiguity that he is the father of the plaintiff, in the letter dated August 1st 1919 and addressed the plaintiff's mother, as well as in many other letters before and after his birth, assuming all of the responsibilities and reaffirming this recognition that results also from the letter he sent in August of the same year to Queen Maria of Romania. When the plaintiff was born, his father made this fact known by letters addressed to the Chairman of the Chamber of Deputy and to the Chairman of the Romanian Chamber of Senate. The plaintiff was treated and regarded as a son by his father and is considered as such by the public, the echo of this birth being sensed in the world-wide press that continues referring to the plaintiff constantly considering him the son of King Carol. The plaintiff's mother and father lived as husband and wife during the legal period of conception, the author considering her as his legitimate wife even after the annulment of the marriage. The reported facts as well as the amazing physical resemblance between the plaintiff and his alleged father leads us to the belief that the plaintiff is indeed the son of His Majesty, King Carol of Romania. Therefore he should be considered his heir and as such admitted to take part in the inventory following his death.

In conclusion, he asks the action to be considered admitted and proved and: first of all – to be declared legitimate son of His Majesty King Carol II or, as a subsidiary request, second of all to be recognised as illegitimate son of the same king and any way considered heir of the late king with all the legal consequences and especially to be admitted to interfere with the procedure of pending inventory.

He enclosed many documents including the death certificate and marriage certificate with the plaintiff's mother, the certificates of the late king, his birth certificate and a power of attorney document as well as the inheritance administrator's statements on the occasion of the pending inventory.

The defendants have been cited in person, those with residence in England by Pleading Commission and made no appeal; the representative of the Public Ministry has been also informed.

The defendant has enclosed in the file of the trial the arguments written from pages seventy to eighty-two and out of its conclusions took out the subsidiary claim made under item two of the initial claim, meaning his acknowledgement as illegitimate son of the late King Carol II of Romania, in order to remain only the claim of being declared the legitimate son of the above mentioned king, declaring also his wish of being exempt from bringing a testimonial evidence, all of the elements allowing a balanced decision that results already from the procedure and thus the action should be on trial without hearing the witnesses.

A hearing of discussions took place just for examining the trial matters without hearing the witnesses and then, after paying the necessary fees and being informed by the Public Ministry on the bad-will the trial went back to the judge for pronouncing the sentence.

After pronouncing the sentence: being respected the order indicated by the article two hundred ninety-three of Civil Procedure Code we have to estimate first of all the matter of the Court competence to decide for this action. Nobody raised the question – on the basis of the above mentioned code – regarding the relative incompetence of the Court, which leads to the conclusion that nobody has any doubt as for its competence to decide in this matter. Which is correct. According to the article sixty-five, paragraph a) of the above mentioned code, the circumstance which the international authority of the Portuguese courts depends on is that the action should be brought in Portugal according to the rules of the territory competence established by the Portuguese law.

But according to the article eighty-six, when there are more defendants in the same action, all of them have to be cited to appear in front of the court where most of them have the residence and in case of an equal number of different residences, the plaintiff should be able to choose any of them.

As there are only two defendants within the action, one with residence in Portugal, the Lisbon jurisdiction, Princess Elena of Romania, and the other one with residence in England, His Majesty King Michael and his wife, the plaintiff, choosing the Lisbon jurisdiction, complied with this legal decision. Moreover, the plaintiff asked for his habilitation as heir of the late King Carol II of Romania in order to be admitted to interfere in the inventory procedure that is in course at this court. As such the Court of

Lisbon which is the place of opening the succession of the above mentioned late king, is competent to decide for this matter according to the article seventy-seven, paragraph two of the mentioned code. The court is therefore competent. There is also no doubt and no reasons to be doubtful concerning the validity of the procedures and personality and capacity of representing the parties.

As well as concerning the identity of the same parties.

Because the father claimed by the plaintiff is dead and the defendants being cited by the inheritance administrator as heirs and their representatives, they are the only ones who have the right to be cited in this quality according to the article twenty-seven of the Civil Procedure Code, being directly interested in the appeal of the claim concerning the prejudice that results for them by accepting the claim just like the plaintiff has a direct interest in requesting that as for the same decisions to benefit from accepting the claim.

In the presented argumentation it is showed on page seventy-one that in the mentioned inventory the quality of the defendant, princess Elena, as heiress has been contested but this is not mentioned in the certificate from page seven just as it is not proved that this appeal has been accepted. Therefore she continues to have a direct interest in contesting just as this court continues to have the territory competence regarding the action because the competence is established when the action is brought. The changes of facto that appear later are irrelevant and irrelevant are the rightful ones according to article sixty-three of the mentioned Civil Procedure Code.

There is no exception and no prior matter to prevent the basic examination of this matter.

In essence: we are faced with a case in which the will of parties is inefficient to produce the juridical effect claimed to be obtained by the action, article four hundred eighty-nine, item 3 and article three hundred and four of the Civil Procedure Code, annotated Code, on page one hundred ninety-two, at the end of the end from article three hundred and six where the divorce or separation actions, the actions of marriage annulment, the appeal for children legitimacy, the restriction actions are enumerated etc. This etc. means that it is about simple examples and not just an enumeration cu limited character.

And because all of the actions given as example are focused on the status of the persons, in the articles have to be included all of the actions that refer to such status and as a consequence the investigations regarding paternity, legitimate or illegitimate.

But the cited articles do not deny for probatory force of the documents, official or personal, that have to be recognized because they are not contested by the party against which the document has been drawn, according to the articles five hundred thirty-eight and the followings from the Civil Procedure Code, as long as the matter has to be solved taking into consideration only the documents presented in this trial in which there are not facts to be proved with the help of witnesses which the plaintiff did not bring. As far as these documents are concerned, even if they are not very rigorous, taking into consideration the other elements that exist in the trial, the prove both the wish of the person investigated that the one that investigates to be considered his son and unquestioning by the other members of the investigated person's family of his acknowledgement just like in the decision of the High Court of Justice from March seventeenth nineteen-fifty three, the Legislation and Jurisprudence Magazine, the year eighty-six, issue number three thousand, page forty-four when the proof of the consanguinity in lineal descent is made by appreciating the proves over the facts that demonstrate the existence of the status. Because we are faced not only with the Portuguese legislation it is necessary to check which would be the law applicable for this basic matter, taking into consideration that – as resulting from the procedure that has not been contested – the alleged father was of Romanian nationality as well as the son that is the object of the investigation, that the first died in Portugal and the latter lives in France. So the three laws can be invoked in order to solve this matter.

According to the article twenty-seven of our Civil Code, the civil status and capacity of the foreigners are submitted to their country's legislation; and the national law of origin, both of the investigator and of the investigated person is the Romanian law.

But the author of the research, acknowledging the present international situation could be considered a stateless person and thus we should – in subsidiary – appeal to the French law because his residence is in France, according to the Geneva Convention from July twenty-eighth nineteen-fifty one, signed in New York on September eleventh nineteen-fifty two, convention ratified by France.

If this is how the things work, three laws can be applied in order to solve the situation: the Romanian law as being that of the origin nationality both of the investigated and the investigator; the Portuguese law because the residence of the investigated was, at the time of death in Portugal; the French law because the investigator is a resident here. In order not to favor either of them in the detriment of that one that has to be applied legally let's

take into consideration all three of them and we shall see that according to the three laws the claim of the investigator has to be admitted.

We have to start from the principle that all documents shown during the trial have to be recognized as truthful according to our law, at least the decision of articles five hundred thirty-eight and five hundred thirty-nine of the Civil Procedure Code, promulgated on December fourth eighteen-sixty four and in force from December first eighteen-sixty five, articles one hundred eighty-three and one hundred eighty-four: "the marriage declared null still has effects both regarding the spouses and the children if it has been made in good-will and if the good-will existed only on one of the two spouses the marriage has effects on the spouse with good-will as well as for the children that are born from this marriage", the document on page ninety that has not been contested.

The good will of the spouses, the investigated one and the investigator's mother is affirmed, being sure that nobody contested this statement. According to article two hundred eighty-six (the law on March fifteenth nineteen six): "the husband is the father of the child conceived during the marriage", the document on page ninety reverse also unquestionable document.

It is also proved by unquestionable document that the investigated married the investigator's mother on August thirty-first nineteen eighteen, document on pages ninety-four to ninety-seven although this marriage was declared null, document on page ninety-six reverse and also the certificate on page one hundred and seven.

The investigated married thus the investigator's mother and therefore according to article two hundred eighty-six and articles one hundred eighty-three and one hundred eighty-four of the Romanian Civil Code, the investigated one is the investigator's father and the annulment of his marriage to the investigator's mother does not prevent such a marriage to have all its civil effects both concerning the spouses and the children, in our case the investigator. And even the investigated declared that he will remain faithful to his wife and that his son was about to be born soon, that he was about to have a son which is the author of the investigation, document on page one hundred and four. He again declared himself the father of the investigator, according to the document on page one hundred and nine. And that his one was born by Ioana Lambrino, the wife of the investigated, on January eighth nineteen-twenty is proved by the documents on pages one hundred ten and one hundred eleven.

New documents are presented. In them the investigated claims to be the father of the investigator, on pages one hundred thirteen, one hundred fifteen, one hundred sixteen and one hundred seventeen.

Short and in conclusion: according to the Romanian law and seeing the clear and firm statements of the investigated, made more that one time, the investigator is the legitimate son of the investigated. And the picture enclosed on page one hundred nineteen only builds up the belief of this paternity and consanguinity in lineal descent. The physical resemblance between father and son is striking.

According to the French law we reach the same conclusion according to the article two hundred and one of the Civil Code. This article is identically written as the article one hundred eighty-three of the Romanian Civil Code.

Moreover according to the article three hundred nineteen of the French Civil Code parallel with the article two hundred ninety-two of the Romanian Civil Code, the consanguinity in lineal descent of the legitimate children is proved by birth certificates issued by registers of civil status and according to article three hundred twenty of the French Code parallel with article two hundred ninety-three of the Romanian Civil Code in the absence of such a certificate which is not in the file, having constantly the status of legitimate son is enough, unquestionable document enclosed on pages ninety and ninety-one. All that have been said here are arguments in the trial and unquestionable. Therefore everything has to be truly accepted both in comparison with the laws of the two countries and with our law. Also according to the French law the investigator has to be considered legitimate son of the investigated. Now let's take into consideration the Portuguese law. Article one hundred and one of the Civil Code states that are considered legitimate the children born from a marriage closed legally after one hundred and eighty days from closing the marriage or within three hundred days after ending it or after the spouses' separation, by court decision. Article thirty-one of the first Decree dated December twenty-fifth nineteen-ten stipulates that children born from a null or annulled marriage are always legitimate. And this "always" means they are legitimate even if the marriage was closed in good or bad will: but the fact that the marriage of the investigated with the investigator's mother was closed in good will is proved.

In this file there is no evidence against this. On the contrary, the enclosed documents prove that there was good will on the both of the two spouses when closing the marriage.

There is also no doubt that the investigator was born on January eighth nineteen-twenty according to documents already mentioned from pages one hundred ten and one

hundred eleven. The statement of the marriage annulment – with power of execution – took place on March twenty-ninth nineteen-nineteen, document on page one hundred and six. And the three hundred days period mentioned in article one hundred and one of our Civil code and in article seven of the second Decree dated December twenty- fifth nineteen-ten is the same with that stipulated by the Romanian and French Civil Codes just as it has been stated and unquestionable even proved in court by the enclosed documents.

The period of time between the investigator's date of birth, January eighth nineteen-twenty and the date on which the sentence of marriage annulment has been pronounced, March twenty-ninth nineteen-nineteen is of two hundred eighty-five days. This fact proves that the investigator was born within the three hundred days period after his parents' marriage was annulled and thus he has to be considered legitimate both according to the Romanian and French Codes and according to our code article one hundred and one and article seven of the second Decree dated December twenty-fifth nineteen-ten. TAKING INTO CONSIDERATION ALL THE ABOVE-MENTIONED REASONS, I declare as being competent the Court, the procedure valid, the parties endowed with judicial capacity, the plaintiff rightful represented by an attorney, legitimate and without any exceptions or other prior matters to solve, matters that could hinder the estimation of the cause content. I declare the action admitted and proved and as a consequence I declare the plaintiff the legitimate son of His Majesty Carol II of Romania, regarding him as heir of the late king, with all legal consequences and especially for him to be admitted to interfere in the procedure of pending inventory following the death of the late king.

And according to the stipulations of article four hundred fifty-eight, items one and three of the Civil Procedure Code I compel the plaintiff to pay the expenses. And according to the stipulations of item fifteen of article six of Expenses Code I set the action value at two hundred escudos.

Registered and notified
Lisbon, 02.06.1955
(a) Manuel Ribeiro

Lisbon, December 23rd 1992
Deputy clerk.

8

Amerigo Aragao de Almeida

Legalization conclusion no. 758

Today, day 18, month January, year 1993.

This translation is legalized with text in the Portuguese language that has 11 pages and has been reviewed by me.

A tax of 3.000 escudos has been paid per one copy.

III Secretary,

Adrian Budacu

Stamp applied

Illegible signature

9