**Partial English Translation (DEEPL) of September 6, 1996**
**Swiss decision dismissing Romania's lawsuit to recover stolen paintings**

### JUDGMENT

Between:      Romania, Bucharest, plaintiff, appearing through Philippe Neyroud, attorney-at-law, with an address for service.

And:          Mr. Michel from Romania

[Fact sections not translated] ...

III.

The defendant invokes its immunity from jurisdiction in respect of events that occurred in Romania while it was sovereign of that country.

At the root of the principle of immunity from jurisdiction lies the legal status of the Prince, who in his kingdom is "fons justifias", so that when placed above the courts, which derive their authority from him, he cannot be subject to their jurisdictional power. It was therefore essential to recognize the same immunity for foreign sovereigns: "Par in parem non habet imperium" [quote] There was a time when the monarch embodied the sovereignty of the state. Naturally, he enjoyed absolute immunity from the jurisdictional powers of foreign states, which were tied to his person. Today, the head of state appears as an organ of the state, but because of his rank and the special esteem due to him, personal immunity has not entirely disappeared. There are, however, uncertainties as to the exact content of customary international law [quote].

....

The claimant argues that the State of Romania thus became the owner of the paintings on the death of Carol I and, by the will of the late King, they became part of the patrimony of the Romanian State. She maintains that the Crown is an institution of public law distinct from the person of the monarch, and that the Proclamation of the Republic [quote].

For the defendant, quoting the Romanian constitutionalist, [quote], the estates whose usufruct was ceded to the Crown in 1884 were private property of the State [quote]. At the very least, the Crown cannot be assimilated to the private domain of the State. On the contrary, he considered that the Crown was "personified by the King, head of the royal family" [quote].

Neither party indicates that the Crown would have been defined as to the nature and scope of the institution by a norm of Romanian law. The plaintiff refers to the law on the Domaine de la Couronne and invokes the situation under French law [cited]. The defendant points out that King Carol I in no way decided that the paintings would belong to the Romanian State, whether in the public or private domain, but to the Crown personified by the King.

The resolution of the dispute between Romania and its former Sovereign, who has not renounced his title and, in this capacity, is undoubtedly not treated as an ordinary Romanian citizen, since, even though he is a Romanian national, he cannot freely travel to his country of origin, requires the Court to interpret and apply Romanian constitutional and public law. The Court must therefore declare itself incompetent ration materiae. In the final analysis, the situation is no different, with

necessary changes made, under the applicable law of public authority, from that of a Romanian civil servant or that of another State who finds himself opposed, either as plaintiff or defendant, to the State which employs him, a situation in which foreign courts are fundamentally incompetent to deal with the relationship between the State and one of its civil servants.

IV.

The defendant was King of Romania, head of state. If the plaintiff, by her legal action, must be considered to have implicitly waived her immunity from jurisdiction (ATF 107 Ia 171), she in no way establishes that that of her Sovereign would have been expressly waived by a formal decision of the 'competent Authority, assuredly the representatives of the nation. The Tribunal de céans cannot accept an implicit waiver of the immunity from jurisdiction of a King or ex-King, subject to his person and not only to his functions under public international law.

It follows that, in addition to its fundamental incompetence, the Tribunal de ceans must also recognize its incompetence ratione personae, so that the claim is inadmissible on this ground.

V.

The plaintiff will be ordered to pay the costs of the proceedings and a contribution to the defendants' legal fees.





**POUVOIR JUDICIAIRE**

TRIBUNAL DE
PREMIÈRE INSTANCE

**J U G E M E N T**

16ème CHAMBRE                                    N° JTPI/13039/96

DU MERCREDI 4 SEPTEMBRE 1996

ENTRE : LA ROUMANIE, Bucarest

demanderesse comparant par Me Philippe NEYROUD,
avocat, en l'Etude duquel elle élit domicile

ET      : Monsieur Michel de ROUMANIE,

ch. Louis-Degallier 77, Versoix GE,
défendeur comparant par Mes Ileana BUSCHI, avocate,
et Michaël FLAKS, avocat, en l'Etude duquel il élit
domicile.

Cause n° C/15595/93-16                           VPF/RUF



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

2.

Ce jour, le Tribunal rend le jugement suivant :

### EN FAIT :

1.

La Roumanie est née de la réunion, en 1859, des principautés de Moldavie et de Valachie, alors rattachées à l'empire ottoman, avec l'élection de Alexandre CUZA comme "Gospodar" de ces principautés. Durant près de six siècles les principautés roumaines de Moldavie et de Valachie avaient conservé intacte leur autonomie interne, gouvernées par des princes roumains, à la différence de la Grèce et de la Bulgarie qui étaient des provinces turques gouvernées par des pachas. Les relations entre les principautés roumaines et l'Empire ottoman étaient celles existant entre un vassal et son suzerain et se limitaient au paiement d'un tribut annuel (chargé déf. : pce 6).

Alexandre CUZA fut renversé en 1866 par un coup d'Etat militaire. Le prince Charles de HOHENZOLLERN SIGMARINGEN, soutenu par la Prusse et la France, arriva en Roumanie. Il fut élu Prince régnant de Roumanie avec droit d'hérédité par plébiscite en avril 1866. La constitution du 1$^{er}$ juillet 1866 fut révisée pour accorder le droit de citoyens aux Juifs à la suite du Congrès de Berlin de 1878.

La Roumanie est reconnue comme indépendante en 1880 et devient un royaume l'année suivante. Charles de HOHENZOLLERN est proclamé Roi de Roumanie le 14 mars 1881 sous le nom de CAROL I par vote unanime des représentants de la nation (chargé déf. : annexe, repères chronologiques).



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

3.

2.

Le 9 juin 1884, le Roi CAROL I fit promul-
guer la Loi n° 1789 sur le Domaine de la Couronne, votée par l'Assemblée
des Députés le 5 juin 1884 par une majorité de 76 voix contre 11 et 4
abstentions et le 6 juin 1884 par le Sénat par une majorité de 45 voix
contre 5 et 2 abstentions (Moniteur officiel de la Roumanie du 10.06.1884)
(chargé déf. : pce  6, annexe III, en roumain et en traduction).

Selon cette loi (art. 1), font parties du
Domaine de la Couronne, les immeubles ruraux suivants :
- Rusetul dans le district de Braila,
- Sadova dans le district de Dolj,
- Segarcea dans le district de Dolj,
- Cociocul dans le district de Ilfov,
- Bicazul dans le district de Nemtu,
- Gherghita dans le district de Prahova,
- Clabucetu-Taurului et le mont Caraiman dans le district de Prahova,
- Domnita dans le district de Ramnicu-Sarat,
- Malini dans le district de Suceava,
- Borca dans le district de Suceava,
- Sabasa et Farcasa dans le district de Suceava,
- Dobrovetu dans le district de Vasluiu.

L'usufruit de ces domaines propriété de
l'Etat, en surface et en sous-sol, était attribué à la Couronne. Cette
dernière avait faculté de les exploiter directement ou de les affermer
(art. 2). La Couronne acquérait le droit d'exploiter les forêts se trou-
vant sur les propriétés, à charge pour elle de nommer et de rémunérer les



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

4.

agents sylvicoles, ces derniers ayant les mêmes droits et obligations que tous les autres agents forestiers de l'Etat (art. 3 et 4). Les immeubles de la Couronne étaient déclarés inaliénables et imprescriptibles; ils ne pouvaient être vendus, échangés, donnés, hypothéqués ou soumis à quelque charge que ce soit (art. 5). Les propriétés étaient exemptes des impôts de l'Etat; elles restaient en revanche soumises aux impôts des districts et des communes (art. 6). Les contrats et tous autres documents relatifs à l'administration du Domaine de la Couronne étaient exempts du droit de timbre et d'enregistrement; en cas de litige, les émoluments judiciaires étaient identiques à ceux perçus lors de procédures intentées par l'Etat (art. 7). Les propriétés faisant partie du Domaine de la Couronne étaient administrées par une personne nommée et payée par la Couronne qui n'avait pas le statut de fonctionnaire. L'administrateur du Domaine de la Couronne ne pouvait agir que dans les limites des instructions que lui donnait la Couronne (art. 8). Les actions judiciaires ne pouvaient être intentées que par ou contre l'administrateur du Domaine de la Couronne, toute décision judiciaire ne pouvant être exécutée que pour le compte ou à l'encontre de l'administrateur (art. 9). Les transactions effectuées par la Couronne avec son Domaine étaient soumises aux mêmes dispositions légales que les transactions effectuées par l'Etat en relation avec ses propriétés, de même en ce qui concerne les délits sylvicoles commis à son préjudice (art. 10). L'intervention du Ministère public aux côtés du représentant du Domaine de la Couronne était obligatoire dans tous les procès impliquant



POUVOIR JUDICIAIRE

5.

TRIBUNAL DE PREMIÈRE INSTANCE

ce dernier et les avocats publics affectés aux administrations des domaines, ainsi que ceux des districts, étaient tenus d'apporter leur concours juridique à l'administrateur et de le représenter par devant les instances judiciaires. Ce dernier était même tenu de demander cette assistance à chaque fois qu'un tiers usurpait le territoire d'une propriété (art. 11).

L'entrée en vigueur de la loi fut fixée au 1$^{er}$ octobre 1884. Dès cette date, le revenu des propriétés a cessé de faire partie du budget de l'Etat, les droits et les obligations découlant des contrats d'affermage concernant les propriétés étant transférés à la Couronne (art. 12).

La raison de la loi fut que, après la proclamation du Royaume, le pays n'avait pas la possibilité de fournir la liste civile nécessaire à la fonction royale. Le Parlement a voté la loi pour que la liste civile, grâce aux revenus du Domaine, qui restait propriété de l'Etat, puisse être complétée (chargé déf. pce 17).

3.

Le Roi CAROL I, avec ses revenus et en particulier ceux tirés des propriétés du Domaine de la Couronne, avait acquis une importante collection d'oeuvres d'art, notamment de tableaux. Il acquit ainsi les peintures de l'ancien consul allemand Félix BAMBERG, familier des HOHENZOLLERN SIGMARINGEN et ami personnel. Ce dernier avait acheté au cours de sa carrière consulaire de nombreuses oeuvres d'art dont une partie provenait directement d'églises ou de galeries privées italiennes, ainsi que de la collection PEREIRE de Paris, celle du marquis de LAS MARISMAS, celle du maréchal SOULT, la collection du marquis de SALAMANCA



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

6.

et surtout la Galerie espagnole de Louis-Philippe de BOURBON, aïeul de
Anne de ROUMANIE, Princesse de BOURBON-PARME, épouse de Michel de ROUMANIE
(chargé dem. : pce 22).

4.

Par testament des 14 et 26 février 1889, ainsi que par codicille des 14 et
27 septembre 1911, le Roi CAROL I, outre des dispositions funéraires et
divers legs en faveur d'institutions charitables, prit des dispositions
testamentaires en faveur de son épouse, de ses enfants et du futur roi de
Roumanie. Il attribua sa galerie de tableaux décrite dans le catalogue
illustré de L. BACHELIN ("Tableaux anciens de la Galerie Charles 1er, Roi
de Roumanie, catalogue raisonné par L. Bachelin" - chargé dem. : pce 5) et
sa collection d'armes à la Couronne de Roumanie. Il précisa en particu-
lier : "Galeria mea de tablouri, tocmai cum este descrisà in catalogul
ilustrat al bibliotecarului meu Bachelin, va ràmàne pentru totdeauna si de
întregul in Tarà, ca proprietate a Coroanei Romàniei".

Après le décès de CAROL I, son testament et
le codicille furent publiés au Moniteur Officiel du royaume de Roumanie le
29 septembre 1914 (chargé dem. : pces 3 et 4).

5.

Ferdinand de HOHENZOLLERN, neveu de CAROL I, devint Roi sous le nom de
FERDINAND I. Il avait épousé Marie d'EDIMBOURG en 1883, année où il avait
été reconnu comme successeur.



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

7.

Le 28 mars 1923, FERDINAND I approuva la Constitution votée par l'Assemblée constituante des Députés le 26 mars 1923 et l'Assemblée nationale constituante du Sénat le 27 mars 1923 (chargé dem. : pce 17 ; chargé déf. : pce 1).

La nouvelle Constitution confirma que la Roumanie était un Royaume et constituait un Etat unitaire et indivisible (art. 1). Tous les pouvoirs de l'Etat émanaient de la nation, qui ne pouvait les exercer que par délégation (art. 33).

Le pouvoir législatif était exercé collectivement par le Roi et la Représentation nationale composée du Sénat et de l'Assemblée des Députés. Toute loi demandait l'approbation des trois branches du pouvoir législatif. Aucune d'entre elles ne pouvait être soumise à la sanction royale qu'après avoir été discutée et votée librement par la majorité des deux Assemblées (art. 34).

Le pouvoir exécutif était confié au Roi (art. 39). Il nommait et révoquait les ministres, sanctionnait et promulguait les lois. Il ne pouvait suspendre le cours des poursuites ou des jugements ni intervenir d'aucune manière dans l'administration de la justice. Il faisait les règlements nécessaires à l'exécution des lois et était le Chef de la force armée (art. 88). Le Roi avait pouvoir de dissoudre les deux Assemblées ou l'une d'elles tout en convoquant les électeurs dans un délai de trois mois (art. 90).

Le pouvoir judiciaire était exercé par ses propres organes et les décisions de justice étaient exécutées au nom du Roi (art. 40).



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

Les pouvoirs constitutionnels du Roi étaient déclarés héréditaires en ligne de descendance directe et légitime du Roi CAROL I de HOHENZOLLERN SIGMARINGEN, de mâle en mâle par ordre de primogéniture et à l'exclusion perpétuelle des femmes et de leurs descendants (art. 77). A défaut de descendant en ligne masculine du Roi CAROL I, la succession au trône revenait au plus âgé de ses frères ou aux descendants de celui-ci (art. 77).

Le Roi devenait majeur à dix-huit ans révolus et prêtait le serment suivant : "Je jure de défendre la Constitution et les lois du Peuple roumain, de maintenir ses droits nationaux et l'intégrité de son territoire" (art. 82). La personnalité du Roi était inviolable (art. 87).

La loi fixait la liste civile pour la durée de chaque régime (art. 89).

6.

Le Roi FERDINAND I est décédé le 20 juillet 1927. Une Régence fut mise en place, le fils du Roi défunt ayant renoncé au trône par acte enregistré le 6 janvier 1926 et le fils de ce dernier, Michel de ROUMANIE, étant encore un enfant âgé de six ans.

Après le décès de FERDINAND I, les héritiers du défunt roi, savoir la reine Marie de ROUMANIE, la princesse Marie Hélène de ROUMANIE, Michel de ROUMANIE, représenté par ses régents, Carol CARAIMAN, la reine Elisabeth de GRECE, la reine Marie de YOUGOSLAVIE, le



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

9.

prince Nicolas de ROUMANIE et la princesse Ileana de ROUMANIE se répartirent sa succession sur la base de la convention de partage ("Act de impartealà") du 2 décembre 1927 (chargé dem. : pce 6). Les propriétés mobilières et immobilières royales furent partagées entre les héritiers, le Roi Michel de ROUMANIE se voyant attribuer le château de Peles et les autres châteaux, demeures et résidences ainsi que leur ameublement, à l'exception des tableaux et de la collection d'armes se trouvant dans le château Peles légués par le Roi CAROL I à la Couronne de Roumanie.

Le fils de FERDINAND I fut de retour en Roumanie le 5 juin 1930. Il régna sous le nom de CAROL II après que l'acte de renonciation au trône fut annulé. Il fit publier une nouvelle Constitution qu'il soumit au référendum le 24 février 1938. Le texte fut approuvé par 4.289.581 voix contre 5.483 au vote obligatoire et public.

Après une période troublée (révision du droit de cité pour les Juifs en janvier 1938, suppression des partis politiques en mars 1938, assassinat de CODREANU condamné à dix ans de travaux forcés pour complot contre la sûreté de l'Etat et de plusieurs personnalités légionnaires en novembre 1938, institution du Front de la renaissance nationale qui eut seul le droit de proposer des candidats aux élections parlementaires en décembre 1938, accord commercial avec le Reich en mars 1939, ultimatum soviétique relatif à l'évacuation de la Bessarabie en juin 1940, conférence de Craiova qui rétablit la frontière avec la Bulgarie à son tracé de 1912 et attribution à Vienne par RIBBENTROP et CIANO



POUVOIR JUDICIAIRE

TRIBUNAL DE PREMIÈRE INSTANCE

10.

aux Hongrois de la Transylvanie septentrionale avec Oradea Mare, Cluj et la région des Sicules en août 1940, appel au Palais du général Ion ANTONESCU et attribution à ce dernier du titre de Conducator de l'Etat le 5 septembre 1940 avec manifestation des légionnaires contre le Roi), le Roi CAROL II renonça le 6 septembre 1940 au pouvoir en faveur de son fils Mihai (Michel de ROUMANIE). Ce dernier était alors âgé de dix-neuf ans.

Le 16 septembre 1940, la Roumanie devint un "Etat national légionnaire" et la terreur légionnaire s'installa dans le pays. Ion ANTONESCU liquida le 23 janvier 1941 avec l'appui de Berlin l'insurrection légionnaire; il partit en guerre contre l'URSS le 22 juin 1941. De nouvelles mesures antisémites furent prises le 27 mars 1943 et les populations juives furent massacrées à Iassi fin juin 1943. Tous les territoires abandonnés à l'URSS en 1940 furent réintégrés dans les frontières roumaines fin juillet 1943. Le 23 août 1943 Ion ANTONESCU fut promu au rang de maréchal.

Le 23 août 1944, le Roi Michel de ROUMANIE fit arrêter le maréchal Ion ANTONESCU et le ministre des affaires étrangères Mihai ANTONESCU, lesquels avaient soutenu l'Axe et l'avaient, à un certain moment, fait emprisonner. Un nouveau gouvernement fut constitué sous la présidence du général SANATESCU, chef de la maison militaire du Roi.

Une convention d'armistice fut passée entre la Roumanie et l'URSS le 12 septembre 1944 alors que l'Armée rouge occupait le pays. L'arbitrage de Vienne fut annulé. La Bessarabie et la



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

11.

Bucovine restaient sous suzeraineté soviétique, mais la Transylvanie fut réintégrée dans les frontières roumaines. Le général SANATESCU fut remplacé par le général RADESCU en décembre 1944.

Le 6 mars 1945, sous la pression de Andreï VICHINSKY, commissaire-adjoint des affaires étrangères de l'URSS, Petru GROZA, Président du Front des laboureurs, forma le gouvernement. Le pays était toujours occupé par l'Armée rouge.

Le 20 mars 1946, les Etats-Unis conférèrent à Michel de ROUMANIE le grade de Commandant en Chef de la Légion du Mérite, la plus haute décoration américaine (chargé déf. : pce 3). STALINE lui octroya l'ordre de la Victoire, distinction qui ne fut accordée qu'à cinq étrangers dans toute l'histoire de l'URSS, dont le Général EINSENHOWER et le Maréchal MONTGOMERY.

En juin 1946, après un procès devant le Tribunal du peuple, le maréchal ANTONESCU et Mihai ANTONESCU, ministre des affaires étrangères, furent fusillés à la prison Jilava. Le 19 novembre 1946, les élections apportèrent la victoire au BPD (Bloc des partis démocratiques) dominés par le parti communiste après falsification des résultats (chargé déf. : pces 5 et 6). En novembre 1947, MANIU, chef du parti national-tsaraniste, fut condamné à la prison à perpétuité.

Le 11 novembre 1947, Michel de ROUMANIE fut invité à Londres au mariage de sa cousine la Princesse Elisabeth de Grande-Bretagne (Elisabeth II). A l'occasion de ce déplacement, des biens



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

12.

et des tableaux, dont deux oeuvres de EL GRECO, furent placés dans le vagon du Roi. Ils furent déposés le 12 novembre 1947 auprès de l'UNION DE BANQUES SUISSES / Zurich (chargé dem. : pce 12).

Michel de ROUMANIE revint dans son pays contre l'avis de Winston CHURCHILL et de Clement ATLEE, premier ministre britannique, qui concevaient des craintes pour sa sécurité personnelle. Le 30 décembre 1947, une arme braquée sur lui et, sous la menace d'une répression massive et sanglante d'un mouvement d'étudiants, le roi Michel DE ROUMANIE fut contraint d'abdiquer. Il quitta le pays en compagnie de sa mère, la Reine Hélène, le 2 janvier 1948. Un passeport diplomatique roumain lui fut délivré ce jour-là au nom de "Michel, Prince de Hohenzollern, Roi de Roumanie" (chargé déf. : pce 2). Le gouvernement roumain sollicita de la Confédération suisse l'octroi d'un visa pour Michel de ROUMANIE et sa mère (Emmanuel DECAUX, Le statut du Chef de l'Etat déchu, Annuaire français de droit international, 1980, p. 101 ss, not. 104).

Par déclaration du 4 mars 1948 à Londres, Michel de ROUMANIE confirma la nullité de son abdication (chargé déf. : pce 7).

L'Assemble Nationale abrogea la Constitution de mars 1923 et instaura la République Populaire de Roumanie qui fut proclamée le 30 décembre 1947 (chargé dem. : pce 2 ; chargé déf. : pce 6, annexe I). Les procès-verbaux de la session du Parlement, lequel ne fut en réalité jamais réuni en session extraordinaire, furent fabriqués (chargé déf. : pce 5, consultation du Dr Jonathan EYAL, directeur des Etudes au Royal United Services Institute for Defense Studies, Londres).



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

13.

La confiscation des biens de la famille royale fut décidée par décret présidentiel n° 38 du 27 mai 1948 et décision du Conseil des Ministres du 18 juin 1948 (chargé déf. : pces 10 et 16). Un inventaire des biens meubles et immeubles saisis avait été établi le 28 avril 1948 par la Commission spéciale du gouvernement et du parti communiste (chargé déf. : pce 10bis).

7.

Lorsqu'il s'est rendu à Londres au mariage de sa cousine la Princesse de Grande-Bretagne, Michel de ROUMANIE l'a été "avec l'accord total du gouvernement qui pensait pouvoir se débarrasser de lui. Il pouvait emporter les biens mobiliers qu'il voulait, car ceux-ci représentaient bien peu par rapport aux biens immobiliers qu'il laissait derrière lui. Outre les 2 tableaux litigieux (portrait de Diego Covarruvias ou Canon Bosio et Saint-Sébastien) bien d'autres tableaux, ainsi que divers autres objets (argenterie, lingerie, etc.) sortaient du pays. (...). Aucune liste des tableaux ni des autres biens n'a été dressée. L'argent nécessaire à l'organisation du voyage a été remis par le gouvernement. Celui-ci s'est préoccupé du bien-être du Roi. La position du gouvernement était la même vis-à-vis de la reine Hélène qui a pu emporter ce qu'elle voulait. Il était prévu que le roi se marierait. Il était prévu de meubler leur future demeure de Florence ou en Suisse (...)" (témoignage du Professeur Jacques VERGOTTI, successivement officier d'ordonnance du Roi, puis dès 1944, Préfet de la Maison du Roi Michel, responsable des biens publics et privés, intermédiaire entre le Roi et le gouvernement - chargé déf. : pce 12).



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

14.

8.

Par assignation déposée en conciliation le 11 mai 1993, la REPUBLIQUE DE ROUMANIE (recte : LA ROUMANIE selon la Constitution du 21 novembre 1991 approuvée par référendum populaire le 8 décembre 1991 - chargé dem. : pce 24 ; chargé déf. : pce 6, annexe I) forma par devant le Tribunal de première instance de Genève une action mobilière et en revendication. Elle conclut à ce que Michel de ROUMANIE soit condamné à lui restituer, sous la menace des peines prévues à l'article 292 du Code pénal suisse, 42 tableaux portés au catalogue de Bachelin qu'elle considère comme sa propriété, ainsi qu'à la condamnation du défendeur aux frais et dépens.

Les droits de greffe, fixés initialement à CHF 1.548.400.-- furent ramenés, ensuite de l'arrêt du Tribunal fédéral (2P.353/1993 et 2P.74/1994) du 28 novembre 1994, à CHF 100.000.-- et CHF 85.-- de déboursés (ordonnance du 15 septembre 1995).

Dans son mémoire de réponse du 21 mars 1996, Michel de ROUMANIE excipa de l'incompétence du Tribunal ratione personae - il soutient devoir être mis au bénéfice de l'immunité de juridiction - et, subsidiairement, conclut au déboutement de la demanderesse de toutes ses conclusions.

Les parties procédèrent à un second échange d'écritures. Elles persistèrent dans leurs conclusions, Michel de ROUMANIE faisant toutefois valoir que la demande était irrecevable pour un second motif tiré du fait que la ROUMANIE invoquait le droit public pour fonder sa propriété.

La cause fut gardée à juger à l'audience de plaidoiries du 30 mai 1996.



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

15.

EN DROIT :

I.

La demande a été présentée au nom de la REPUBLIQUE DE ROUMANIE. Or, pour la Constitution du 21 novembre 1991, appouvée par referendum le 8 décembre 1991, l'Etat roumain actuel est LA ROUMANIE (chargé dem. : pce 19; chargé déf. : pce 6, annexe I). Les qualités de la partie demanderesse seront dès lors modifiées en ce sens.

II.

Michel de ROUMANIE, né en Roumanie et originaire de ce pays, est citoyen roumain. La situation présente un caractère international qui relève, en l'absence de convention particulière, de la Loi fédérale sur le droit international privé du 18 décembre 1987, entrée en vigueur le 1er janvier 1989 (ci-après : LDIP).

Les tribunaux suisses du domicile ou, à défaut de domicile, ceux de la résidence habituelle du défendeur, sont compétents pour connaître des actions réelles mobilières (art. 98 al. 1 LDIP). Le défendeur étant domicilié en Suisse, précisément à Versoix, le Tribunal de céans est ainsi en principe compétent ratione loci. Le droit applicable est celui du lieu de situation du meuble au moment de l'acquisition et de la perte des droits réels immobiliers, soit en l'occurence le droit roumain (art. 100 al. 1 LDIP; ATF 109 II 319 = JdT 1984 I 139; ATF 96 II 150 = JdT 1971 I 522; ATF 94 II 303 = JdT 1970 I 181; ATF 93 III 100 = JdT 1968 II 14; ATF 75 I 122 = JdT 1950 II 122).



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

16.

L'application du droit étranger n'est pas exclue du seul fait qu'on attribue à la disposition un caractère de droit public (art. 13 LDIP).

La revendication d'une chose située en Suisse est soumise à la loi suisse (art. 100 LDIP; ATF 109 II 319 = JdT 1984 I 139 = SJ 1981 449; ATF 93 II 373 = JdT 1969 I 249).

III.

Le défendeur excipe de son immunité de juridiction s'agissant d'événements survenus en Roumanie alors qu'il était souverain de ce pays.

A l'origine du principe de l'immunité de juridiction, il faut sans doute reconnaître le statut juridique du Prince, qui dans son royaume, est "fons justiciae", de sorte que placé au-dessus des tribunaux, qui tirent leur autorité de lui, il ne saurait être assujetti à leur pouvoir juridictionnel. Dès lors, il s'imposait de reconnaître la même immunité au souverain étranger : "Par in parem non habet imperium" (Christian Dominicé, Immunités de juridiction et d'exécution des états et chefs d'état étrangers, FJS N° 934 ad 1.1). Il fut un temps où le monarque incarnait la souveraineté de l'Etat. Il bénéficiait tout naturellement d'une immunité absolue à l'égard du pouvoir juridictionnel des Etats étrangers, qui tenait à sa personne. Aujourd'hui, le chef d'Etat apparaît comme un organe de l'Etat, mais en raison de son rang et des égards particuliers qui lui sont dus, l'immunité personnelle n'a pas entièrement disparu. Il y a cependant des incertitudes sur la teneur exacte du droit international coutumier (Christian Dominicé, op. cit., ad 6.1.1 et SJ 1990 p. 513 p. 520, Note après ATF 115 Ib 496 : Ferdinand et



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

Imelda Marcos). Les agents de l'Etat ne bénéficient de l'immunité de juridiction que pour leurs actes officiels, à l'exception cependant des agents diplomatiques qui, parce qu'ils résident sur le territoire de l'Etat accréditaire, sont mis au bénéfice d'une immunité plus étendue (Christian Dominicé, op. cit. ad 6.1.1 qui cite Philippe Cahier, Le droit diplomatique contemporain, Genève 1962, p. 242).

S'agissant des anciens chefs d'Etat, le droit des gens ne leur accorde pas une protection plus étendue que celle que mérite la puissance publique étrangère. Ce n'est donc, en principe, que pour les actes qu'il a accomplis en sa capacité officielle que l'ancien chef d'Etat bénéficie de l'immunité de juridiction pénale et civile (Christian Dominicé, op. cit ad 6.2 qui cite Emmanuel DECAUX, Le statut du chef d'Etat déchu, AFDI 1980 p. 101 ss). L'immunité est reconnue à l'ancien chef d'Etat par égard pour l'Etat dont il a été l'organe, et non pas dans son intérêt propre. Les autorités légitimes de l'Etat en cause sont habilitées à lever l'immunité, notamment lorsque des poursuites sont engagées contre l'ancien chef d'Etat en raison d'actes illicites commis alors qu'il exerçait ses fonctions. Les tribunaux d'un Etat tiers doivent donner effet à la levée d'immunité, dès lors qu'elle est clairement établie (Christian Dominicé, op. cit. ad 6.2).

Pour le Tribunal fédéral, les textes normatifs élaborés sous l'égide des Nations-Unies ne sauraient établir pour les chefs d'Etat étrangers une protection inférieure à celle des



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

représentants diplomatiques de l'Etat qu'ils dirigent ou qu'ils repré-
sentent universellement (ATF 115 Ib 496 c. 5c). La Convention sur les
missions spéciales conclue à New York le 8 décembre 1969 (ratifiée par la
Suisse le 3 novembre 1977 et entrée en vigueur pour elle le 21 juin 1985)
désigne par exemple nommément le chef de l'Etat d'envoi comme l'un des
titulaires de l'immunité de juridiction civile (sous réserve des litiges
concernant les immeubles, les successions, les activités professionnelle
et commerciale) à l'égard de l'Etat de réception lorsqu'il est en visite
officielle (art. 31 al. 2 de la Convention).

S'agissant d'un Roi, la protection ne sau-
rait, pour des raisons historiques et d'importance des pouvoirs, être
inférieure à celle d'un chef d'Etat.

En l'espèce, le défendeur, à l'époque des
événements, était le Souverain de son pays. A teneur de la Constitution de
1923, il avait la charge du pouvoir exécutif (art. 39); il sanctionnait et
promulgait les lois (art. 88); il était le chef de la force armée (art.
88); il avait le pouvoir de dissoudre l'Assemblée des Députés et le Sénat
(art. 90) et les décisions de justice étaient exécutées en son nom (art.
40); sa personnalité était inviolable (art. 87).

Le litige qui l'oppose à la demanderesse
concerne une collection de tableaux constituée par son grand-oncle, le
Roi CAROL I, avec les revenus tirés notamment du Domaine de la Couronne,
soit des propriétés appartenant à l'Etat de Roumanie et dont l'usufruit



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

19.

avait été cédé à la Couronne pour compléter la liste civile. Le Roi CAROL I a disposé par testament que ces tableaux devaient revenir à son décès non pas à ses héritiers mais rester à la Couronne pour toujours sans quitter le pays.

La demanderesse fait valoir que l'Etat de Roumanie est ainsi devenu propriétaire des tableaux au décès de CAROL I et sont entrés, de par la volonté du Roi défunt, dans le patrimoine de l'Etat roumain. Elle soutient que la Couronne constitue une institution de droit public distincte de la personne du monarque et que la proclamation de la République (précisément : République Populaire de Roumanie) le 31 décembre 1947 n'a été qu'une modification de l'organisation interne de l'Etat "sans conséquence sur le droit de propriété de l'Etat sur les tableaux légués par le roi CAROL I" (demande p. 14 ad 34).

Pour le défendeur, qui cite le constitution- naliste roumain, C. G. DISSESCU (Cours de droit public roumain, Bucarest 1890), les domaines dont l'usufruit a été cédé à la Couronne en 1884 étaient propriété privée de l'Etat (réponse p. 22 ad 4). La Couronne ne saurait à tout le moins être assimilée au domaine privé de l'Etat. Il considère au contraire que la Couronne était "personnifiée par le Roi, chef de la famille royale" (réponse p. 21 ad 9).

Ni l'une ni l'autre des parties n'indique que la Couronne aurait été définie quant à la nature et l'étendue de l'institution par une norme du droit roumain. La demanderesse fait



RÉPUBLIQUE ET CANTON DE GENÈVE

POUVOIR JUDICIAIRE

20.

TRIBUNAL DE PREMIÈRE INSTANCE

référence à la Loi sur le Domaine de la Couronne et invoque la situation en droit français (chargé dem. : pce 14 - avis de droit de M. LESAGE). Le défendeur met en évidence que le Roi CAROL I n'a nullement décidé que les tableaux reviendraient à l'Etat roumain, que ce soit au domaine public ou au domaine privé, mais à la Couronne personnifiée par le Roi.

La solution du litige qui oppose LA ROUMANIE à son ancien Souverain, lequel n'a au demeurant pas renoncé à son titre et, en cette qualité sans doute, n'est pas traité comme un citoyen roumain ordinaire dès lors que, quand bien même ressortissant du pays, il ne peut pas se rendre librement dans son pays d'origine, requiert du Tribunal de céans l'interprétation et l'application du droit constitutionnel et public roumain. Le Tribunal doit dès lors se déclarer incompétent ratione materiae. La situation n'est, en définitive, pas différente par le droit de puissance publique applicable, mutatis mutandis, de celle d'un fonctionnaire roumain ou d'un autre Etat qui se verrait opposé, soit comme demandeur soit comme défendeur, à l'Etat qui l'emploie, situation dans laquelle il y a une incompétence fondamentale des tribunaux étrangers à connaître du rapport entre l'Etat et l'un de ses fonctionnaires.

IV.

Le défendeur était Roi de Roumanie, chef de l'Etat. Si la demanderesse, par son action en justice doit être considérée comme ayant renoncé implicitement à son immunité de juridiction (ATF 107 Ia 171), elle n'établit nullement que celle de son Souverain aurait été



POUVOIR JUDICIAIRE

TRIBUNAL DE PREMIÈRE INSTANCE

21.

levée de manière expresse par une décision formelle de l'Autorité compé-
tente, assurément les représentants de la nation. Le Tribunal de céans ne
saurait retenir une levée implicite de l'immunité de juridiction d'un Roi
ou ex-Roi, sujet par sa personne et non seulement par ses fonctions de
droit international public.

Il en résulte que le Tribunal de céans doit,
en plus de son incompétence fondamentale, reconnaître également son incom-
pétence ratione personnae de sorte que la demande est irrecevable pour ce
motif.

V.

La demandresse sera condamnée aux frais de
la procédure et à une indemnité au titre de participation aux honoraires
des Conseils des défendeurs.

\* ° \*

Par ces motifs :

Vu en droit les articles 1 ss CCS; 1 ss,
not. 98 et 100 LDIP; 1 ss, not. 7, 97, 98 et 176 LPC;

LE TRIBUNAL,

Statuant contradictoirement :

Préalablement :

Modifie les qualités de la partie demande-
resse en ce sens qu'elles deviennent LA ROUMANIE.



**POUVOIR JUDICIAIRE**

TRIBUNAL DE PREMIÈRE INSTANCE

22.

Principalement :

1.

Se déclare incompétent ratione materiae.

2.

Dit que la demande est irrecevable ratione

personae.

3.

Déboute LA ROUMANIE de ses conclusions.

4.

Condamne LA ROUMANIE aux dépens, y compris

une indemnité de procédure de Frs 8.000.-- au titre de participation aux

honoraires des avocats de Michel DE ROUMANIE.

6.

Déboute les parties de toutes autres conclu-

sions.

Siégeant : MM. Jean RUFFIEUX, juge et

Gilbert WEPF, greffier de chambre.

Le présent jugement est communiqué aux

parties par plis recommandés du greffier du 6 septembre 1996.

pour communication conforme

p.o. G. WEPF

Greffier de chambre