UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>      Plaintiff,<br><br>-against-<br><br>CHRISTIE'S, INC.,<br><br>      Defendant. | Case No. 25-cv-1151 (LLS) |
| CHRISTIE'S, INC.,<br><br>      Counterclaim and Third-Party Plaintiff,<br><br>-against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>      Counterclaim Defendant,<br><br>ACCENT DELIGHT INTERNATIONAL LTD. and STATE OF ROMANIA,<br><br>      Third-Party Defendants. | **THIRD-PARTY DEFENDANT ACCENT DELIGHT INTERNATIONAL LTD.'S ANSWER TO INTERPLEADER THIRD-PARTY CLAIM WITH CROSS-CLAIMS** |
| ACCENT DELIGHT INTERNATIONAL LTD.,<br><br>      Interpleader Defendant and Cross-Claim Plaintiff,<br><br>-against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA, and STATE OF ROMANIA,<br><br>      Interpleader Defendants and Cross-Claim Defendants. | |

Interpleader Defendant and Cross-Claim Plaintiff Accent Delight International Ltd. ("Accent"), by its attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, answers the Third-Party Claim of Christie's, Inc. ("Christie's") (the "Interpleader Complaint") and cross-claims against Interpleader Defendants and Cross-Claim Defendants Paul Philippe of Romania ("Philippe") and State of Romania ("Romania"), and, on knowledge as to its own acts and otherwise on information and belief, states as follows:

## ANSWER

1. Admits the allegations of Paragraph 1.

2. Admits the allegations of Paragraph 2.

3. Admits the allegations of Paragraph 3.

4. Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4.

5. Admits the allegations of Paragraph 5.

6. Admits the allegations of Paragraph 6.

7. Admits the allegations of Paragraph 7.

8. Admits the allegations of Paragraph 8.

9. Admits the allegations of Paragraph 9.

10. Admits the allegations of Paragraph 10, that, as of August 2024 (not 2025), the Painting was in Accent's possession.

11. Admits the allegations of Paragraph 11, that on or about September 4, 2024 (not 2025), it signed a Seller's Agreement with Christie's, and refers to that Seller's Agreement for its precise terms.

12. Admits the allegations of Paragraph 12 and refers to the Seller's Agreement for its precise terms.

13. Admits, on information and belief, the allegations of Paragraph 13, and refers to Christie's website listing for its precise wording.

14. Admits, on information and belief, the allegations of Paragraph 14, and refers to Romania's letter for its precise wording.

15. Admits, on information and belief, the allegations of Paragraph 15, refers to Romania's letter for its precise wording, except denies Romania's counsel's characterization of the Painting as the "lawful property of the State of Romania."

16. Admits, on information and belief, the allegations of Paragraph 16, refers to Romania's letter for its precise wording, except denies the accuracy and correctness of Romania's counsel's statements in the letter regarding King Michael's acquisition of the Painting.

17. Admits the allegations of Paragraph 17.

18. Admits the allegations of Paragraph 18, except denies Philippe's characterizations that he is a member of the Romanian royal family, that he acts on behalf of the Estate of Carol II, and that the Painting was "stolen from Carol II's personal collection in 1947."

19. Admits the allegations of Paragraph 19.

20. Admits the allegations of Paragraph 20, except the preliminary injunction hearing is presently scheduled for July 1, 2025.

21. Admits the allegations of Paragraph 21, except denies that there are multiple claims of ownership to the Painting because Accent is the rightful owner.

22. Admits the allegations of Paragraph 22, except denies that Philippe or Romania has any legal ownership of the Painting.

23. Admits the allegations of Paragraph 23, except denies that Philippe or Romania has any rights to the Painting and denies that the Painting belongs to either Philippe or Romania.

24. Admits the allegations of Paragraph 24 but denies that there are any lawful owners of the Painting other than Accent.

25. Admits the allegations of Paragraph 25.

26. Admits, on information and belief, the allegations of Paragraph 26, except states that only Philippe and Romania should pay Christie's the storage and insurance costs of maintaining possession of the Painting until this matter is resolved.

27. Admits the allegations of Paragraph 27 insofar as they relate to Accent, which did not collude with Christie's to bring its interpleader counterclaim and third-party claim, but denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27 as they relate to Philippe and Romania.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Interpleader Complaint fails to state a claim as against Accent because neither Philippe nor Romania has any title to the Painting, or superior title to Accent, which is a good faith purchaser from a professional art dealer.

### SECOND AFFIRMATIVE DEFENSE

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the doctrine of accord and satisfaction.

**THIRD AFFIRMATIVE DEFENSE**

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the doctrine of laches.

**FOURTH AFFIRMATIVE DEFENSE**

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the doctrines of waiver and estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the applicable statute of limitations.

**SIXTH AFFIRMATIVE DEFENSE**

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of Romania's unclean hands.

**SEVENTH AFFIRMATIVE DEFENSE**

Romania is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of Romania's own conduct.

**EIGHTH AFFIRMATIVE DEFENSE**

Romania is barred from pursuing any alleged claim to the Painting by virtue of the doctrine of res judicata.

**NINTH AFFIRMATIVE DEFENSE**

Philippe lacks standing to pursue any alleged claim to the Painting.

### TENTH AFFIRMATIVE DEFENSE

Philippe is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the doctrine of laches.

### ELEVENTH AFFIRMATIVE DEFENSE

Philippe is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the doctrines of waiver and estoppel.

### TWELFTH AFFIRMATIVE DEFENSE

Philippe is precluded, estopped, and/or barred from pursuing any alleged claim to the Painting by virtue of the applicable statute of limitations.

### FIRST CROSS-CLAIM
(Against Defendants Philippe and State of Romania)
For Declaratory Judgment Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201

1.  In February 2025, Philippe and Romania improperly intervened to prevent Accent from selling *Saint Sébastien*, a painting by Spanish Renaissance "Old Master" artist Doménikos Theotokópoulos, widely known as El Greco ("the Painting"). Accent had acquired the work in 2010 from a professional art dealer, the most recent of several owners tracing back to King Michael I of Romania. Accent later learned that Romania had allowed King Michael I to take the Painting and others with him when the Communist government forced him to abdicate the throne in 1947. In the intervening eight decades, however, Romania has repeatedly asserted—and lost—claims to take back the Painting. Philippe's and Romania's most recent attacks on Accent's title to *Saint Sébastien* are baseless and barred by their previous failed attempts. Given their interference, however, the only way to enable Accent to benefit from its ownership rights is to clear title to the work.

5

2.     Accordingly, Accent cross-claims against Philippe and Romania, seeking a declaratory judgment that it is the rightful owner of *Saint Sébastien*, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201.

**The Parties**

3.     Accent is an entity incorporated in the British Virgin Islands.

4.     Upon information and belief, Philippe is a citizen of the United Kingdom and Romania who currently resides in France.

5.     Romania is a foreign state, as defined in 28 U.S.C. § 1603(a).

**In 1947, Romania Agreed to Let King Michael I Take the Painting with Him When He Was Forced to Abdicate the Throne**

6.     By the nineteenth century, the Romanian royal family had acquired a collection of paintings by Old Masters. The Painting was part of that collection.

7.     King Michael I was the last King of Romania. After his father, King Carol II, abdicated the throne, King Michael took the throne at the age of five as the royal ward of a regency from July 20, 1927, until June 8, 1930, when King Carol II resumed his rule. When King Carol II again abdicated the throne in 1940, King Michael—still only nineteen years old—resumed his reign on September 6, 1940, as a "virtual prisoner of a fascist military regime." *State of Romania v. Former King Michael*, 212 A.D.2d 422, 423 (1st Dep't 1995).

8.     During World War II, in his early twenties, King Michael successfully ousted the pro-Nazi Prime Minister Ion Antonescu. But after the war ended, political and military pressures forced King Michael to appoint a pro-Soviet government. Over the last two years of King Michael's rule, the burgeoning Communist regime rapidly took control of Romania and governmental affairs.

9.   In the fall of 1947, the Communist government mounted pressure on King Michael to formally abdicate the throne. To avoid public unrest because of his popularity, the Communist authorities wanted to induce King Michael to leave on terms that were comfortable and dignified, and with enough property to support his lifestyle once he had left Romania.

10.  In November 1947, accompanied by governmental aides and employees, King Michael traveled by train to England for the wedding of Princess Elizabeth (later Queen Elizabeth II) and Prince Philip. With the knowledge, assistance, and permission of the Romanian Communist government, King Michael took with him paintings from the royal collection—including the Painting at issue in this action—as well as other valuables.

11.  A month later, on December 30, 1947, King Michael was forced to abdicate the throne by the Communist regime. But he was not asked to return the Painting or any other property that the Communist authorities had permitted him to take when he left the country.

12.  Whether the Painting belonged to the royal family or the "Crown of Romania" as of 1947, the Romanian Communist government in that year permitted King Michael, the head of the royal family, to possess and take it with him as incentive for abdicating the throne and leaving the country of Romania.

13.  Over the later decades, King Michael sold paintings he had taken with him in 1947, including the Painting.

14.  Romania was aware of these sales at least as early as 1982 and has tried unsuccessfully to lay claim to King Michael's paintings several times in different courts, to no avail.

15.  King Michael returned to Romania in 1997 at the government's invitation and received from the Romanian government some of the properties that had been taken from him in

1947. He held a popular public role in Romania until his death, addressing the Romanian parliament and undertaking diplomatic work on Romania's behalf throughout Europe—in fact, King Michael's efforts helped Romania become a member of NATO.

16. In 2005, in response to a question from a member of the Romanian Parliament about the paintings that King Michael took with him when he left the country in 1947, the prime minister of Romania stated (translated from Romanian) that "the allegations regarding the unlawful appropriation of valuable assets by the former monarch are highly questionable," and that "the authorities do not have evidence to support such claims." Despite his public presence in Romania from 1997 until his death in 2017, Romania did not bring any claim against King Michael. Indeed, he received a state funeral attended by representatives of most European monarchies and wartime allies, including the Prince of Wales, with over a million Romanians watching the funeral procession.

**Over and Over, Romania Fails to Make Out a Claim for King Michael's Paintings; Philippe Takes No Action at All**

17. In 1984, Romania sued the Kimbell Art Foundation, the purchaser of one of the King's paintings, in Fort Worth, Texas, and attempted to obtain possession of that painting. *Socialist Republic of Romania v. Kimbell Art Foundation*, No. 84 Civ. 176K (N.D. Tex.). In 1986, the case was dismissed "with prejudice" for failure to prosecute, after Romania's attorneys filed an affidavit with the Court explaining that the Romanian government was not cooperating with its counsel and was not providing the materials or information necessary to prosecute the action.

18. Philippe, King Carol II's grandson, was almost 40 years old at the time Romania filed its Texas action. He did not participate in the litigation or file his own action against the Kimbell Art Foundation.

8

19. In 1985, Romania sued Wildenstein & Co., the purchaser of a number of the King's paintings, again attempting to obtain possession of those paintings—*including the Painting at issue here*. *Socialist Republic of Romania v. Wildenstein*, No. 85 Civ. 2435 (S.D.N.Y.). That action was also dismissed "with prejudice" in 1986 pursuant to Federal Rule of Civil Procedure 37(b)(2)(C). Then, in 1993, Romania moved under Rule 60(b)(6) to reopen the case and vacate the prior dismissal. Such a motion requires a showing of a meritorious claim. *Drywall Tapers & Pointers of Greater New York Loc. Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc.*, 343 F.R.D. 358, 364 (S.D.N.Y. 2022). The Court denied Romania's motion, explicitly finding that "a change in government, or the fact that a former regime pursued a different litigation strategy than would the government currently in power, does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion," and implicitly and necessarily finding that Romania had no meritorious claim.

20. Philippe did not participate in that litigation either, or file his own action against Wildenstein & Co.

21. In 1993, Romania tried a third time and sued King Michael himself in New York State court, again seeking possession of the King's paintings. *State of Romania v. Former King Michael*, Index No. 14664/1993 (Sup. Ct. N.Y. Cnty.). This case too was dismissed in 1994, N.Y.L.J., Jun. 24, 1994, at 1, and that dismissal affirmed in 1995, 212 A.D.2d 422 (1st Dep't 1995), on *forum non conveniens* grounds.

22. Philippe did not participate in that litigation either, or file his own action against King Michael.

23. Romania's efforts were not limited to American courts: in 1993, Romania sued King Michael in Switzerland too. *Romania v. Michel de Roumanie*, No. JTPI/13039/96 (16th

Chambre, Pourvoir Judiciaire, Tribunal de Première Instance). The case was also dismissed, and in 1996, the Swiss appellate court affirmed that dismissal, based in part on King Michael's sovereign immunity.

24. Romania sought to lay claim to King Michael's paintings three times in American courts and once in Switzerland; it lost every time.

25. Philippe has been on notice of these attempts, and even though forty years have passed since Romania's lawsuit against Wildenstein & Co., he has never sued King Michael or any purchaser of the paintings.

26. Instead, in 2020, Philippe was sentenced by a Romanian court to three years and four months in jail after being found guilty of "working with a gang of con artists to recover properties he claims are his as the heir to the last-but-one king, Carol II." AFP, *France detains alleged Romanian royal wanted in home country*, (Apr. 7, 2025).[1] And on April 7, 2025, Philippe was detained by a French court as the subject of a European arrest warrant related to this sentence.

**Accent's Purchase of the Painting Was Proper, and Accent Is a Bona Fide Purchaser for Value**

27. On December 15, 2010, Accent acquired the Painting from a professional art dealer.

28. The final person listed in the Painting's provenance, as provided to Accent, was King Michael.

29. As of December 15, 2010, the Painting was not registered as stolen or missing in the database of the Art Loss Register, the world's largest database of stolen art, which is used by experts and insurers to confirm the provenance of artwork before its purchase. The Art Loss

---

[1] Available at https://www.yahoo.com/news/france-detains-alleged-romanian-royal-162503082.html.

Register now shows that a claim to Interpol that the Painting was stolen was made on February 18, 2025, after this case was filed, and the website of the Romanian Police lists the Painting as a stolen object in a report dated January 14, 2025, shortly before the Christie's auction was scheduled to take place.[2] Apparently, Romania took these steps only in 2025 in connection with this case and the state court case it filed on February 26, 2025.

30. With respect to the Painting, Accent is a bona fide purchaser for value.

**Accent Is Unable to Benefit Fully from Its Ownership Rights in the Painting and Faces Prejudice Due to Romania and Philippe's Interference**

31. In September 2024, Accent entered into a Seller's Agreement with Christie's with the intention that Christie's would offer the Painting for public action at its Old Masters sale in New York on February 5, 2025.

32. Merely seven days before the auction was set to take place, Romania asserted a claim of ownership to the Painting through emails from Romania's counsel to Christie's and to Accent's counsel, falsely claiming that the Painting is stolen property taken unlawfully from Romania in 1947 by King Michael.

33. Christie's withdrew the Painting from the auction on or before February 3, 2025.

34. On February 9, 2025, Philippe sued Christie's in this Court for replevin, demanding title to and return of the Painting.

35. On February 26, 2025, Christie's answered Philippe's complaint and claimed interpleader.

---

[2] Available at https://politiaromana.ro/en/stolen-objects/saint-sebastian.

36. Hours later, despite having notice of the proceeding already pending in this Court, Romania sued Christie's, Accent, and Philippe in New York state court seeking to recover the Painting.

37. Romania's and Philippe's baseless claims to the Painting have prejudiced Accent, which is unable to benefit fully from its ownership rights in the Painting.

38. The Painting is currently the subject of multiple litigations, and its title has been needlessly clouded, preventing Accent from selling the Painting, which is the reason that Accent entered into the Seller's Agreement with Christie's.

**Declaratory Judgment Is the Only Remedy Suitable for the Current Situation**

39. Declaratory judgment by this Court that Accent's title to the painting is valid, binding, and superior to any claimed rights by the Cross-claim Defendants with respect to the Painting is the only way to serve the purpose of clarifying and settling the alleged competing legal interests in the Painting.

40. Judgment by this Court directing turnover of the Painting to Accent would finally resolve the controversy and eliminate any uncertainty.

41. On information and belief, and based on the allegations in the Complaint, no other Interpleader and/or Cross-claim Defendant has a superior title claim.

42. Accent has no other adequate or alternative remedy for determination of the competing legal interests, and accordingly, declaratory judgment is an appropriate remedy.

43. Accent has not previously sought such relief in this or any other action.

**SECOND CROSS-CLAIM**
**(Against Defendant Romania)**
**For Tortious Interference with Contract**

44. Accent repeats and realleges the allegations in Paragraphs 1-43 above.

45. Accent and Christie's had a contract by which Christie's would offer the Painting for public auction at its Old Masters sale in New York on February 5, 2025.

46. Romania was aware of that contract.

47. On January 29, 2025, Romania, through its counsel, intentionally and unjustifiably induced Christie's to breach the contract by telephoning and writing to Christie's in New York and "demand[ing] that the Painting be withdrawn from the upcoming auction."

48. As a direct result of Romania's improper action, and at Romania's "demand," Christie's canceled the auction of the Painting.

49. As a proximate result of the auction being canceled due to Romania's improper intervention, Accent sustained compensatory damages in an amount to be determined at trial.

50. Romania's action constitutes tortious interference with Accent's contractual relations with Christie's.

51. Romania's wrongful action was baseless, wanton, willful, and reckless.

**WHEREFORE**, Accent requests that the Court enter judgment in favor of Accent:

(a) Against the Cross-Claim-Defendants, declaring that Accent's title to the Painting is valid, binding, and superior to any claimed interests or rights by the Cross-claim Defendants with respect to the Painting;

(b) Directing turnover of the Painting to Accent;

(c) Directing Romania and Philippe to pay any and all costs, fees, and charges incurred by Christie's in connection with this Action, including insurance and storage fees for the Painting;

(d) Directing Romania to pay compensatory damages to Accent in an amount to be determined at trial plus interest from February 5, 2025;

(e) Directing Romania to pay exemplary damages to Accent in an amount to be determined at trial;

(f) Directing Romania and Philippe to pay Accent its reasonable attorneys' and/or experts' fees incurred in connection with this baseless Action; and

(g) Granting any such other, further, and different relief as the Court may deem just and proper under the circumstances.

Dated: April 14, 2025
         New York, New York

                                                EMERY CELLI BRINCKERHOFF
                                                ABADY WARD & MAAZEL LLP

                                                */s/ Sonya Levitova*
                                                Daniel J. Kornstein
                                                O. Andrew F. Wilson
                                                Sonya Levitova

                                                One Rockefeller Plaza, 8th Floor
                                                New York, New York 10020

                                                (212) 763-5000

                                                *Attorneys for Interpleader Defendant*
                                                *and Cross-Claim Plaintiff Accent*
                                                *Delight International, Ltd.*