## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>          Plaintiff,<br><br>-against-<br><br>CHRISTIE'S, INC.,<br><br>          Defendant. | Case No.: 1:25-cv-01151-LLS<br><br><br>**MEMORANDUM IN SUPPORT OF STATE OF ROMANIA'S MOTION TO DISMISS FOR LACK OF JURISDICTION, OR, ALTERNATIVELY, MOTION TO STAY PENDING STATE COURT ACTION** |
| CHRISTIE'S, INC.,<br><br>          Counterclaim and Third-Party Plaintiff,<br><br>-against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>          Counterclaim Defendant, and<br><br>ACCENT DELIGHT INTERNATIONAL LTD. and STATE OF ROMANIA,<br><br>          Third-Party Defendants. | |
| ACCENT DELIGHT INTERNATIONAL LTD.,<br><br>          Interpleader Defendant and Cross-Claim Plaintiff,<br><br>-against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA, and STATE OF ROMANIA,<br><br>          Interpleader Defendants and Cross-Claim Defendants. | |

TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................... 1

II.  PROCEDURAL HISTORY ................................................................................ 2

     A.   Plaintiff's Complaint ............................................................................... 2

     B.   Plaintiff's Motion for a Temporary Restraining Order ........................... 3

     C.   Christie's Answer and Interpleader ........................................................ 4

     D.   Romania's State Court Complaint .......................................................... 4

     E.   Paul Philippe's Answer to Christie's Interpleader .................................. 5

     F.   Accent's Answer and Cross-Claims ....................................................... 5

III. LEGAL STANDARDS ...................................................................................... 5

     A.   Motion to Dismiss Romania for Lack of Jurisdiction Based on the Foreign
          Sovereign Immunity Act ......................................................................... 5

          1.   Requirements to Satisfy the Expropriation Exception to the FSIA .......... 7

          2.   Requirements to Satisfy the Successor Exception to the FSIA ................ 8

     B.   Motion to Dismiss Entire Action When the Joinder of Romania, a Necessary
          Party, Is Not Feasible ............................................................................. 8

     C.   Motion to Dismiss for Lack of Diversity Jurisdiction ........................... 9

IV.  LEGAL ARGUMENT ..................................................................................... 12

     A.   FSIA Requires Dismissal of Romania .................................................. 12

          1.   Romania is a "Foreign State" and Presumptively Immune .................... 12

          2.   No Exceptions Apply to Romania's Immunity as a Foreign Sovereign .. 12

               a.   The Expropriation Exception Does Not Apply ........................... 12

               b.   The Successor Exception Does Not Apply ................................. 13

     B.   Dismissal of Romania, an Indispensable Party, Requires Dismissal of the
          Entire Action - Rule 19(b), 12(b)(7) ..................................................... 14

C.    The Case Must Be Dismissed Because There Is Not Complete Diversity Among the Necessary Parties ............................................................. 17

D.    The Court Should Abstain or Stay This Case in Favor of the New York Action ................................................................................. 19

     1.    The New York Action and This Action Are Concurrent and Parallel ..... 19

     2.    Even if There Was a Basis for Jurisdiction, *Wilton* Provides this Court with Substantial Discretion to Abstain in Favor of the New York Action .............................................................................. 21

     3.    The *Wilton* Factors Weigh in Favor of Abstention ................................. 22

     4.    Alternatively, the Court Should Stay This Case in Favor of the New York Action ................................................................................. 26

V.    CONCLUSION .............................................................................. 27

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ace Am. Ins. Co. v. Graf Tech Int'l Ltd.*,
    No. 12-cv-6355 (RA), 2014 WL 2884681 (S.D.N.Y. June 24, 2014)....................................25

*Analisis y Estrategia, S.A. de C.V. v. Andersen*,
    No. 14-CV-8016 SAS, 2015 WL 4510772 (S.D.N.Y. July 24, 2015).....................................9

*Angiolillo v. Christie's, Inc.*,
    64 Misc. 3d 500 (N.Y. Sup. Ct. 2019) ................................................................................25

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)..........................................................................................................5, 6

*Audi of Smithtown, Inc.* v. *Volkswagen of Am., Inc.*,
    No. 08 Civ. 1773 (JFB) (AKT), 2009 WL 385541 (E.D.N.Y. Feb. 11, 2009) .................11, 17

*Bakalar v. Vavra*,
    619 F.3d 136 (2d Cir. 2010)................................................................................................25

*Bank of Am., N.A. v. E. Fordham DE LLC*,
    804 F. App'x 106 (2d Cir. 2020) .........................................................................................19

*Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012)..................................................................................................18

*Bentinck v. Guar. Tr. Co. of New York*,
    109 F. Supp. 827 (S.D.N.Y. 1952) .................................................................................11, 17

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    581 U.S. 170 (2017)..........................................................................................................6, 7

*Brillhart v. Excess Ins. Co.*,
    316 U.S. 491 (1942)............................................................................................................22

*Calcote v. Texas Pac. Coal & Oil Co.*,
    157 F.2d 216 (5th Cir. 1946) .........................................................................................11, 17

*Cassirer v. Kingdom of Spain*,
    616 F.3d 1019 (9th Cir. 2010) ..........................................................................................8, 13

*City of Indianapolis v. Chase Nat. Bank of New York*,
    314 U.S. 63 (1941)..............................................................................................................10

*Managing Directors' Long Term Incentne Plan ex rel. Comm. v. Boccella*,
　No. 14 CIV. 7033 PAC, 2015 WL 2130876 (S.D.N.Y. May 6, 2015).............................24, 25

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
　629 F.2d 786 (2d Cir. 1980)...........................................................................................10, 17

*De Carvalhosa v. Lindgren*,
　546 F. Supp. 228 (S.D.N.Y. 1982) ..................................................................................26, 27

*Dow Jones & Co. v. Harrods, Ltd.*,
　237 F. Supp.2d 394 (S.D.N.Y. 2002).....................................................................................24

*Errico v. Stryker Corp.*,
　281 F.R.D. 182 (S.D.N.Y. 2012) .....................................................................................16, 17

*Fed. Republic of Germany v. Philipp*,
　592 U.S. 169 (2021).........................................................................................................7, 12

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*,
　862 F. Supp. 2d 170 (E.D.N.Y. 2012) ...................................................................................19

*Fluent v. Salamanca Indian Lease Auth.*,
　928 F.2d 542 (2d Cir. 1991)............................................................................................15, 16

*Freedom, N.Y. Inc. v. United States*,
　No. 86 CIV. 1363 (CBM), 1986 WL 6163 (S.D.N.Y. May 27, 1986) ...................................15

*Freund v. Republic of Fr.*,
　592 F. Supp. 2d 540 (S.D.N.Y. 2008)......................................................................................6

*Giulini v. Blessing*,
　654 F.2d 189 (2d Cir. 1981)...................................................................................................26

*Glenclova Inv. Co. v. Trans-Res., Inc.*,
　874 F. Supp. 2d 292 (S.D.N.Y. 2012).................................................................21, 23, 26, 27

*Han v. Fin. Supervisor Serv.*,
　No. 17CV4383GBDBCM, 2017 WL 7689223 (S.D.N.Y. Oct. 6, 2017) ...............................24

*Hulton v. Bayerische Staatsgemaldesammlungen*,
　346 F. Supp. 3d 546 (S.D.N.Y. 2018)......................................................................................7

*Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*,
　875 F.2d 388 (2d Cir. 1989)....................................................................................................10

*Jonesfilm v. Lion Gate Int'l*,
　299 F.3d 134 (2d Cir. 2002)..................................................................................................8, 9

*JPMorgan Chase Bank, N.A. v. Avara US Holdings LLC*,
   No. 23-CV-7145 (JGK), 2024 WL 709068 (S.D.N.Y. Feb. 21, 2024)..................................20

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
   676 F.3d 83 (2d Cir. 2012).......................................................................................................26

*Marrero v. U.S. Bank Nat'l Ass'n*,
   2022 WL 4072936 (S.D.N.Y. Sept. 2, 2022)...........................................................................20

*Maryland Cas. Co. v. W.R. Grace & Co.*,
   23 F.3d 617 (2d Cir. 1993), *amended* (May 16, 1994) ...........................................................10

*Mazaya Trading Co. v. Li & Fung Ltd.*,
   833 F. App'x 841 (2d Cir. 2020) ............................................................................................10

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Int'l Wire Grp., Inc.*,
   No. 02-cv-10338 (SAS), 2003 WL 21277114 (S.D.N.Y. June 2, 2003) ..............................23

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Karp*,
   108 F.3d 17 (2d Cir.1997)......................................................................................................21

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Warrantech Corp.*,
   No. 00 Civ. 5007 (NRB), 2001 WL 194903 (S.D.N.Y. Feb. 27, 2001) ...........................22, 23

*New York State Ass'n for Retarded Children v. Carey*,
   438 F. Supp. 440 (E.D.N.Y. 1977) .........................................................................................11

*Perlman v. Fid. Brokerage Services LLC*,
   932 F. Supp. 2d 397 (E.D N.Y. 2013) .....................................................................................20

*Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*,
   943 F.3d 613 (2d Cir. 2019)....................................................................................................10

*In re Republic of Philippines*,
   309 F.3d 1143 (9th Cir. 2002) ............................................................................................8, 13

*Republic of Philippines v. Pimentel*,
   553 U.S. 851 (2008)...........................................................................................................15, 16

*Rukoro v. Fed. Republic of Germany*,
   976 F.3d 218 (2d Cir. 2020)....................................................................................................13

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)............................................................................................................6, 12

*Seneca Nation of Indians v. New York*,
   383 F.3d 45 (2d Cir. 2004)......................................................................................................15

*Shields v. Murdoch*,
    891 F. Supp. 2d 567 (S.D.N.Y. 2012)............................................................19, 20

*Hodge ex rel. Skiff v. Hodge*,
    78 F.Supp.2d 29 (N.D.N.Y. 1999)..........................................................................25

*Skiva International, Inc. v. Minx International Inc.*,
    No. 15-cv-4580 (KBF), 2015 WL 5853854 (S.D.N.Y. Oct. 7, 2015) ....................23

*Smith v. Kessner*,
    183 F.R.D. 373 (S.D.N.Y.1998) .............................................................................17

*Solomon R. Guggenheim Found. v. Lubell*,
    77 N.Y.2d 311 (1991) .............................................................................................25

*Swarna v. Al-Awadi*,
    622 F.3d 123 (2d Cir. 2010).....................................................................................6

*Thompson v. Daxor Corp.*,
    No. 23 CIV. 8272 (KPF), 2024 WL 1484192 (S.D.N.Y. Apr. 5, 2024)................26

*TIG Ins. Co. v. Fairchild Corp.*,
    No. 07 Civ. 8250, 2008 WL 2198087 ....................................................................22

*Travelers Indem. Co. v. Philips Elecs. N. Am. Corp.*,
    No. 02-cv-9800 (WHP), 2004 WL 193564 (S.D.N.Y. Feb. 3, 2004)....................25

*United States v. Kordel*,
    397 U.S. 1 (1970) ...................................................................................................26

*Wells Fargo Bank, Nat'l Ass'n v. Patel*,
    No. 24 CIV. 1162 (KPF), 2025 WL 844161 (S.D.N.Y. Mar. 18, 2025) ...............26

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)..........................................................................19, 21, 22, 24, 25

*Wynn v. AC Rochester*,
    273 F.3d 153 (2d Cir. 2001)...............................................................................9, 18

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*,
    215 F.3d 247 (2d Cir. 2000)......................................................................................7

## Statutes

28 U.S.C. § 1603(a) ....................................................................................................4, 12

28 U.S.C. § 1604 ..............................................................................................................6

28 U.S.C. § 1605(a)(3)..............................................................................................4, 6, 7

28 U.S.C. § 1605(a)(4).................................................................................................4, 6, 13

**Other Authorities**

Federal Rule Civil Procedure 7.1 ....................................................................................5

Federal Rule Civil Procedure 12(b)(1) ......................................................................1, 19

Federal Rule Civil Procedure 12(b)(7) .............................................................1, 14, 15, 17

Federal Rule Civil Procedure 19(a) ...........................................................................9, 15

Federal Rule Civil Procedure 19(b) .......................................................................... *passim*

Federal Rule Civil Procedure 22 ..............................................................................4, 20

H.R. REP. 94-1487 (1976), 1976 U.S.C.C.A.N. 6604 ..............................................8, 13

Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on
    Claims and Gov'tl Relations of the House Comm. on the Judiciary, 93d Cong.
    (1973)..................................................................................................................8, 13

## I.    INTRODUCTION

This action involves competing claims for ownership of the painting *Saint Sebastian,* by Doménikos Theotokópoulos (called El Greco), oil on canvas, oval 35 ½ x 27 ¾ in. (90.2 x 70.5 cm.) (the "Painting").

Accent Delight Int'l Ltd. ("Accent"), a foreign entity, consigned the Painting to Christies, Inc. to be offered for sale at auction, scheduled for February 5, 2025. The State of Romania ("Romania") asserted a claim of ownership and Christie's withdrew the Painting from the auction. After New York media reported on Romania's claim and Christie's withdrawal, plaintiff Paul Philippe ("Plaintiff" or "Paul Philippe") filed this action and claimed superior title to the Painting. Plaintiff's lawsuit was against Christie's, only.  Christie's, in turn, filed an interpleader action and named Accent and Romania as additional, necessary parties.  Plaintiff and Accent have since filed responses to Christie's interpleader; Accent also asserted cross-claims against Romania.

Romania, however, is a foreign state and presumptively immune from this Court's jurisdiction.  No statutory exception to Romania's sovereign immunity applies, and Romania must therefore be dismissed from this action pursuant to Rule 12(b)(1).  In addition, because Romania is an indispensable party and the case cannot proceed in its absence, the case must be dismissed pursuant to Rule 19(b) and 12(b)(7).

This action must also be dismissed, pursuant to Rule 12(b)(1), because there is not complete diversity between the parties.  Accent and Romania are both necessary and indispensable to Plaintiff's replevin action and, like the Plaintiff, they are both foreign citizens.  The citizenship of absent, yet indispensable parties must be considered for diversity purposes. When the citizenship of Accent and Romania is considered, diversity is lost.

Dismissal of this action for any of the above reasons will not cause prejudice to the parties because there is a parallel action pending in state court that includes the same parties, concerns the

same Painting, and is free of any jurisdictional deficiency. Thus, even if there was some basis for jurisdiction, the Court should decline jurisdiction pursuant to *Wilton v. Seven Falls Co.* and abstain in favor of the parallel state court proceeding.

## II.    PROCEDURAL HISTORY

### A.    Plaintiff's Complaint

On February 9, 2025, Plaintiff, on behalf of the Estate of King Carol II of Romania, filed a lawsuit against Christie's for replevin of the Painting. (Dkt. 1, Complaint, ¶ 1.) Plaintiff claimed he was the grandson and principal heir of King Carol II and that he brought this action "on a temporary basis while he petitions the New York County Surrogate's Court for appointment as the Estate's ancillary administrator." (*Id.*, ¶ 2.) Plaintiff alleged the Painting was owned by King Carol II, and that it had been stolen in 1947 by King Carol II's second born son, Michael. (*Id.*, ¶ 3.)

Plaintiff alleged that Michael sold the Painting to New York art dealer Wildenstein & Co., and that Wildenstein & Co. knew the Painting was stolen. (*Id.*, ¶ 5.) Plaintiff alleged Christie's obtained possession of the Painting from an "unknown consignor who instructed Christie's to sell the painting at auction. (*Id.*, ¶ 3.) Plaintiff alleged the Painting resurfaced in New York in February 2025 as one of the "Old Masters" paintings to be auctioned by Christie's. (*Id.*, ¶ 6.) Plaintiff alleged that Christie's withdrew that Painting from the auction after Romania asserted an ownership claim. (*Id.*)

Plaintiff acknowledged that Romania's ownership claim was reported in the papers, but sought to dismiss the relevance by alleging the claim was barred by the affirmative defenses of *res judicata* and issue preclusion. (*Id.*, ¶¶ 6-8.) Plaintiff also alleged that Romania's ownership claim failed on the merits (*id.*, ¶ 35), and that Plaintiff's title to the Painting is superior to that of Christie's and the "anonymous consignor." (*Id.*, ¶ 58.)

Plaintiff alleged this Court has subject matter jurisdiction based on diversity between the two parties in the lawsuit, Paul Philippe and Christie's. (Dkt. 1, ¶ 12.) Plaintiff knew of Romania's ownership claim (*id.*, ¶ 6) and knew another party had consigned the Painting to Christie's and would have a claim (*id.*, ¶ 58), but Plaintiff did not name either of the competing claimants as a defendant or include any "Doe" defendants in his complaint for replevin.

Romania considers Plaintiff to be a fugitive. (*See* Declaration of Paul F. Downs ("Downs Decl."), **Exhibit A**.) In December 2020, Plaintiff was convicted in Romania for serious crimes based on his bad faith attempt to recover property that did not belong to him. (Complaint, ¶ 45.) Plaintiff alleged that he was in Portugal when the conviction was announced and Romania was unable to arrest him. (*Id.*, ¶ 46.) Plaintiff alleged that despite subsequent extradition requests, and arrests in France and Malta, no country has extradited him to Romania to serve his prison sentence. (*Id.*, ¶¶ 50-51.) Plaintiff was arrested again, in France, on April 7, 2025, in connection with the 2020 conviction and pursuant to a European arrest warrant. (Downs Decl., **Exhibits A-B**.)

B.   **Plaintiff's Motion for a Temporary Restraining Order**

On February 11, 2025, Plaintiff filed a motion for preliminary injunction and temporary restraining order (TRO). (Dkt. 10.) Plaintiff argued that because of Romania's claim and Christie's decision to postpone the auction, there was an "imminent risk that Christie's and its consignor will anticipate this lawsuit or a similar one and take steps to insulate the Painting from impoundment or injunctive relief by removing it from New York." (*Id.*, at 7.)

Plaintiff and Christie's consented to a TRO through March 3, 2025, which the Court ordered by endorsement. (Dkt. 15.) The Court extended the TRO to July 1, 2025, based on a subsequent letter from Christie's. (Dkt. 20.)

### C.    Christie's Answer and Interpleader

On February 26, 2025, Christie's answered Plaintiff's complaint.  (Dkt. 18.)  Christie's also asserted an interpleader counterclaim against Plaintiff and, pursuant to Rule 22, third-party interpleader claims against Accent and Romania.  (Dkt. 18, at 10, ¶ 1.)  Christie's made no claim of ownership to the Painting (*id.*, ¶ 2), asserting instead it was a "disinterested stakeholder holding the Painting which Plaintiff and other parties . . . claim to own" and that it was ready and willing to deliver the Painting to such person or entity as the Court ordered.  (Dkt. 18, at 9, Tenth Affirmative Defense; and at 14, ¶ 26.)

Christie's alleged that Plaintiff is a citizen of the U.K. and Romania who resides in France; that Accent is an entity incorporated in the British Virgin Islands; and that Romania is a foreign state, as defined in 28 U.S.C. § 1603(a).  (*Id.*, ¶ 4-6.)  Christie's alleged the Court had jurisdiction because there was complete diversity between it, on one hand, and Plaintiff, Accent and Romania, on the other.  (*Id.*, at 11, ¶ 7.)  Christie's further alleged that Romania, a foreign sovereign, was subject to jurisdiction under two exceptions to the Foreign Sovereign Immunity Act ("FSIA"), specifically, the exceptions found at 28 U.S.C. § 1605(a)(3) and § 1605(a)(4).  (*Id.*, ¶ 8.)

### D.    Romania's State Court Complaint

On February 26, 2025, Romania filed a complaint for recovery of the Painting in the New York Supreme Court for the County of New York (the "New York Action").  (Downs Decl., **Exhibit C**.)  Romania named Christie's, Paul Philippe, Accent, Dmitri Rybolovlev and the Painting, *in rem*, as defendants. (*Id.*)  Pursuant to an agreement with counsel for Christie's and Accent, Romania will file an amended state court complaint that omits the claims against Christie's and Dmitri Rybolovlev.  (Downs Decl., ¶7, **Exhibit D**.)

### E.    Paul Philippe's Answer to Christie's Interpleader

On March 7, 2025, Plaintiff answered Christie's Interpleader Action, and conceded "that a determination of the lawful owner of the Painting needs to be settled in a single forum in a manner that is binding on all the Interpleader Defendants."  (Dkt. 22, ¶ 24.)  Plaintiff made no allegation that the Court had subject matter jurisdiction.

### F.    Accent's Answer and Cross-Claims

On April 14, 2025, Accent filed its Rule 7.1 Corporate Disclosure Statement and answered Christie's Interpleader Action.  (Dkt. 38, 39.)  In its Disclosure Statement, Accent stated that it was owned by Bolton Trustees Limited, of Cyprus, as trustees of the Domus Trust, and that no publicly held corporation owns more than 10% of its stock.  (Dkt. 38.)  In its Answer, Accent alleged it was incorporated in the British Virgin Islands, that Romania was a foreign state and that Paul Philippe, upon information and belief, was a citizen of the U.K. and Romania who resides in France.  (Dkt. 39, at 6, ¶¶ 3-5.)  Accent made no allegation that the Court had subject matter jurisdiction.

Accent claimed it acquired the Painting from a professional art dealer in 2010, and that it learned later Romania had "allowed King Michael I to take the Painting with him[.]"  (*Id.*, at 5, ¶ 1.)  Accent asserted a cross-claim against Plaintiff and Romania for declaratory judgment.  (*Id.*, at 5.)  Accent separately cross-claimed against Romania for tortious interference with contract.  (*Id.*, at 12.)

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss Romania for Lack of Jurisdiction Based on the Foreign Sovereign Immunity Act

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443

(1989).  The FSIA's premise is that foreign sovereigns, like Romania, are immune from suit in the U.S. unless the action falls under one of the specific exceptions enumerated in the statute.  *See,* 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the Act, a foreign state is presumptively immune from the jurisdiction of U.S. courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.")

In a motion to dismiss on FSIA grounds, once the foreign sovereign makes a *prima facie* showing it is a foreign state, "the opposing party 'has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted.'"  *Freund v. Republic of Fr.*, 592 F. Supp. 2d 540, 552 (S.D.N.Y. 2008) (quoting *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)); *see also Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010) ("burden falls on the plaintiff to establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign").  To meet that burden, the party arguing for jurisdiction must present evidence that shows, and not just arguably shows, the exception applies; "[s]imply making a nonfrivolous argument to that effect is not sufficient."  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 187 (2017).  "Moreover, where jurisdictional questions turn upon further factual development, the trial judge may take evidence and resolve relevant factual disputes."  *Helmerich*, 581 U.S. at 174.

Romania is a foreign state and presumptively immune.  To defeat Romania's immunity, Christie's alleged that (1) the *expropriation exception* (1605(a)(3)) applies because "the Painting is claimed to be the lawful property of the State of Romania, wrongfully removed from the country in 1947" and (2) the *successor exception* (1605(a)(4)) applies because "the Painting is located in the United States[.]"  (Dkt. 18, at 11, ¶ 8.)  As discussed below, these allegations are insufficient to show that either exception applies and, moreover, the facts show that neither exception applies.

*Hulton v. Bayerische Staatsgemaldesammlungen*, 346 F. Supp. 3d 546, 549 (S.D.N.Y. 2018) ("the possibility that the Court might resort to evidence outside the pleadings does not relieve Plaintiffs of their burden to set out factual allegations in the Complaint that amount to 'a legally valid claim' under the FSIA and its exceptions") (*quoting Helmerich*, 581 U.S. at 174)).

### 1.    Requirements to Satisfy the Expropriation Exception to the FSIA

To satisfy the expropriation exception, §1605(a)(3), Christie's must show that "(1) rights in property are in issue; (2) that the property was "taken"; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements is satisfied." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000).

This requires Christie's to first show the Painting was taken in violation of the international law of expropriation; in other words, that a state took the Painting from an alien, a citizen of another state. *Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 180 (2021) (exception requires showing that "a state deprived 'an alien' of property") (*quoting* Restatement (Second) of Foreign Relations Law § 185 (1965)). Christie's makes no such allegation. Instead, Christie's alleged only that "the Painting is claimed to be the lawful property of the State of Romania, wrongfully removed from the country in 1947." (Dkt. 18, at 11, ¶ 8.) But the expropriation exception does not apply to claims regarding property that was taken *from* the foreign state. *Philipp*, *supra*, 592 U.S. at 180. There is no allegation (or evidence) that Romania took the Painting from an alien in violation of international law.

Christie's also makes no allegation to satisfy either of the "nexus requirements", which separately require that the Painting (or property exchanged for the Painting) is present in the U.S. in connection with a commercial activity carried on in the U.S. by Romania, or is owned by an agency or instrumentality of Romania that is engaged in commercial activity in the U.S.

## 2.    Requirements to Satisfy the Successor Exception to the FSIA

The successor exception is based on the 1952 Tate letter, which stated, among other things, that sovereign immunity should not be granted "with respect to the disposition of the property of a deceased person even though a foreign sovereign is the beneficiary." H.R. REP. NO. 94-1487, at 20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6619. The exception applies when a foreign sovereign asserts a claim with respect to the disposition of a decedent's property located in the U.S. This exception is described in the legislative history as providing a "pretty clear exception for estate … matters in this country[.]" *Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Gov'tl Relations of the House Comm. on the Judiciary*, 93d Cong. 21 (1973) ("*1973 House Hearing*") (testimony of Charles N. Brower, Acting Legal Adviser, Department of State); and *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1031 (9th Cir. 2010) (explaining that the successor exception applies when a foreign state asserts "**rights in an estate**") (emphasis added); *see also In re Republic of Philippines*, 309 F.3d 1143, 1150 (9th Cir. 2002) ("For the reasons we now explain, we conclude the exception applies only when the sovereign's claim is as a successor to a private party").

To satisfy this exception, therefore, Christie's must allege and show that Romania is acting as a successor to a private party and asserting its claim in a U.S. estate proceeding that is disposing of a decedent's property. Christie's makes no such allegation.

As discussed below, Romania is immune, no exceptions to the FSIA apply, and Romania should be dismissed.

### B.    Motion to Dismiss Entire Action When the Joinder of Romania, a Necessary Party, Is Not Feasible

If a party that is *necessary* to the action cannot be joined, "the district court must determine whether the claim should be dismissed because the necessary party is "indispensable." *Jonesfilm*

*v. Lion Gate Int'l*, 299 F.3d 134, 139 (2d Cir. 2002); *see also* Fed. R. Civ. P. 19. "Under Rule 19(a), a party is deemed necessary if the court 'cannot accord complete relief among existing parties,' or if proceeding would impede the absent party's interest or expose the present parties to 'double, multiple, or otherwise inconsistent obligations.'" *Vision en Analisis y Estrategia, S.A. de C.V. v. Andersen*, No. 14-CV-8016 SAS, 2015 WL 4510772, at *5 (S.D.N.Y. July 24, 2015) (*quoting* Fed. R. Civ. P. 19(a)). If a "necessary" party cannot be joined to the action, Rule 19(b) requires the court to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The Rule provides four factors for the Court to consider when making this determination:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* As discussed below, these factors favor dismissal of the federal court action, particularly in light of the adequate relief that can be afforded in the New York Action.

## C.    Motion to Dismiss for Lack of Diversity Jurisdiction

Federal courts are courts of limited jurisdiction: "Even where the parties are satisfied to present their disputes to the federal courts, the parties cannot confer subject matter jurisdiction where the Constitution and Congress have not." *Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d Cir. 2001). Plaintiff sued Christie's in federal court, asserting jurisdiction under § 1332(a)(2) because there was complete diversity between the two named parties. As the party claiming there

is jurisdiction, Plaintiff has the burden to establish such jurisdiction by a preponderance of the evidence. *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019).

To establish jurisdiction under section 1332(a)(2), Plaintiff must show there is <u>complete diversity</u> between opposing parties. This requirement is "explicit and unequivocal." *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 391 (2d Cir. 1989). However, when foreign parties are involved, as they are here, "diversity is lacking . . . where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens." *Mazaya Trading Co. v. Li & Fung Ltd.*, 833 F. App'x 841, 843 (2d Cir. 2020) (citations omitted); *see also Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980) ("the presence of aliens on two sides of a case destroys diversity jurisdiction"). When determining which parties are on opposite sides, for purposes of analyzing jurisdiction, the Supreme Court instructs that we must:

> look beyond the pleadings, and arrange the parties according to their sides in the dispute. Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary collision of interest exists, is therefore not to be determined by mechanical rules. It must be ascertained from the principal purpose of the suit, and the primary and controlling matter in dispute.

*City of Indianapolis v. Chase Nat. Bank of New York*, 314 U.S. 63, 69-70 (1941) (cleaned up) (citations omitted); *see also Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 622 (2d Cir. 1993), *amended* (May 16, 1994) (under this test, courts realign the parties (if necessary) so there is "an actual, substantial controversy, or a collision of interests" between adversaries).

Courts must also look beyond the caption to ensure the citizenship of all indispensable parties is considered:

> 'The requirement for complete diversity cannot be brought about by a party failing to join, either with himself or on the opposite side, a party who is an

indispensable party to the action, even though joining the absent party would result in a loss of jurisdiction by the federal court.'

*Bentinck v. Guar. Tr. Co. of New York*, 109 F. Supp. 827, 828 (S.D.N.Y. 1952) (quoting *Metropolis Theatre Co. v. Barkhausen*, 170 F.2d 481, 484 (7th Cir. 1948)). "Instead, a necessary or indispensable party to a lawsuit, even where no specific cause of action is asserted against it, should be considered for diversity of jurisdiction purposes if it is a real party to the controversy." *Audi of Smithtown, Inc.* v. *Volkswagen of Am., Inc.*, No. 08 Civ. 1773 (JFB) (AKT), 2009 WL 385541, at *4 (E.D.N.Y. Feb. 11, 2009) (citing *Calcote v. Texas Pac. Coal & Oil Co.*, 157 F.2d 216, 218 (5th Cir. 1946)). If indispensable parties are not named in the initial pleading, the court must consider those parties and factor their citizenship into the diversity analysis. *Calcote,* 157 F.2d at 218–19 ("federal jurisdiction depended wholly upon diversity of citizenship and it was impossible to determine whether such diversity existed unless all indispensable parties were before the court and the citizenship of each was a matter of record"). And if "the court would have had no jurisdiction over the indispensable party at the commencement of the suit, the jurisdictional requirements cannot be avoided by adding him later in the proceedings." *New York State Ass'n for Retarded Children v. Carey*, 438 F. Supp. 440, 445, n.4 (E.D.N.Y. 1977).

The primary purpose of this action, the "collision of interests", is the three-way ownership dispute between Plaintiff, Accent and Romania. Accent and Romania are indispensable parties in that collision of interests, and they are adverse to Plaintiff even if he did not sue them. Factoring their citizenship into the jurisdictional analysis, as required, destroys diversity.

As discussed below, Plaintiff cannot meet his burden of showing there is complete diversity between the indispensable parties.

IV.    **LEGAL ARGUMENT**

A.    **FSIA Requires Dismissal of Romania**

1.    **Romania is a "Foreign State" and Presumptively Immune**

There is no dispute that Romania is a "foreign state" as defined by 28 U.S.C. § 1603(a). According to the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts[.]" *Saudi Arabia*, 507 U.S. at 355. Unless one of the specified statutory exceptions applies, this Court lacks subject matter jurisdiction over the claims against Romania. *Id.*

2.    **No Exceptions Apply to Romania's Immunity as a Foreign Sovereign**

Christie's cited the expropriation and the successor exceptions as grounds for this Court's jurisdiction over Romania. These exceptions do not apply, and no other party has asserted a separate basis for this Court's jurisdiction over Romania.

a.    **The Expropriation Exception Does Not Apply**

The expropriation exception applies only when property is taken in violation of the international law of expropriation. *Philipp*, 592 U.S. at 187. This requires showing that a state has expropriated the property of an alien: "'taking of property' could be 'wrongful under international law' only where a state deprived 'an alien' of property." *Id.*, at 180 (quoting Restatement (Second) of Foreign Relations Law § 185). This does not include a state's taking of property from its own citizens. *Id.*, at 176 ("what a country does to property belonging to its own citizens within its own borders is not the subject of international law"). To support application of this exception, Christie's cites to King Michael's 1947 theft of the Painting. That theft, however, did not amount to a state depriving an alien of property and it did not violate the international law of expropriation.

Further, even if King Michael's theft violated the international law of expropriation, the exception would not apply because Christie's makes no allegation to satisfy the nexus requirement.

*Rukoro v. Fed. Republic of Germany*, 976 F.3d 218, 228 (2d Cir. 2020) (dismissing for lack of allegation that "the expropriated property is currently present in the United States in connection with commercial activity"). Nor is there any evidence to support this requirement—the Painting is not owned by a separate "agency or instrumentality" of Romania and is not present in the U.S. as the result of Romania's commercial activity. To the contrary, the Painting was brought to New York by the consignor Accent, without Romania's involvement or knowledge.

### b.    The Successor Exception Does Not Apply

Pursuant to 28 U.S.C. § 1605(a)(4), a foreign state is not immune from jurisdiction in any case "in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue[.]" This exception is based on the 1952 Tate letter, which included the following analog: "sovereign immunity should not be claimed or granted in actions . . . with respect to the disposition of the property of a deceased person even though a foreign sovereign is the beneficiary." H.R. REP. NO. 94-1487, at 20. Despite an exhaustive search, no case was found where this exception was applied to a foreign sovereign's claim for property it *previously* received by succession in a foreign state that was *later* transported to the U.S. for unrelated reasons.

Discussion of the exception makes clear it was meant for situations where the foreign state asserted a claim to property located in, and being administered in, the U.S. as part of an estate proceeding *and* the foreign state's claim was "as a successor to a private party." *See e.g.*, *1973 House Hearing*, 21; *Cassirer*, 616 F.3d at 1031 (exception was meant to apply when foreign state is "asserting rights in an estate"); *and In re Philippines*, 309 F.3d at 1150 ("the exception applies only when the sovereign's claim is as a successor to a private party"). That is not what happened here.

Romania's first king, Carol I, owned the Painting until he died in 1914 in Romania, at

which point the Painting was transferred pursuant to his will to "remain forever and entirely in the country, as the property of the Crown of Romania." (Downs Decl., **Exhibit E**, at 4-5; and **Exhibit F**.) After King Carol I's death, his succession and will were opened and administered by a Romanian tribunal. (Downs Decl., **Exhibit G**, at 21.) Pursuant to King Carol I's will, after his death the Painting became part of the Crown Domain, a public institution that is distinct from the King's personal estate. (Downs Decl., **Exhibit E**, at 6-8 ("Crown's assets belong to the State of Romania and are therefore public assets. The King is not the owner of them in his own right and cannot dispose of them.").) Romania abolished the monarchy and dissolved the Crown Domain in 1947, at which point the Painting and other Crown Domain assets were reintegrated in the public domain of the newly formed Romania People's Republic. (*Id.*, at 9.) Romanian law instructs that the State of Romania is the actual and legal successor to the Crown of Romania, and thus the rightful owner of the Painting, which is part of Romania's national heritage. (*Id.*, at 9-10.) The ownership dispute in New York is not over claims to property being administered in a U.S. estate proceeding; it is over competing claims to a Painting that became part of Romania's public assets in 1914.

Romania must be dismissed because it is immune from this Court's jurisdiction and none of the cited exceptions apply.

### B.      Dismissal of Romania, an Indispensable Party, Requires Dismissal of the Entire Action - Rule 19(b), 12(b)(7)

Each of the other parties have asserted claims that would require Romania's presence in this action. Plaintiff's claim for replevin requires resolution of Romania's competing claim for the Painting. Christie's named Romania as a defendant, seeks a determination of which claimant has "superior right, title and interest" in the Painting, and cites concern of potential multiple suits and multiple liability arising from the competing ownership claims. (Dkt. 18, at 13 ¶ 24.) Accent

likewise asserted claims against Romania for declaratory relief and tortious interference with contract. (Dkt. 39.)

The absence of Romania from this action would prevent this Court from providing complete relief on the other parties' claims. Romania's absence would also impede its ability to protect its interest in the Painting and would leave Christie's subject to "substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Accordingly, pursuant to Rule 19(a), Romania is a necessary party to this action and the claims asserted therein. *See also Republic of Philippines v. Pimentel*, 553 U.S. 851, 863–64 (2008) ("The Republic and the Commission are required entities because '[w]ithout [them] as parties in this interpleader action, their interests in the subject matter are not protected'") (alteration in original, citation omitted).

Because Romania is a necessary party that is also immune and must be dismissed, the Court must determine if the entire action must be dismissed because Romania is "indispensable." Fed. R. Civ. P. 19(b) ("If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed"); *see also Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004) (affirming district court's finding that "the State of New York was an absent and indispensable party under Rule 19 […] and that the action was thus barred by sovereign immunity"; *Freedom, N.Y. Inc. v. United States*, No. 86 CIV. 1363 (CBM), 1986 WL 6163, at *4 (S.D.N.Y. May 27, 1986) (dismissing lawsuit pursuant to Rule 12(b)(7) when absent third party was indispensable per Rule 19(b) but was not amenable to court's jurisdiction).

Although Rule 19(b) provides four factors to consider in making this determination, Romania's sovereign immunity is compelling by itself when determining whether the action should be dismissed because of Romania's absence. *Fluent v. Salamanca Indian Lease Auth.*, 928

F.2d 542, 548 (2d Cir. 1991) ("when an indispensable party is immune from suit, there is very little room for balancing of other factors set out in rule 19(b), because immunity may be viewed as one of those interests compelling by themselves") (cleaned up) (citations omitted). For purposes of Rule 19, an indispensable party's sovereign immunity is accorded "paramount importance." *Id*., at 548. Even if Romania's sovereign immunity was not given paramount importance, each of Rule 19(b)'s factors favors dismissal.

First, Romania and its claim for the Painting would be severely prejudiced if the Court determined ownership of the Painting in Romania's absence. *Pimentel*, 553 U.S. at 869 ("the decision to proceed in the absence of the Republic and the Commission ignored the substantial prejudice those entities likely would incur"); *see also* Rule 19(b)(1). Second, there is no method to lessen or avoid the prejudice Romania would suffer if a judgment was rendered in its absence; *i.e.*, no remaining party would protect Romania's interest. *See*, *e.g.*, *id*., at 869-870; *see also* Rule 19(b)(2). Third, any judgment rendered in Romania's absence would not be adequate because Romania's rights and ownership claim would not be extinguished, Romania would not be bound by the judgment, and Romania could pursue its rights elsewhere. *Id*., at 870–71 ("Going forward with the action without the Republic and the Commission would not further the public interest in settling the dispute as a whole because the Republic and the Commission would not be bound by the judgment"); *see also* Rule 19(b)(3). Fourth, there is an adequate alternative remedy for the remaining parties in the New York Action, already filed, which includes the same parties, covers the same subject matter, and does not have the same jurisdictional deficiencies. *Errico v. Stryker Corp.*, 281 F.R.D. 182, 191-192 (S.D.N.Y. 2012) ; *see also* Rule 19(b)(4). When considering this fourth factor, the district court in *Errico* found significance in the availability of other actions to resolve the dispute:

> [T]he presence of [defendant's] lawsuit in Michigan state court ensures that Plaintiffs will not have to 'start over,' as that lawsuit is already underway and provides an adequate forum [or, in the alternative] Plaintiffs may refile their lawsuit in state court in New York, where the parties have consented to jurisdiction. While this may reset the litigation in a procedural sense, judicial economy is better served with a state court lawsuit involving all required parties, instead of a judgment from a federal court that does not resolve the dispute between all parties, and leaves open the possibility for further litigation. … In any event, a lawsuit by Plaintiffs in state court would likely allege identical facts and seek the same damages that are sought in this action.

*Errico*, 281 F.R.D. at 192; *see also*, *e.g.*, *Smith v. Kessner*, 183 F.R.D. 373, 376 (S.D.N.Y.1998).

The combination of Romania's sovereign immunity and the relevant factors favors dismissal of this action, pursuant to Rule 19(b) and 12(b)(7).

### C.    The Case Must Be Dismissed Because There Is Not Complete Diversity Among the Necessary Parties

This action was started by Paul Philippe's action for replevin.  Paul Philippe is a foreign party.  This Court has jurisdiction under 1332(a)(2) if, and only if, there are no foreign parties adverse to Paul Philippe.  *Corporacion Venezolana*, 629 F.2d at 790 ("the presence of aliens on two sides of a case destroys diversity jurisdiction").

Plaintiff's decision to sue only Christie's for replevin, an entity that made no claim of ownership to the Painting, created an illusion of diversity because Christie's is a citizen of New York.  But a district court's diversity analysis must include indispensable parties that were omitted from the initial pleading.  *Bentinck*, *supra*, 109 F. Supp. at 828; *Audi of Smithtown*, *supra*, 2009 WL 385541, at *4 ("a necessary or indispensable party to a lawsuit […] should be considered for diversity of jurisdiction purposes"); *and Calcote*, 157 F.2d at 218–19 (noting it is "impossible to determine whether such diversity existed unless all indispensable parties were before the court and the citizenship of each was a matter of record").  As discussed above, Romania is a necessary and indispensable party.  Accent, the Painting's consignor that likewise claims ownership of the Painting, is also a necessary and indispensable party. (*See also*, Dkt. 18, Christie's Eleventh

Affirmative Defense ("Plaintiff has failed to include necessary and indispensable parties in this action.").) Romania and Accent are necessary and indispensable pursuant to Rule 19, and their citizenship must be considered when analyzing the alleged basis for diversity jurisdiction.

Federal courts are courts of limited jurisdiction. This Court must dismiss the action if it lacks subject matter jurisdiction, whether or not some or all of the parties object to dismissal. *Wynn*, 273 F.3d at 157. The absence of jurisdiction is "non-waivable; before deciding any case we are required to assure ourselves that the case is properly within our subject matter jurisdiction." *Id.* There is not complete diversity between all necessary and indispensable parties. Paul Philippe's claim for the Painting is adverse to Romania and Accent, whose respective claims for the Painting are, in turn, adverse to Paul Philippe and each other. Because this case is between aliens, there is not complete diversity, the Court does not have jurisdiction, and the case must be dismissed. *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) ("We have diversity jurisdiction over cases between citizens of the United States and citizens of foreign states, but we do not have diversity jurisdiction over cases between aliens.").

Christie's interpleader action was derivative of Paul Philippe's replevin action, and a non-compulsory counterclaim. Christie's is a nominal party and disclaims any interest in the Painting. Christie's interpleader action cannot be used to create jurisdiction over the case between the necessary and indispensable claimants that did not exist at the outset. Moreover, because Romania must be dismissed as an immune foreign sovereign, the interpleader action must be dismissed under Rule 19 even if there was diversity jurisdiction.

### D.    The Court Should Abstain or Stay This Case in Favor of the New York Action

Under *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), a federal court may decline jurisdiction and abstain in favor of a parallel proceeding in state court.[1] Here, the New York Action and this case are concurrent and parallel because both cases involve the same parties and ultimately seek a determination of ownership of the Painting. Analysis under *Wilton* weighs in favor of abstention, particularly in light of Romania's immunity from suit and the dubious jurisdictional basis for this case.

### 1.    The New York Action and This Action Are Concurrent and Parallel

Federal and state proceedings are considered parallel "when the two proceedings are 'essentially the same'—when there is an identity of parties, and the issues and relief sought are the same." *U.S. Bank Nat'l Ass'n as trustee Bank of Am., N.A. v. E. Fordham DE LLC*, 804 F. App'x 106, 107 (2d Cir. 2020). "Perfect symmetry of parties and issues is not required. Rather, parallelism is achieved where there is a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (internal quotation omitted).

This action and the New York Action are parallel because they "involve the same (i) parties, (ii) subject matter, and (iii) relief requested." *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 182 (E.D.N.Y. 2012). Both cases are at their core a three-way ownership dispute over the Painting. And both actions involve the same claimants: Romania, Paul Philippe, and Accent. The relief requested in both actions is also the

---

[1] "A motion to abstain 'is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.'" *Phillips v. Citibank*, N.A., 252 F. Supp. 3d 289, 295 (S.D.N.Y. 2017).

same. *JPMorgan Chase Bank, N.A. v. Avara US Holdings LLC*, No. 23-CV-7145 (JGK), 2024 WL 709068, at *6 (S.D.N.Y. Feb. 21, 2024) ("actions are parallel if the 'main form of relief' sought is the same and if the relief covers 'the same essential issues'"). "'Merely raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit.'" *JPMorgan Chase Bank*, at *6 (quoting *Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 362 (2d Cir. 1985)).

In the New York Action, Romania asserts claims for, *inter alia*, conversion and replevin, and seeks a declaratory judgment that it is the lawful owner of the Painting. (New York Compl., at PRAYER FOR RELIEF.) In this action, Paul Philippe asserts a cause of action for replevin, seeking possession of the Painting, and Christie's has in turn filed a Rule 22 interpleader to "resolve [the parties'] respective claims to the Painting at issue[.]" (Christie's Interpleader, at WHEREFORE clause ¶ 2.) Accent has since answered Christie's Interpleader and similarly asserted a cross-claim for a declaratory judgment as to which party has superior title to the Painting. (Accent Answer, at FIRST CROSS-CLAIM.)

It is indisputable that the New York Action is parallel to this action and will dispose of all claims presented in this case. *Shields*, 891 F. Supp. 2d at 577; *see also Perlman v. Fid. Brokerage Services LLC*, 932 F. Supp. 2d 397, 416-17 (E.D N.Y. 2013) ("The question of who is entitled to the [property] at the heart of the interpleader action is also one of the many issues before the [state] Court, and in that sense, the interpleader action is parallel to the state proceeding"); *Marrero v. U.S. Bank Nat'l Ass'n*, 2022 WL 4072936, at *6 (S.D.N.Y. Sept. 2, 2022) (abstaining where "both actions turn on the validity of [defendant's] interest in the Property").

2. **Even if There Was a Basis for Jurisdiction, *Wilton* Provides this Court with Substantial Discretion to Abstain in Favor of the New York Action**

In *Wilton*, the Supreme Court approved a "standard vesting district courts with greater discretion in declaratory judgment actions" to stay or dismiss a case in light of parallel state court proceedings. *Wilton*, 515 U.S. at 286. Under *Wilton*, the district court may decline to hear declaratory judgment suits in favor of pending state actions because "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288.

Courts in the Second Circuit have applied *Wilton* to all claims where the relief sought is ultimately declaratory in nature, including interpleader claims. *See Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 306 (S.D.N.Y. 2012) ("Although the interpleader complaints do not explicitly invoke the Declaratory Judgment Act ["DJA"], they each seek a determination of which of the defendants is entitled to the [property at issue], relief that is declaratory in nature."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Karp*, 108 F.3d 17, 20 (2d Cir.1997) ("the ultimate authority to grant declaratory relief in a case rests with the DJA itself, whether or not the claim for declaratory relief is brought solely under the DJA or is added to claims for relief brought under other auspices").

The Second Circuit has further held that "a district court can abstain from the declaratory relief claims included in an interpleader action *as a matter of its discretion*" pursuant to *Wilton* (*Nat'l Union Fire*, 108 F.3d at 20 (emphasis in original)), and "has thrice confirmed that 'the availability of interpleader jurisdiction does not require its exercise, and the district court acts within its discretion to decline adjudicating issues raised in an interpleader action that can be "fairly adjudicated" in state court.'" *Glenclova*, 874 F. Supp. 2d at 306 (citing *Nat'l Union Fire*, 108 F.3d at 21; *Truck–A–Tune, Inc. v. Re*, 23 F.3d 60, 63 (2d Cir. 1994); *Am. Airlines, Inc. v.*

*Block*, 905 F.2d 12, 14 (2d Cir.1990) (per curiam) ("[I]t is well recognized that interpleader is an equitable remedy, and a federal court may abstain from deciding an interpleader action if another action could adequately redress the threat that the stakeholder might be held doubly liable.")).

### 3.    The *Wilton* Factors Weigh in Favor of Abstention

Under *Wilton*, the overarching principle guiding the district court's analysis is "whether the questions in controversy between the parties to the federal suit . . . can better be settled in the proceeding pending in the state court." 515 U.S. at 282. The *Wilton* Court endorsed a non-exclusive list of factors set forth in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942) as guiding factors for when to abstain, and courts in this Circuit have since articulated the following factors based on *Wilton* and *Brillhart*:

> (1) the scope of the pending state proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; and (4) whether such parties are amenable to process in that proceeding; (5) avoiding duplicative proceedings; (6) avoiding forum shopping; (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law.

*TIG Ins. Co. v. Fairchild Corp.*, No. 07 Civ. 8250, 2008 WL 2198087, at *2 (S.D.N.Y. May 27, 2008 (collecting cases).

Each factor weighs in favor of abstention. With respect to the first (1) through fifth (5) *Wilton/Brillhart* factors, this action and the New York Action are virtually identical. The New York Action involves the same parties, issues and claims to the Painting and is therefore entirely duplicative of this proceeding. Further, all necessary parties have agreed to accept service of the New York Complaint (Downs Decl., **Exhibit H**, at 2), and the New York Supreme Court's jurisdiction to decide this dispute and the respective rights of the parties is unquestioned. The New York Action is thus the better and more effective forum to finally resolve this ownership dispute. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Warrantech Corp.*, No. 00 Civ. 5007

(NRB), 2001 WL 194903, at *3 (S.D.N.Y. Feb. 27, 2001) (declining jurisdiction where "all of the issues presented in this suit are either already asserted in the [state court] action or are readily assertable as defenses to the third party claims and/or counterclaims in that suit"); *Glencova, Inc.*, 874 F. Supp. 2d at 307 (noting courts' discretion to dismiss interpleader and declaratory judgment actions where parallel state action has the ability to adjudicate all the parties' respective rights).

Turning to the sixth (6) and seventh (7) factors, the avoidance of forum shopping and relative convenience of the fora, it is undisputable that both this Court and the New York Supreme Court are equally convenient forums. *See Glenclova*, 874 F. Supp. 2d at 307 ("New York [Supreme Court] . . . and the Southern District of New York are equally convenient fora for these New York . . . and [foreign] parties"). Paul Philippe commenced this action only <u>after</u> learning of Romania's ownership claim to the painting. (*See* Compl., ¶ 6.) Christie's, in turn, filed its Interpleader <u>after</u> Romania had sent demand letters to Christie's and Accent, and informed Christie's of its intent to file its action in state court. (Downs Decl., **Exhibits I-K**.) "Courts in the Second Circuit have repeatedly refused to exercise jurisdiction over declaratory actions motivated by a desire to wrest the choice of forum from the real plaintiff." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Int'l Wire Grp., Inc.*, No. 02-cv-10338 (SAS), 2003 WL 21277114, at *6 (S.D.N.Y. June 2, 2003); *see also Skiva International, Inc. v. Minx International Inc.*, No. 15-cv-4580 (KBF), 2015 WL 5853854 (S.D.N.Y. Oct. 7, 2015) (granting motion to dismiss where defendant filed a declaratory judgment action after receiving cease and desist letter from the natural plaintiff); *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters*, AFL-CIO, No. 04-cv-9949 (KMK), 2005 WL 646350, at *16 (S.D.N.Y. Mar. 21, 2005) ("courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum"). The circumstances

of Plaintiff's and Christie's filings suggest this action was brought to deprive Romania from its chosen forum, and, regardless, the New York Supreme Court is an equally convenient forum to hear this dispute.

Relatedly, with respect to the order of filing (the eighth (8) factor), both Romania's Complaint in New York Supreme Court and Christie's Interpleader Complaint were filed on the same day, parties in both cases have only just agreed to accept service, and both cases are in the early, motion to dismiss phase of the litigation. Moreover, what matters in the *Wilton* inquiry is not the "mechanistic accrual of rights that attaches by reason of reaching the courthouse first," but rather "what counts in the relevant inquiry, among other considerations, is which forum is better and more efficiently equipped to serve the interests and convenience of the parties; whether defenses may be adequately addressed in the alternative forum; [and] whether all of the issues and parties in dispute may be joined and the conflict comprehensively adjudicated." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp.2d 394, 443 (S.D.N.Y. 2002), *aff'd*, 346 F. 3d 357 (2d Cir. 2003).

Thus, the order of filing factor is of little significance as neither case has progressed beyond the very early stages of litigation. Moreover, Romania's immunity from this Court's jurisdiction, pursuant to the FSIA, creates a number of challenges to this case moving forward. Conversely, all parties have agreed to accept service of the New York Action, where there are no jurisdictional barriers to the case proceeding. As this Court has noted, "[t]o litigate the immunity issue prematurely, in an independent plenary action—when no decision may ever be required—would undercut rather than promote the 'utilitarian values' underlying the DJA." *Han v. Fin. Supervisor Serv.*, No. 17CV4383GBDBCM, 2017 WL 7689223, at *6 (S.D.N.Y. Oct. 6, 2017), *report and recommendation adopted*, 2018 WL 791353 (S.D.N.Y. Feb. 8, 2018). For this reason alone, this Court should "abstain[] from whatever jurisdiction it has in this case." *Managing Directors' Long*

*Term Incentive Plan ex rel. Comm. v. Boccella*, No. 14 CIV. 7033 PAC, 2015 WL 2130876, at *7 (S.D.N.Y. May 6, 2015).

Finally, the ninth (9) *Wilton/Brillhart* factor—choice of law—again weighs in favor of abstention. "Abstention under *Wilton* is particularly appropriate where the suit only presents issues of state, but not federal, law." *Ace Am. Ins. Co. v. Graf Tech Int'l Ltd.*, No. 12-cv-6355 (RA), 2014 WL 2884681, at *4 (S.D.N.Y. June 24, 2014) (citation omitted); *see also Travelers Indem. Co. v. Philips Elecs. N. Am. Corp.*, No. 02-cv-9800 (WHP), 2004 WL 193564, at *2 (S.D.N.Y. Feb. 3, 2004) ("Tipping heavily in favor of abstention in this case . . . is the fact that state law will govern the outcome of this action."). This is especially true where the claims at issue "necessarily involve questions . . . that have traditionally been considered matters of important state interest." *Hodge ex rel. Skiff v. Hodge*, 78 F.Supp.2d 29, 32–33 (N.D.N.Y. 1999).

This action involves no questions of federal law and there is no federal interest in this ownership dispute over the Painting. Moreover, New York courts have repeatedly emphasized the state's "greater interest in seeking to preserve the integrity of transactions within its borders and preventing the state from becoming a marketplace for stolen goods." *Angiolillo v. Christie's, Inc.*, 64 Misc. 3d 500, 519 (N.Y. Sup. Ct. 2019), *aff'd, appeal dismissed*, 185 A.D.3d 442 (2020); *see also Bakalar v. Vavra*, 619 F.3d 136, 145 (2d Cir. 2010) (noting "the significantly greater interest of New York, as articulated in *Lubell* and *Elicofon*, in preventing the state from becoming a marketplace for stolen goods"); *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 320 (1991) ("our decision today is in part influenced by our recognition that New York enjoys a worldwide reputation as a preeminent cultural center"). Because this is a matter of purely state— and Romanian—interest that has no special call on the federal forum, the ninth *Wilton/Brillhart* factor strongly supports a decision to decline jurisdiction here.

### 4. Alternatively, the Court Should Stay This Case in Favor of the New York Action

Even if the Court should find that the abstention doctrines do not oblige the Court to decline jurisdiction over this case, the Court should exercise its own inherent powers to stay this proceeding in favor of the New York Action. All the relevant factors favor a discretionary stay, and there is ample precedent for such a stay even assuming abstention is inapplicable. *See*, *e.g.*, *Wells Fargo Bank, Nat'l Ass'n v. Patel*, No. 24 CIV. 1162 (KPF), 2025 WL 844161 (S.D.N.Y. Mar. 18, 2025) (declining to abstain from hearing case after finding cases were not "parallel," but nonetheless staying case pursuant to the court's inherent power to control its docket); *Thompson v. Daxor Corp.*, No. 23 CIV. 8272 (KPF), 2024 WL 1484192, at *5 (S.D.N.Y. Apr. 5, 2024) (holding "while the 'identity of parties and issues in both actions' is not sufficient for the purposes of invoking [abstention], it is sufficient to counsel in favor of a stay of this action"); *Glenclova*, 874 F. Supp. 2d at 313 (S.D.N.Y. 2012) (same).

District courts have broad discretionary powers to stay proceedings pursuant to their inherent authority to manage dockets. *See United States v. Kordel*, 397 U.S. 1, 12 n. 27 (1970); *Louis Vuitton Malletier S.A. v. LY USA, Inc*., 676 F.3d 83, 96 (2d Cir. 2012) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). Such stays are often granted "to allow resolution of a similar cause of action pending in state court." *De Carvalhosa v. Lindgren*, 546 F. Supp. 228, 230 (S.D.N.Y. 1982) (*quoting Clarkson Co. v. Shaheen*, 544 F.2d 624, 629 (2d Cir. 1976)); *see also Giulini v. Blessing*, 654 F.2d 189, 193-94 (2d Cir. 1981) ("[A] federal court is not precluded, in the exercise of its discretion, from staying proceedings in the action before it pending a decision by the state court, with a view to avoiding wasteful duplication of judicial resources and having the benefit of the state court's views").

The relevant factors favor staying this case for the reasons outlined above. *See Lindgren*, 546 F. Supp. at 230 (identifying the seven *Lindgren* factors to consider). In fact, staying this case in favor of the New York Action—where there are no jurisdictional barriers to the case proceeding—will only expedite adjudication of the parties' respective claims. *See Glenclova*, 874 F. Supp. 2d at 314 (staying case and "strongly suggest[ing] that the parties agree to litigate their claims in the [state court]" due to the difficulty of obtaining personal jurisdiction over certain defendants).

For all the foregoing reasons, Romania respectfully submits that this Court should abstain from hearing or, alternatively, stay this case in favor of the New York Action as it deems appropriate.

## V.    CONCLUSION

For the reasons set forth above, Defendant respectfully moves the Court to dismiss this action.

Dated: May 30, 2025                    NIXON PEABODY LLP


                                       By:   */s/ Thaddeus J. Stauber*
                                             Thaddeus J. Stauber

                                             Thaddeus J. Stauber
                                             Paul F. Downs
                                             Zachary C. Osinski, *pro hac vice forthcoming*
                                             Tower 46
                                             55 West 46th Street
                                             New York, New York 10036
                                             (212) 940-3000
                                             tstauber@nixonpeabody.com
                                             pdowns@nixonpeabody.com
                                             zosinski@nixonpeabody.com

                                             Aaron M. Brian, *pro hac vice forthcoming*
                                             300 South Grand Avenue, Suite 4100
                                             Los Angeles, CA 90071-3151
                                             Tel: (213) 629-6000
                                             abrian@nixonpeabody.com

                                       LEXTERS LAW FIRM - STANESCU, VASILE
                                       SCA


                                       By:   */s/ Alexandru Stanescu*
                                             Alexandru Stanescu
                                             17 Helesteului Street,
                                             Bucharest, Romania, CP 011986

                                             ***Counsel for Interpleader and Third-Party
                                             Defendant State of Romania***

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this Memorandum of Law in Support of Romania's Motion to Dismiss (the "Motion") complies with the word limit of 8,750 words set forth in this Court's Local Rule 7.1.  According to the word-processing system used to prepare the Motion, the total word count for all text in the Motion, including footnotes and endnotes, but excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 8,734 words.

<i>/s/ Thaddeus J. Stauber</i>
Thaddeus J. Stauber