UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PAUL PHILIPPE OF ROMANIA, on behalf of the
ESTATE OF KING CAROL II OF ROMANIA,

        Plaintiff,

    -against-

  CHRISTIE'S, INC.,

        Defendant.

Case No. 25-cv-1151 (LLS)

**ORAL ARGUMENT REQUESTED**

---

CHRISTIE'S, INC.,

        Counterclaim and Third-
        Party Plaintiff,

    -against-

PAUL PHILIPPE OF ROMANIA, on behalf of the
ESTATE OF KING CAROL II OF ROMANIA,

        Counterclaim Defendant,

ACCENT DELIGHT INTERNATIONAL LTD.
and STATE OF ROMANIA,

        Third-Party Defendants.

---

ACCENT DELIGHT INTERNATIONAL LTD.,

        Interpleader Defendant and
        Cross-Claim Plaintiff,

    -against-

PAUL PHILIPPE OF ROMANIA, on behalf of the
ESTATE OF KING CAROL II OF ROMANIA,
and STATE OF ROMANIA,

        Interpleader Defendants and
        Cross-Claim Defendants.

---

## THIRD-PARTY DEFENDANT ACCENT DELIGHT'S OPPOSITION TO ROMANIA'S MOTION TO DISMISS OR STAY

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

Attorneys for Accent Delight International Ltd.

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................... ii-v

PENTIMENTO ................................................................................................... 1

WHY ROMANIA'S MOTION SHOULD BE DENIED ....................................... 1

HOW WE GOT HERE: ROMANIA'S FOURTH BITE AT THE APPLE ................. 2

ARGUMENT ...................................................................................................... 4

I.      THE COURT HAS DIVERSITY JURISDICTION BECAUSE
        INTERPLEADER CHRISTIE'S IS DIVERSE TO EVERY CLAIMANT .......... 4

II.     THE FOREIGN SOVEREIGN IMMUNITIES ACT IS NO BAR TO SUIT
        BECAUSE ROMANIA HAS WAIVED IMMUNITY AND ITS CLAIM
        TO THE PAINTING IS BASED ON RIGHTS ACQUIRED BY
        SUCCESSION ...................................................................................... 7

        A.      Romania Has Waived Immunity ................................................ 8

        B.      Romania's Claim to the Painting Is Based on Rights Acquired
                by Succession ........................................................................ 10

III.    NEITHER ABSTENTION NOR A STAY IS WARRANTED ......................... 13

        A.      To Prevent Romania's Forum Shopping and Allow the First-Filed
                Case to Proceed, the Court Should Not Abstain from Exercising
                Jurisdiction ........................................................................... 15

        B.      The Proceedings Here Need Not Be Duplicative; The State Court
                Case Can Be Stayed, or Both Cases Can Proceed ..................... 18

CONCLUSION ................................................................................................... 19

TABLE OF AUTHORITIES

**Cases**

*Amusement Indus., Inc. v. Stern*,
    786 F. Supp. 2d 741 (S.D.N.Y. 2011) ................................................................. 7

*Angiolillo v. Christie's, Inc.*,
    64 Misc. 3d 500 (Sup. Ct. N.Y. Cnty. 2019) ..................................................... 18

*Ansary v. Cent. Bank of Curacao & Sint Maarten*,
    735 F. Supp. 3d 37 (D.D.C. 2024) ....................................................................... 9

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) .............................................................................................. 7

*Asociacion De Reclamantes v. United Mexican States*,
    561 F. Supp. 1190 (D.D.C. 1983) ....................................................................... 11

*Bakalar v. Vavra*,
    619 F.3d 136 (2d Cir. 2010) ............................................................................... 18

*Blaxland v. Commonwealth Dir. of Pub. Prosecutions*,
    323 F.3d 1198 (9th Cir. 2003) .............................................................................. 9

*Briarpatch Ltd. v. Phx. Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) ................................................................................. 7

*Cabiri v. Gov't of Republic of Ghana*,
    165 F.3d 193 (2d Cir. 1999) ............................................................................. 8, 9

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
    727 F.2d 274 (2d Cir. 1984) ................................................................................. 9

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016) ................................................................................... 4

*City of New York v. Permanent Mission of India to the United Nations*,
    446 F.3d 365 (2d Cir. 2006) ............................................................................... 12

*Colorado River Water Conservation District v. United States*,
    424 U.S. 800 (1976) ..................................................................................... 14, 17

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
    477 F. Supp. 615 (S.D.N.Y. 1979) ....................................................................... 6

*Correspondent Servs. Corp. v. First Equities Corp. of Fla.*,
    338 F.3d 119 (2d Cir. 2003) ................................................................................. 6

*De Csepel v. Republic of Hungary,*
    808 F. Supp. 2d 113 (D.D.C. 2011) ....................................................... 11

*Dow Jones & Co. v. Harrods, Ltd.,*
    237 F. Supp. 2d 394 (S.D.N.Y. 2002) .................................................... 15

*Drywall Tapers & Pointers of Greater N.Y. Loc. Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc.,*
    343 F.R.D. 358 (S.D.N.Y. 2022) ........................................................... 16

*FDIC v. Four Star Holding Co.,*
    178 F.3d 97 (2d Cir. 1999) ....................................................................... 8

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.,*
    862 F. Supp. 2d 170 (E.D.N.Y. 2012) ................................................... 14

*Franceskin v. Credit Suisse,*
    214 F.3d 253 (2d Cir. 2000) ............................................................... 4, 5

*Glenclova Inv. Co. v. Trans-Res., Inc.,*
    874 F. Supp. 2d 292 (S.D.N.Y. 2012) ...................................... 14, 15, 17

*Gotham Asset Locators Inc. v. State of Israel,*
    27 F. Supp. 3d 409 (S.D.N.Y. 2014) ..................................................... 12

*Great Am. Ins. Co. v. Houston Gen. Ins. Co.,*
    735 F. Supp. 581 (S.D.N.Y. 1990) ........................................................ 16

*Han v. Financial Supervisory Service,*
    No. 17 Civ. 4383,
    2017 WL 7689223 (S.D.N.Y. Oct. 6, 2017) .......................................... 17

*In re Republic of Philippines,*
    309 F.3d 1143 (9th Cir. 2002) ......................................................... 10, 13

*Lord Day & Lord v. Socialist Republic of Vietnam,*
    134 F. Supp. 2d 549 (S.D.N.Y. 2001) ..................................................... 9

*Managing Directors' Long Term Incentne Plan ex rel. Comm. v. Boccella,*
    No. 14 Civ. 7033,
    2015 WL 2130876 (S.D.N.Y. May 6, 2015) ..................................... 14, 17, 18

*Marrero v. U.S. Bank Nat'l Ass'n as Tr. for Citigroup Mortg. Loan Tr. Inc., Asset-Backed Passthrough Certificates, Series 2006-HE3,*
    No. 21 Civ. 11182,
    2022 WL 4072936 (S.D.N.Y. Sept. 2, 2022) ......................................... 14

*N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*,
No. 04 Civ. 9949,
2005 WL 646350 (S.D.N.Y. Mar. 21, 2005) .................................................. 17

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Coric*,
924 F. Supp. 373 (N.D.N.Y. 1996) ................................................................ 15

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Grp., Inc.*,
No. 02 Civ. 10338,
2003 WL 21277114 (S.D.N.Y. June 2, 2003) ............................................... 17

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp*,
108 F.3d 17 (2d Cir. 1997).............................................................................. 15

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*,
94 F.3d 747 (2d Cir. 1996)................................................................................ 6

*Perlman v. Fid. Brokerage Servs. LLC*,
932 F. Supp. 2d 397 (E.D.N.Y. 2013) ........................................................... 15

*Republic of China v. Am. Express Co.*,
195 F.2d 230 (2d Cir. 1952).............................................................................. 5

*Shields v. Murdoch*,
891 F. Supp. 2d 567 (S.D.N.Y. 2012).............................................................. 14

*Skiva Int'l, Inc. v. Minx Int'l Inc.*,
No. 15 Civ. 4580,
2015 WL 5853854 (S.D.N.Y. Oct. 7, 2015).................................................... 17

*Socialist Republic of Romania v. Wildenstein*,
147 F.R.D. 62 (S.D.N.Y. 1993) .......................................................... 3, 13, 16

*Spivak v. United States*,
254 F. Supp. 517 (S.D.N.Y. 1966) .................................................................... 6

*State of Romania v. Former King Michael*,
212 A.D.2d 422 (1st Dep't 1995). ..................................................................... 3

*Sun Life & Health Ins. Co. (U.S.) v. Colavito*,
14 F. Supp. 3d 176 (S.D.N.Y. 2014)................................................................. 7

*U.S. Bank Nat'l Ass'n as Tr. Bank of Am., N.A. v. E. Fordham DE LLC*,
804 F. App'x 106 (2d Cir. 2020) .................................................................... 14

*Wei Su v. Sotheby's, Inc.*,
No. 17 Civ. 4577,
2019 WL 4917609 (S.D.N.Y. Oct. 4, 2019)................................................. 5, 6

iv

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ............................................................... 13, 14, 18

**Statutes**

28 U.S.C. § 1330 .......................................................................... 7

28 U.S.C. § 1367 ........................................................................ 6, 7

28 U.S.C. § 1604 .......................................................................... 7

28 U.S.C. § 1605 ............................................................... 7, 8, 10, 12

28 U.S.C. § 1607 .......................................................................... 8

**Rules**

Federal Rule of Civil Procedure 22 ........................................... 5

Federal Rule of Civil Procedure 37 ........................................ 3, 16

Federal Rule of Civil Procedure 60 ........................................ 3, 16

**Other Authorities**

7 Fed. Prac. & Proc. Civ. § 1710 (3d ed.) ................................. 5

H.R. Rep. 94-1487 (1976), 1976 U.S.C.C.A.N. 6604 ................... 10

*Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims &
    Governmental Relations of the Committee on the Judiciary*,
    93d Cong. 21 (1973). ........................................................... 12

## PENTIMENTO

Romania's motion resembles what the art world calls pentimento, which is the reemergence in a painting of an image that has been painted over. "This is called pentimento because the artist changed his mind." Lillian Hellman, *Pentimento* (1973). Like a visible trace of earlier painting beneath layers of paint on canvas, the answer to Romania's motion lies beneath layers of its confusing argument and history.

Earlier this year, Paul Philippe ("Philippe") and the State of Romania ("Romania") improperly prevented Accent Delight International Ltd. ("Accent") from selling at a Christie's auction *Saint Sébastian*, a painting by Spanish Renaissance "Old Master" artist Doménikos Theotokópoulos, widely known as El Greco ("the Painting"). Ownership of the Painting, which Accent acquired in 2010, traces back to King Michael I of Romania, who took the Painting and others with him in 1947, when the Romanian Communist government forced him to abdicate the throne.

What Romania fails to mention in its motion, and what reemerges now is that, over the last 80 years, Romania has repeatedly asserted—and lost—claims to take back King Michael I's works, including an unsuccessful action in this Court about the Painting at issue here. Christie's has properly brought an interpleader action to resolve Philippe's, Romania's, and Accent's (collectively, the "Claimants") respective rights to the Painting. Given its past litigation conduct, Romania naturally seeks to avoid this Court's jurisdiction and moves to dismiss or stay this action in favor of one that *Romania* later filed in state court.

## WHY ROMANIA'S MOTION SHOULD BE DENIED

Romania's motion should be denied for three reasons.

First, the Court has diversity jurisdiction because there is complete diversity between Christie's and the three Claimants. Romania's attempt to shuffle the parties into a non-diverse

1

configuration defies both longstanding case law on interpleader actions and the facts. *Infra* at 4-7.

Second, the Foreign Sovereign Immunities Act ("FSIA") does not preclude jurisdiction. Romania has waived immunity, and its succession-based claim to the Painting is an exception under FSIA. Because the Court has jurisdiction, Romania's indispensable party arguments are moot. *Infra* at 7-13.

Third, this case should proceed, as a stay would reward Romania for decades of repeated forum-shopping. Dismissal or stay is neither warranted nor proper. *Infra* at 13-19.

Rather than bless Romania's transparent attempt to forum-shop, the Court should determine it has subject matter jurisdiction and adjudicate the Claimants' respective rights to the Painting.

**HOW WE GOT HERE: ROMANIA'S FOURTH BITE AT THE APPLE**

In September 2024, Accent—a bona fide purchaser of the Painting that acquired it from a professional art dealer in 2010—agreed with Christie's to offer the Painting for public auction at Christie's Old Masters sale in New York on February 5, 2025. ECF No. 39 (Accent Answer) ¶¶ 30-31. Seven days before the auction, Romania asserted that it owns the Painting, falsely claiming that the Painting is stolen property taken unlawfully from Romania in 1947 by King Michael and preventing Accent from benefiting from its ownership rights. *Id.* ¶ 32.

The Painting was part of a collection of paintings by Old Masters that the Romanian royal family had acquired by the end of the nineteenth century. *Id.* ¶ 6. Though Romania and Philippe both claim that, under their respective interpretations of Romanian law, the Painting was left to them in the early 1900s, *see* ECF No. 45-1 (Romania Mot.) at 13-14; ECF No. 1 (Philippe Compl.) ¶¶ 15, 17, by the fall of 1947, the Romanian Communist government had permitted King Michael, the head of the royal family, to have and take the Painting (and other

paintings and valuables) with him as incentive for abdicating the throne and leaving Romania. Accent Answer ¶¶ 9-13. In the following decades, King Michael sold paintings he had taken with him, including the Painting. *Id.* ¶ 13.

Romania became aware of such sales as early as 1982, and has, over and over again, tried and failed to make out a claim for King Michael's paintings. *See id.* ¶¶ 14, 17-24.

In 1984, Romania sued the Kimbell Art Foundation, the buyer of one of the King's paintings, in Fort Worth, Texas, and tried to get possession of that painting. *Socialist Republic of Romania v. Kimbell Art Foundation*, No. 84 Civ. 176K (N.D. Tex.). The court dismissed that case "with prejudice" for Romania's failure to prosecute. Accent Answer ¶ 17; *see* Ex. A to June 27, 2025 Declaration of Daniel J. Kornstein ("Kornstein Decl.").

In 1985, in this Court, Romania sued Wildenstein & Co., the purchaser of a number of the King's paintings—*including the Painting at issue here*—again attempting to obtain possession. *Socialist Republic of Romania v. Wildenstein*, No. 85 Civ. 2435 (S.D.N.Y.). That action was also dismissed "with prejudice" in 1986 under Federal Rule of Civil Procedure 37(b)(2)(C), Accent Answer ¶ 19, and Romania's 1993 motion under Rule 60(b)(6) to reopen the case and vacate the dismissal was also denied. *Socialist Republic of Romania v. Wildenstein*, 147 F.R.D. 62, 64, 66 (S.D.N.Y. 1993); *see* Kornstein Decl. Ex. B.

Also in 1993, Romania tried a third time and sued King Michael himself in New York State court, again seeking possession of the King's paintings. *State of Romania v. Former King Michael*, Index No. 14664/1993 (Sup. Ct. N.Y. Cnty.). This case too was dismissed in 1994, N.Y.L.J., Jun. 24, 1994, at 1, and that dismissal affirmed in 1995, 212 A.D.2d 422 (1st Dep't 1995). *See* Kornstein Decl. Ex. C.

Romania again asserted a claim to the Painting earlier this year. Accent Answer ¶ 32. As a result, Christie's withdrew the Painting from the auction, and shortly afterward, Philippe sued Christie's in this Court for replevin, demanding title to and return of the Painting. *Id.* ¶¶ 33-34. Christie's answered Philippe's complaint by claiming interpleader to resolve the Claimants' respective rights to the Painting.

## ARGUMENT

No factual—or, for that matter, legal—problem prevents the Court from asserting diversity jurisdiction over this interpleader action. Where a motion to dismiss for lack of subject matter jurisdiction "proffer[s] evidence beyond the pleading," as Romania's does, Accent is "entitled to rely on the allegations in the Pleading" to demonstrate the existence of federal jurisdiction because Romania's proffered evidence is "immaterial" and "does not contradict plausible allegations that are themselves sufficient to show [jurisdiction]." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). The Court has diversity jurisdiction; the Foreign Sovereign Immunities Act is no bar to suit; and the *Wilton* factors do not support a stay.

## I.    THE COURT HAS DIVERSITY JURISDICTION BECAUSE INTERPLEADER CHRISTIE'S IS DIVERSE TO EVERY CLAIMANT

The fact that disposes of Romania's diversity objection is that the party initiating the interpleader (Christie's, the stakeholder) is diverse as to every claimant. "[A] federal court has diversity jurisdiction over an interpleader action brought pursuant to the Rule so long as the stakeholder . . . is diverse from every claimant." *Franceskin v. Credit Suisse*, 214 F.3d 253, 259 (2d Cir. 2000). Just as in *Wei Su v. Sotheby's, Inc.*, "[Christie's] has New York citizenship and is diverse from [Philippe, Accent, and Romania], who are foreign nationals. Notwithstanding [Christie's] discharge from liability as a disinterested stakeholder, jurisdiction persists because diversity is determined at the time the interpleader action was commenced." No. 17 Civ. 4577,

4

2019 WL 4917609, at *2 n.1 (S.D.N.Y. Oct. 4, 2019). *Cf. Franceskin*, 214 F.3d at 259 (finding

no diversity jurisdiction where *foreign* stakeholder brought interpleader against *foreign*

claimants).

 Christie's status as a disinterested stakeholder does not render it a "nominal" party for

purposes of jurisdiction, as Romania claims. Romania Mot. at 18. To the contrary, while

Christie's may not have an ownership interest in the Painting, it has an interest in seeing the

Claimants' competing claims to the Painting resolved, and Christie's filing an interpleader action

against Claimants from whom it is fully diverse confers diversity jurisdiction. *See Republic of*

*China v. Am. Express Co.*, 195 F.2d 230, 234 (2d Cir. 1952) ("The appellants' argument to the

contrary [that interpleader destroyed jurisdiction] is based upon the theory that the order, by

discharging the appellee from liability, left no one but aliens as parties to the suit who will then

be in litigation with each other in an action separate and distinct from the initial one. We cannot

agree."); 7 Fed. Prac. & Proc. Civ. § 1710 (3d ed.) ("In upholding jurisdiction under Rule 22(a) .

. . when the claimants are all of the same citizenship but of diverse citizenship from the

stakeholder, the lower federal courts have recognized that even a disinterested stakeholder has a

very real interest in the first stage of an interpleader action.").

 Romania's misguided attack on Philippe's basis for subject matter jurisdiction in suing

Christie's but not Romania, Romania Mot. at 17-18, has no bearing on the subject matter

jurisdiction over Christie's interpleader action. This is so because, whether or not some problem

exists with subject matter jurisdiction over Philippe's original claim against Christie's, a

counterclaim with "a separate basis of federal jurisdiction . . . may be allowed to proceed without

regard to the fate of the main claim," and "a third party action that is supported by an

independent basis of subject matter jurisdiction may be adjudicated even after the dismissal of

the main action for lack of jurisdiction." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 477 F. Supp. 615, 621 (S.D.N.Y. 1979); *see also Spivak v. United States*, 254 F. Supp. 517, 523 (S.D.N.Y. 1966) (holding same as to counterclaim), *aff'd*, 370 F.2d 612 (2d Cir. 1967); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 753 (2d Cir. 1996) ("Where a court dismisses an action for lack of federal subject matter jurisdiction, it may nonetheless adjudicate a counterclaim presenting an independent basis for federal jurisdiction.").

Regardless of any possible jurisdictional defects in Philippe's case against Christie's, Christie's interpleader action against Philippe, Romania, and Accent is well grounded in diversity jurisdiction because there was complete diversity between Christie's and the Claimants when the action was filed, whether the action is defined as Philippe's replevin claim against Christie's or Christie's interpleader claim against the Claimants. *See Wei Su*, 2019 WL 4917609, at *2 n.1; *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 338 F.3d 119, 125 (2d Cir. 2003) ("The assertion of diversity jurisdiction relates back to the commencement of the action when the underlying facts, if properly pled, would have supported jurisdiction at the time the action commenced.").

Accent's cross-claims against Philippe and Romania also have a valid jurisdictional basis. Romania's stray comment that Accent "made no allegation that the Court had subject matter jurisdiction," Romania Mot. at 5, is irrelevant. This is so because 28 U.S.C. § 1367(a) provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over *all other claims* that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." (emphasis added). Accent's cross-claims are about

determining who is the owner of the Painting, which is precisely the same issue as the underlying interpleader action.

A counterclaim or cross-claim "forms part of the same controversy [for purposes of § 1367] if it and the federal claim derive from a common nucleus of operative fact." *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (internal quotations omitted) (noting that "[t]his is so even if the . . . claim is asserted against a party different from the one named in the federal claim"). Courts in this district have exercised supplemental jurisdiction over cross-claims like Accent's, which "relate[s] directly to" and "arise[s] from the same basic facts" as the claims in the main complaint. *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 741, 755 (S.D.N.Y. 2011). As a result, no independent jurisdictional basis is necessary for Accent's cross-claims. *See id.*; *see also Sun Life & Health Ins. Co. (U.S.) v. Colavito*, 14 F. Supp. 3d 176, 182-83 (S.D.N.Y. 2014) (exercising supplemental jurisdiction over interpleader counterclaim that "requires the Court to resolve the very issue presented in the Interpleader Complaint" and refusing to exercise jurisdiction over cross-claim that did not "share a common nucleus of operative fact with the original claim").

## II.    THE FOREIGN SOVEREIGN IMMUNITIES ACT IS NO BAR TO SUIT BECAUSE ROMANIA HAS WAIVED IMMUNITY AND ITS CLAIM TO THE PAINTING IS BASED ON RIGHTS ACQUIRED BY SUCCESSION

The FSIA, the sole basis for jurisdiction over a foreign state in federal court, poses no obstacle to this Court's subject-matter jurisdiction. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); 28 U.S.C. § 1330(a). Although 28 U.S.C. § 1604 allows that foreign states are generally "immune from the jurisdiction of the courts of the United States and of the states," the next statutory provision, § 1605, sets out exceptions to that immunity. Two apply here—waiver and the "successor" exception—and the Court can consider

both. *See FDIC v. Four Star Holding Co.*, 178 F.3d 97, 100 n.2 (2d Cir. 1999) ("[T]he Court

may examine subject matter jurisdiction, *sua sponte*, at any stage of the proceeding.").

     **A.     Romania Has Waived Immunity**

     Romania has waived its immunity by starting litigation in New York state court about the

same events and transactions at issue before this Court, *see* ECF No. 35 (Letter from Counsel for

Romania) at 3. Under 28 U.S.C. § 1605(a)(1), a foreign state shall not be immune in any case in

which it has waived its immunity "either explicitly or by implication." The filing of a later,

duplicate case in the same state in which this case is pending satisfies this test.

     *Cabiri v. Government of Republic of Ghana*, 165 F.3d 193 (2d Cir. 1999), is instructive

on the legal and logical framework for this exception. In *Cabiri*, a Ghana trade representative to

the United States was summoned back to Ghana, where he was detained and tortured;

meanwhile, his wife and family lived in New York in a house owned by Ghana that the

representative had been given to use during his employment. *Id.* at 195-96. When Ghana brought

a New York state court eviction proceeding against the family as part of its efforts for

repatriation, the plaintiff and family counterclaimed for breach of contract and various torts. *Id.*

at 196.

     The *Cabiri* court found that Ghana had not impliedly waived its immunity against the

plaintiffs' claims by bringing a state court eviction proceeding in part because "the eviction

action lacks a direct connection to the Cabiris' claims in this lawsuit," *id.* at 202, and "none of

[the federal case] claims [arose] out of the same transaction or occurrence as the eviction

proceeding. To allow plaintiffs to establish waiver based on a connection between Ghana's

eviction proceeding and causes of action that do not come within the counterclaim exception [to

FSIA, at 28 U.S.C. § 1607] would in effect broaden the application of the counterclaim

exception beyond the parameters intended by Congress," *id.* at 203. As a matter of logic, the inverse of this holding is also true.

*Cabiri* thus stands for the proposition that "a foreign state may implicitly waive sovereign immunity by initiating a related proceeding in a U.S. court if the related proceeding contains a 'direct connection' to the claims in the instant action." *Ansary v. Cent. Bank of Curacao & Sint Maarten*, 735 F. Supp. 3d 37, 45 (D.D.C. 2024) (quoting *Cabiri*, 165 F.3d at 202). *Cabiri* found no waiver where the proceeding initiated by the foreign state did not arise out of the same transaction or occurrence as the case at bar. 165 F.3d at 202-03. Later courts have cited *Cabiri* in concluding that waiver is appropriate "to consider factually and legally related causes of action"—the precise circumstances present here. *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 558 (S.D.N.Y. 2001); *see Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003) ("To support a finding of implied waiver . . . there must exist a direct connection between the sovereign's activities in our courts and the plaintiff's claims for relief." (citation omitted)). District courts have discretion in determining whether the conduct of a party constitutes an implicit waiver of foreign sovereign immunity "in light of the circumstances of a particular case." *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984).

Waiver happened here. Romania—unlike Ghana in *Cabiri*—is currently raising in state court the same claims that Christie's raises in this interpleader action, with a clear and close connection between the two suits. This direct overlap creates waiver of Romania's immunity from suit. Romania itself relies on the two actions' similarity, describing the state court proceeding as "parallel" and involving the same parties, subject matter, and relief requested. Romania Mot. at 19. This alone meets the standard for waiver.

The current New York action is not the only one on which a conclusion of waiver can be based. Romania has brought several suits in U.S. courts asserting claims to King Michael's paintings (all of them dismissed), including an action that tried to get possession of the same Painting at issue here. *See Socialist Republic of Romania v. Wildenstein*, No. 85 Civ. 2435 (S.D.N.Y.) (suit seeking title to the Painting and other property); *see also Socialist Republic of Romania v. Kimbell Art Foundation*, No. 84 Civ. 176K (N.D. Tex.) (suit seeking title to other of King Michael's paintings); *State of Romania v. Former King Michael*, Index No. 14664/1993 (Sup. Ct. N.Y. Cnty.) (same). *See* Kornstein Decl. Exs. A-C. Like the curious incident of the dog that failed to bark in the Sherlock Holmes story *Silver Blaze*, Romania's motion curiously fails to mention any of these cases. The omitted cases demonstrate a clear pattern of conduct by Romania both factually and legally related to the interpleader action here—a pattern that Romania has extended by bringing its current state court action that it claims would "dispose of all claims presented in this case." Romania Mot. at 20. Through its prior and current activities, Romania has waived its immunity from suit under 28 U.S.C. § 1605(a)(1).

### B.    Romania's Claim to the Painting Is Based on Rights Acquired by Succession

Romania also loses FSIA immunity under 28 U.S.C. § 1605(a)(4), the "successor" exception, which provides that a foreign state is not immune from court jurisdiction when "rights in property in the United States acquired by succession or gift . . . are in issue." This exception applies when, as here, the foreign state claims to have rights in property through a gift or succession. *See* H.R. Rep. 94-1487, at 20 (1976), 1976 U.S.C.C.A.N. 6604, 6619 ("There is general agreement that a foreign state may not claim immunity when the suit against it relates to rights in property . . . inherited by the foreign state and situated or administered in the country where the suit is brought."); *In re Republic of Philippines*, 309 F.3d 1143, 1150-51 (9th Cir. 2002) (concluding same); *Asociacion De Reclamantes v. United Mexican States*, 561 F. Supp.

1190, 1197 (D.D.C. 1983) ("Congress included the succession clause . . . to ensure that real, personal and intangible property rights were justiciable where a foreign sovereign steps into the shoes of a private litigant by obtaining rights in property through a gift or inheritance."), *aff'd*, 735 F.2d 1517 (D.C. Cir. 1984).

Both Romania and Philippe argue that they are entitled to the Painting based on King Carol I's will. Romania claims in its state court complaint and motion to dismiss that King Carol I bequeathed the Painting to the Crown of Romania, an "autonomous legal entity[] owned by the State." NYSCEF Doc. 2 (Romania Compl.) ¶¶ 67-68, *State of Romania v. Saint Sebastian*, Index No. 651068/2025 (Sup. Ct. N.Y. Cnty. Feb. 26, 2025). According to Romania, the "Romanian State" therefore inherited the Painting. *Id.*; *see* Romania Mot. at 14. Meanwhile, Philippe claims that, because Romanian kings interpret the "Romanian Crown" "to mean their personal property," King Carol I bequeathed the Painting to Ferdinand I, the succeeding monarch, who in turn left the Painting to King Carol II, Philippe's grandfather (to whose estate Philippe claims entitlement). Philippe Compl. ¶¶ 15, 17. Setting aside the meaning of the phrase "the Crown of Romania," which may be relevant to this Court's future merits determination, both Romania and Philippe's claims to the Painting are based on the same will. In other words, Romania—a foreign state—claims entitlement to the Painting through succession, precisely the circumstance contemplated as an explicit exception from FSIA immunity. *See De Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 127-28 (D.D.C. 2011) (when jurisdiction depends on plaintiff having asserted particular *type* of claim, rather than on *factual propositions* independent of merits, there typically is jurisdiction unless claim is frivolous or immaterial), *aff'd in part, rev'd in part on other grounds*, 714 F.3d 591 (D.C. Cir. 2013).

Romania both overreads and misreads its cited sources in its misguided attempt to distance this case from the obviously applicable "successor" exception. *First*, it is no surprise that there is little authority applying the exception where a foreign state claims entitlement to property moved to a country different from the country the state asserts the property was inherited. The "successor" exception is not frequently invoked, and when it is, courts are typically tasked with deciding rights to immoveable property, which definitionally cannot be transported. *See, e.g.*, *City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369 (2d Cir. 2006) (analyzing "successor" exception as to immoveable property), *aff'd and remanded*, 551 U.S. 193 (2007); *Gotham Asset Locators Inc. v. State of Israel*, 27 F. Supp. 3d 409, 412-14 (S.D.N.Y. 2014) (same). The unique circumstances here are not, by themselves, a bar to the successor exception.

*Second*, it is not true that the "successor" exception only applies to estate proceedings. The plain text of the statute defeats such a reading: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in *any case* in which rights in property in the United States acquired by succession or gift . . . are in issue." 28 U.S.C. § 1605(a)(4) (emphasis added). Nor does the 1973 House hearing on FSIA limit the exception. There, the Department of State adviser describing the "successor" exception articulated it as bearing on "estate and real estate matters," a generalized term encompassing all manner of cases that touch on inherited and real property. *Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims & Governmental Relations of the Committee on the Judiciary*, 93d Cong. 21 (1973) (statement of Charles N. Brower, Acting Legal Adviser, Department of

State).[1] Romania's own papers show on their face that its claim is brought "as a successor to a private party" in this non-estate proceeding. *In re Republic of Philippines*, 309 F.3d at 1150. "There is general agreement that a foreign state may not claim immunity when the suit against it relates to rights in property, real or personal, obtained by gift or inherited by the foreign state and situated or administered in the country where the suit is brought." H.R. Rep. 94-1487, at 20. The "successor" exception applies, and Romania is not immune from this Court's jurisdiction on that basis as well.[2]

## III.    NEITHER ABSTENTION NOR A STAY IS WARRANTED

This case—which was filed first, is procedurally ahead of the concurrent state court action, and would resolve all the issues raised in that action—should not be stayed. Nevertheless, perhaps dissatisfied with litigating in this Court because its previous attempt to obtain title to the Painting was dismissed with prejudice, *see Wildenstein*, 147 F.R.D. at 64, 66, Romania tries its hand at forum-shopping, arguing that this proceeding should be stayed so that the New York state court action—which Romania filed *after* Christie's filed this action—can proceed instead.

The *Wilton* abstention doctrine guides a district court's determination whether "to stay a declaratory judgment action in favor of parallel state litigation." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 281 (1995). In determining whether to do so, district courts consider "whether the questions in controversy between the parties to the federal suit . . . can better be settled in the proceeding pending in the state court." *Id.* at 282. *Wilton* abstention "has no parallelism requirement. *Wilton* speaks only of suits pending in state court 'involving the same parties and

---

[1] Available at https://www.govinfo.gov/content/pkg/CHRG-93hhrg98116O/pdf/CHRG-93hhrg98116O.pdf.

[2] Because this Court has jurisdiction over Romania and Romania is not immune from suit, dismissal of this action is unwarranted, and Romania's indispensable party arguments for dismissal on that basis are moot.

presenting opportunity for ventilation of the same *state law* issues.'"[3] *Managing Directors' Long Term Incentne Plan ex rel. Comm. v. Boccella*, No. 14 Civ. 7033, 2015 WL 2130876, at *5 (S.D.N.Y. May 6, 2015) (quoting *Wilton*, 515 U.S. at 283) (emphasis added). Specifically, courts consider this "non-exclusive" list of factors:

> (1) the scope of the pending state proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; and (4) whether such parties are amenable to process in that proceeding; (5) avoiding duplicative proceedings; (6) avoiding forum shopping; (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law.

*Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 307 (S.D.N.Y. 2012). The factors may be applied to interpleader actions, which seek "relief that is declaratory in nature." *Id.* at 306.

    The *Wilton* factors militate against abstention. The state court action is largely identical to this one, and the common issues of Romanian law—not New York law—may be addressed in either forum, putting the first, second, third, fourth, seventh, and ninth *Wilton* factors in equipoise, favoring neither forum as against the other. But consideration of the fifth (avoiding

---

[3] All but one of the cases Romania cites to support its conclusion that the state action is concurrent and parallel with this one were decided under a different abstention doctrine that does not specifically apply to declaratory judgment actions. This is the *Colorado River* framework, as articulated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817-18 (1976). *See U.S. Bank Nat'l Ass'n as Tr. Bank of Am., N.A. v. E. Fordham DE LLC*, 804 F. App'x 106, 107 (2d Cir. 2020) ("In deciding whether to abstain under *Colorado River*, a district court must first determine whether the federal and state court cases are parallel."); *Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (same); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 182 (E.D.N.Y. 2012) (same); *Marrero v. U.S. Bank Nat'l Ass'n as Tr. for Citigroup Mortg. Loan Tr. Inc., Asset-Backed Passthrough Certificates, Series 2006-HE3*, No. 21 Civ. 11182, 2022 WL 4072936, at *4 (S.D.N.Y. Sept. 2, 2022) (same).

duplicative proceedings), sixth (forum shopping), and eighth (order of filing) factors supports keeping the parties' dispute in this Court, where it can be resolved efficiently and completely.

### A.    To Prevent Romania's Forum Shopping and Allow the First-Filed Case to Proceed, the Court Should Not Abstain from Exercising Jurisdiction

In nearly every case Romania cites to support abstention, courts have stayed federal litigation to prevent litigants from forum shopping to avoid an unfavorable court, or where a state court action was filed some meaningful time before the federal action's commencement.[4]

Not here. After both Philippe and Romania demonstrated their intent to lay claim to the Painting, *see* ECF No. 45-15 (February 26, 2025 letter from Romania counsel); Philippe Compl. at 19 (filed February 9, 2025), Christie's—a disinterested stakeholder with a desire not to be subject to multiple liabilities—did what any litigant in its position would do: it defended itself against Philippe's complaint by filing an interpleader action, pulling all the would-be Claimants into one forum for a single adjudication of the Painting's title.

Romania paints over the past when it tries to portray itself as the "natural" and "real" plaintiff in this action, insinuating that Christie's actions were somehow designed to snatch away Romania's ability to litigate the Painting's title where it would like. This framing ignores the multiple suits *Romania* has brought in three different U.S. courts asserting claims to King Michael's paintings, all of them dismissed. *See Socialist Republic of Romania v. Wildenstein*,

---

[4] *See Perlman v. Fid. Brokerage Servs. LLC*, 932 F. Supp. 2d 397, 404-05, 416 (E.D.N.Y. 2013) (abstention appropriate where surrogate's court proceedings had been pending for a year prior to federal action's commencement); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Coric*, 924 F. Supp. 373, 376 (N.D.N.Y. 1996) (same where state court proceeding had been filed a month prior), *aff'd in relevant part, rev'd in part sub nom. Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp*, 108 F.3d 17 (2d Cir. 1997); *Glenclova Inv. Co.*, 874 F. Supp. 2d at 299, 307 (same as to interpleader actions filed multiple years after Chancery Court and state court actions on the same issues); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 439 (S.D.N.Y. 2002) (same where, "in commencing litigation [in the United States] as and when it did, [plaintiff] sought to score a preemptive procedural strike essentially intended to derail [an action in Britain] by compelling [defendant] to withdraw it"), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

No. 85 Civ. 2435 (S.D.N.Y.) (suit seeking title to the Painting and other property); *see also Socialist Republic of Romania v. Kimbell Art Foundation*, No. 84 Civ. 176K (N.D. Tex.) (suit seeking title to other of King Michael's paintings); *State of Romania v. Former King Michael*, Index No. 14664/1993 (Sup. Ct. N.Y. Cnty.) (same). *See* Kornstein Decl. Exs. A-C.

The last action Romania brought in *this* Court attempted to obtain possession of the very Painting at issue here, and that action was dismissed "with prejudice" in 1986 pursuant to Federal Rule of Civil Procedure 37(b)(2)(C). *See Wildenstein*, 147 F.R.D. at 64. Then, in 1993, Romania moved under Rule 60(b)(6) to reopen the case and vacate the prior dismissal. Such a motion requires a showing of a meritorious claim. *Drywall Tapers & Pointers of Greater N.Y. Loc. Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc.*, 343 F.R.D. 358, 364 (S.D.N.Y. 2022). The Court denied Romania's motion, explicitly finding that "a change in government, or the fact that a former regime pursued a different litigation strategy than would the government currently in power, does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion," implicitly and necessarily finding that Romania had no meritorious claim. *Wildenstein*, 147 F.R.D. at 66.

Sensibly enough, given this precedent, Romania would like to avoid this Court's jurisdiction. But Romania cannot escape its own past litigation conduct through misdirection or mischaracterization of Christie's rights as a stakeholder. Christie's is not Romania's "opponent," and there is no legal dispute between the two parties. *Cf. Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990). Romania's dispute is with Accent and Philippe; Christie's interpleader action provides all three Claimants an efficient opportunity to resolve that

dispute in a single proceeding. Romania's attempt to forum-shop should not be rewarded, and abstention would be inappropriate.[5]

Romania's caution that the state court's jurisdiction is "unquestioned," as opposed to this Court's, is of no moment: once the Court decides Romania's motion, that issue will be resolved. *Cf. Glenclova*, 874 F. Supp. 2d at 313-14 (in *Colorado River* context, where personal jurisdiction was unlikely without party's consent—rather than subject-matter jurisdiction, which cannot be determined via consent—court "strongly suggest[ed]" that parties agree to litigate in state court).

None of the considerations present in *Han v. Financial Supervisory Service* apply. *See* No. 17 Civ. 4383, 2017 WL 7689223 (S.D.N.Y. Oct. 6, 2017), *report and recommendation adopted*, 2018 WL 791353 (S.D.N.Y. Feb. 8, 2018). In *Han*, the court declined to determine whether foreign sovereign immunity applied because the plaintiff sought a "ruling as to the outcome of a discovery motion not yet made, concerning a subpoena not yet issued or served" in another district court. *Id.* at *1, *6. An opinion determining jurisdiction would have been advisory and inappropriate. *See id.* at *5-6.

*Boccella* is similarly inapplicable: there, the court declined to assert jurisdiction over an ERISA action alleging unenforceability of an employment agreement governed by California

---

[5] None of the cases Romania cites on this point changes this conclusion. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Grp., Inc.*, No. 02 Civ. 10338, 2003 WL 21277114, at *6 (S.D.N.Y. June 2, 2003) (dismissing declaratory judgment action as "a classic case of a race to the courthouse" where plaintiff sued defendant "the first possible day" defendant could have filed its own action under Texas law, which required defendant to wait 60 days after providing a notice letter to plaintiff announcing its intention to sue); *Skiva Int'l, Inc. v. Minx Int'l Inc.*, No. 15 Civ. 4580, 2015 WL 5853854, at *1-2 (S.D.N.Y. Oct. 7, 2015) (same where there was no prior litigation, defendant had sent a cease-and-desist letter which "specified both intent to sue and a deadline after which it would sue," and plaintiff filed action three days before that deadline); *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*, No. 04 Civ. 9949, 2005 WL 646350, at *18 (S.D.N.Y. Mar. 21, 2005) (same where party to collective bargaining agreement sought "reprieve in the courts in the midst of the bargaining process").

law where a parallel action about that agreement had already been filed in California. 2015 WL
2130876, at *5-6. The *Boccella* court remarked that the plaintiff's decision to file in federal court
reflected "a thinly-veiled desire to avoid the application of California law." *Id.* at *7. So too here.
Romania's thinly veiled desire to avoid this Court's jurisdiction in light of its previous,
unsuccessful litigation regarding the same Painting should be disregarded.

Romania's choice-of-law argument is more of the same. There may be cases where
abstention is appropriate because state law will govern their outcome. But here, even assuming
Romania's claim is not dismissed for laches or as untimely, to the extent the Court is called on to
determine which Claimant has title of the Painting, such an analysis will be conducted under
*Romanian* law, as both Romania's and Philippe's papers set forth. *See* Romania Mot. at 14;
Philippe Compl. ¶¶ 15-17, 35. A New York state court has no more interest in determining
matters of foreign law than this Court does. *Cf. Bakalar v. Vavra*, 619 F.3d 136, 144-45 (2d Cir.
2010) (articulating New York interest in "preventing the state from becoming a marketplace for
stolen goods" in the context of a choice-of-law analysis determining that New York, rather than
Swiss, law should apply); *Angiolillo v. Christie's, Inc.*, 64 Misc. 3d 500, 519 (Sup. Ct. N.Y.
Cnty. 2019) (same), *aff'd, appeal dismissed*, 185 A.D.3d 442 (2020).

Accordingly, neither the sixth nor eighth *Wilton* factor counsels in favor of abstention.
And, with the other factors, the balance of the *Wilton* analysis favors the assertion of jurisdiction.

**B.    The Proceedings Here Need Not Be Duplicative; The State Court Case Can
Be Stayed, or Both Cases Can Proceed**

Romania has provided no reason that the state court action cannot be stayed, or that the
two actions cannot proceed in tandem. This final attempt to avoid the Court's jurisdiction
focuses on the Court's inherent power to stay this proceeding to foster judicial and litigant
economy. Seen in another light, Romania is restating the fifth *Wilton* factor, avoiding duplicative

proceedings. Accent agrees with Romania that the Claimants' respective rights to the Painting should be adjudicated in an efficient manner. But this Court is the appropriate forum to determine those rights.

To date, the parties have cooperated and coordinated with respect to filing deadlines and agreements respecting the course of litigation. The parties—Romania included—have already agreed to hold the state court action in abeyance pending resolution of Romania's motion in this Court. *See* NYSCEF Doc. No. 46 (Stipulation and Order), *State of Romania v. Saint Sebastian*, Index No. 651068/2025 (Sup. Ct. N.Y. Cnty. May 30, 2025). As the parties' stipulation confirms, this action is further along than the state court action, where Romania has yet to file its amended complaint, and the other parties have yet to respond to that amended complaint. *See id.* Rather than facilitating Romania's start-stop approach to resolving the Claimants' respective rights—holding one action in abeyance, then staying the other—the Court should decide Romania's motion and exercise jurisdiction over this interpleader action.

## CONCLUSION

Once the misleading overlay of Romania's motion is scraped away, hidden facts and the correct result emerge, like pentimento. Romania's motion to dismiss or stay this action should be denied.

Dated:  New York, New York
       June 27, 2025

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


            /s/
_____
Daniel J. Kornstein
O. Andrew F. Wilson
Sonya Levitova

One Rockefeller Plaza, 8th Floor
New York, New York 10020

(212) 763-5000

*Attorneys for Interpleader Defendant*
*and Cross-Claim Plaintiff Accent*
*Delight International, Ltd.*

20

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this sur-reply complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 6,180 words.

*/s Sonya Levitova*
Sonya Levitova