**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA, | Case No.: 1:25-cv-01151-LLS |
| Plaintiff, | |
| -against- | |
| CHRISTIE'S, INC., | |
| Defendant. | |

CHRISTIE'S, INC.,

                    Counterclaim and Third-
                    Party Plaintiff

        -against-

PAUL PHILIPPE OF ROMANIA, on behalf of the
ESTATE OF KING CAROL II OF ROMANIA,

                    Counterclaim Defendant,

        -and-

ACCENT DELIGHT INTERNATIONAL LTD
and STATE OF ROMANIA,

                    Third-Party Defendants.

**PAUL PHILIPPE'S OPPOSITION TO
ROMANIA'S MOTION TO DISMISS**

ACCENT DELIGHT INTERNATIONAL LTD,

                    Interpleader Defendant and
                    Crossclaim Plaintiff,

        -against-

PAUL PHILIPPE OF ROMANIA, on behalf of the
ESTATE OF KING CAROL II OF ROMANIA,
and STATE OF ROMANIA,

                    Interpleader Defendants and
                    Crossclaim Defendants.

THE GRIFFITH FIRM, PLLC
77 Sands Street
Brooklyn, New York 11201
(646) 645-3784 (mobile)

*Counsel to Paul Philippe of Romania*

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    The Painting ....................................................................................... 4

    B.    Romania's 100-year Campaign to Persecute Paul Philippe's Side of the Former Royal Family ............................................................................ 6

    C.    Romania's Ownership Claim to the Painting was Dismissed with Prejudice in 1986 ............................................................................... 9

    D.    Procedural History ............................................................................ 11

ARGUMENT ............................................................................................................... 12

    I.    ROMANIA DOES NOT HAVE SOVEREIGN IMMUNITY FROM THIS COURT'S JURISDICTION .................................................... 12

        A.    Romania Waived Sovereign Immunity.................................... 12

        B.    Romania's Ownership Claim Falls Within the "Successor" Exception ............................................................................... 16

    II.    THIS COURT HAS SUBJECT MATTER JURISDICTION............................ 16

        A.    Diversity Jurisdiction Exists Over This Action ...................... 16

        B.    Alternatively, this Court has Subject Matter Jurisdiction Under 28 U.S.C. §§ 1330 and 1367 ....................................... 19

    III.    THIS COURT SHOULD NOT ABSTAIN FROM JURISDICTION ............... 20

CONCLUSION............................................................................................................. 23

# TABLE OF AUTHORITIES

*Page*

Cases:

*Matter. of Abady*, 22 A.D.3d 71 (1st Dept. 2005) ....................................................... 23

*Bank of Keystone v. Wagensen*, 152 F.R.D. 644 (D. Wyo. 1994) ..................................... 18 n.10

*Browning Debenture Holders' Comm. v. DASA Corp.*, 605 F.2d 35 (2d Cir. 1972) ................. 22

*Burton v. Wells Fargo Bank, N.A.*, 738 F. Supp. 3d 272 (E.D.N.Y. 2024) .......................... 21, 22

*Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193 (2d Cir.),
 *cert. denied*, 527 U.S. 1022 (1999) ........................................................................... 13-16, 16 n.8

*CF 135 Flat LLC v. Triadou SPV S.A.*, 2016 WL 1109092
 (S.D.N.Y. Mar. 18, 2016) ........................................................................................ 19-20

*Downtown Acupuncture PC v. State Wide Ins. Co.*,
 50 Misc. 3d 461 (N.Y. Civ. Ct. 2015) ...................................................................... 23

*Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997) ......................................................... 22

*Haziz-Ramadhan v. Specialized Loan Servicing, LLC*,
 2023 WL 8003339 (E.D.N.Y. Nov. 17, 2023) .............................................................. 21

*In re Hyman*, 502 F.3d 61 (2d Cir. 2007) ................................................................. 22

*Jefftex Int'l Ltd. v. JPI Trading Corp.*, 369 F. App'x 303 (2d Cir. 2010) ................................ 21

*Kalinka v. St. Francis Hospital*, 34 A.D.3d 742 (2d Dept. 2006) ..................................... 23

*Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549
 (S.D.N.Y. 2001) ...................................................................................................... 15, 16 n.8

*Madison Stock Transfer, Inc. v. Exlites Holdings International, Inc.*,
 368 F. Supp. 3d 460 (E.D.N.Y. 2019) ...................................................................... 19

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) ..................................... 21

*MasterCard v. Visa*, 471 F.3d 377 (2d Cir. 2006). ...................................................... 18

*Mendez v. Pretium Mortg. Credit Partners I, Loan Acquisition, LP*,
 2023 WL 8283148 (E.D.N.Y. Nov. 30, 2023) .............................................................. 21

**CASES (CONT.):**

*Metro. Life Ins. Co. v. Carey*, 2017 WL 4351512 (E.D.N.Y. Sept. 29, 2017) ......................... 19

*Moreau v. Oppenheim*, 663 F.2d 1300 (5th Cir. 1981)....................................................... 18 n.10

*Museum of Mod. Art v. Schoeps*, 549 F. Supp. 2d 543 (S.D.N.Y. 2008)................................... 18

*Nasser v. Isthmian Lines*, 331 F.2d 124 (2d Cir. 1964) ........................................................... 22

*Pivar v. Graduate School of Figurative Art of N.Y. Academy of Art*,
290 A.D.2d 212 (1st Dept. 2002)............................................................................................ 19

*Reif v. Nagy*, 175 A.D.3d 107 (1st Dept. 2019) ...................................................................... 19

*Republic of China v. Am. Express Co.*, 195 F.2d 230 (2d Cir. 1952) ........................................ 17

*Snyder v. Yonkers Pub. Sch. Dist.*, 315 F. Supp. 2d 499 (S.D.N.Y. 2004) ................................ 21

*Yeshiva Imrei Chaim Viznitz of Boro Park, Inc. v. City of N.Y.*,
496 F. App'x 122 (2d Cir. 2012) ............................................................................................ 22

*Yonkers Contracting Co., Inc. v. Port Auth. Trans–Hudson Corp.*,
93 N.Y.2d 375 (1999) ............................................................................................................ 21

**STATUTES AND RULES:**

28 U.S.C. § 1330.............................................................................................................. 19-20

28 U.S.C. § 1367.............................................................................................................. 19-20

28 U.S.C. § 1604................................................................................................................... 13

28 U.S.C. § 1605(a)(4) ......................................................................................................... 16

28 U.S.C. § 1605-1607 ........................................................................................................ 13

28 U.S.C. § 1607................................................................................................................... 14

Fed. R. Civ. P. 22 ......................................................................................................throughout

**OTHER AUTHORITY:**

Restatement (Third) of Foreign Relations Law (1987), § 456.................................................... 14

7 Fed. Prac. & Proc. Civ. § 1710 (3d ed.).................................................................................. 18

David Clark, "Fighting Corruption with Con Tricks: Romania's Assault on the
Rule of Law," Henry Jackson Society (2017) ....................................................................... 1, 9

Eugene Ionesco, *Rhinoceros* (1959), .......................................................................................... 6

Plaintiff/Interpleader Defendant Paul Philippe of Romania ("Paul" or "Paul Philippe"), on behalf of the Estate of Carol II of Romania, submits this memorandum in opposition to the motion to dismiss filed by Interpleader Defendant State of Romania ("Romania").

## INTRODUCTION

> *"[A] detailed examination of Romania's anti-corruption activities shows that they often provide convenient cover for acts of political score settling and serious human rights violations. The methods used show a considerable degree of continuity with the practices and attitudes of the communist era."*
>
> - "Fighting Corruption with Con Tricks: Romania's Assault on the Rule of Law," p. 3, Henry Jackson Society (2017)[1]

Romania's claim to own El Greco's *Saint Sébastien*, the painting at stake in this rule interpleader action (the "Painting"), and its efforts to forum shop by moving this litigation to New York state court, are its latest efforts in a 100-year campaign to persecute Paul Philippe's side of Romania's former royal family. For decades, Romania refused to recognize Paul's status as Carol II's legitimate heir, which had been conclusively established in Carol II's Portuguese estate case in 1955, as well as by every other European court that considered the issue. Only after the European Court of Human Rights ruled in 2010 that Romania had violated the human rights of Paul Philippe's father did Romania's highest court reluctantly recognize Paul Philippe's status in 2012.

Notwithstanding that ruling, Romania continued to deny Paul Philippe's rightful share of Carol II's property in Romania, while awarding hundreds of millions of dollars in property and cash to the family of Paul Philippe's uncle, ex-King Michael. When Paul turned his focus to Carol II's assets outside of Romania, such as the Painting, a politically influenced panel of Romania's highest court convicted Paul in December 2020 of a "bad faith attempt to recover [real] property

[1] https://henryjacksonsociety.org/publications/fighting-corruption-with-con-tricks-romanias-assault-on-the-rule-of-law/

that did not belong to him." Sup. Mem. [45-1][2] at 3. The basis of that conviction, however, was that Paul was neither a member of the former royal family nor Carol II's legitimate heir – findings conclusively contradicted by binding court decisions in Portugal, France, the U.K., *and Romania*!

For the last five years, Romania has been trying to extradite Paul Philippe based on that politically motivated conviction. However, because the conviction is contrary to the rule of law, principles of due process, and human rights, Romania's efforts have failed. In March 2023, INTERPOL withdrew its arrest notice for Paul, finding that his conviction was politically motivated and that his trial in Romania lacked due process. In November 2023, France rejected Romania's European Arrest Warrant, citing the INTERPOL decision. In August 2024, Malta rejected Romania's efforts to extradite Paul from that country. And on July 9, 2025, just two days ago, a Paris court rejected Romania's second attempt to extradite Paul Philippe from France.

Romania's motion to dismiss adopts a three-prong strategy that could well succeed in Romania, but borders on the frivolous when viewed objectively. First, Romania's assertion of sovereign immunity overlooks decades of Romania's lawsuits asserting ownership claims to *this Painting*, including Romania's pending state-court lawsuit that asserts the same claims against the same parties as in this action. This conduct has waived Romania's immunity concerning the Painting's ownership. That Romania does not address this issue is astounding, though consistent with a strategy of ignoring well-established facts and compelling legal arguments. That Romania takes the position that it may litigate ownership claims in state court but assert sovereign immunity over the same claims in federal court is contrary to common sense. *See* Argument § I.

Second, Romania's challenge to diversity jurisdiction relegates the most salient

---

[2] Bracketed numbers refer to the ECF docket.

development relevant to diversity – Christie's interpleader counterclaim – to three muddled sentences that lack supporting authority:

> Christie's interpleader action was derivative of Paul Philippe's replevin action, and a noncompulsory counterclaim. Christie's is a nominal party and disclaims any interest in the Painting. Christie's interpleader action cannot be used to create jurisdiction over the case between the necessary and indispensable claimants that did not exist at the outset.

Sup. Mem. [45-1] at 18.

Uniform case law establishes that diversity jurisdiction exists over the Rule 22 interpleader action because Christie's, a New York citizen, is completely diverse from the three claimants to own the Painting, Paul Philippe, Romania, and Christie's consignor, Accent Delight International Ltd. ("Accent Delight"), all of whom are non-U.S. citizens. The interpleader action is now the core of this litigation, yet Romania's motion doesn't even address Rule 22 or its interpreting case law. And the presence of Romania and Accent Delight as third-party Interpleader Defendants establishes that Romania's indispensable party arguments lack merit. *See* Argument § II.

Finally, as a tacit acknowledgment that its sovereign immunity and diversity arguments fail, Romania requests that this Court abstain from jurisdiction. There is no justification for such abstention, however, especially since Romania's ownership claims are barred as a matter of law by a final decision of this Court dismissing with prejudice Romania's identical claim to own this Painting in 1986. This action, including Christie's interpleader action, was filed first and is ready to proceed to discovery. In contrast, the state action was commenced by a party with a legally barred claim and was stayed before any procedural developments took place. Romania's motion is a blatant attempt to forum shop, in the hope that the state court will overlook the consequences of this Court's 1986 decision. Romania's motion should be denied, and this Court should adjudicate the Interpleader Defendants' competing ownership claims. *See* Argument § III.

The relevant background is set forth in the Complaint [1] and Christie's Interpleader Counterclaim and Third-Party Claim [18, pp. 10-15].[3]

### A.     The Painting.

The Painting was stolen by Paul Philippe's uncle, ex-King Michael, in 1947, shortly before he abdicated in favor of the Soviet-backed communist government. The Painting is one of at least 42 "Old Masters" that Michael stole from his father, King Carol II, during and shortly after World War II. Before Michael participated in a 1944 coup that deposed Nazi-aligned dictator Ion Antonescu, he conspired with Antonescu and his Nazi allies to secretly transport Carol II's paintings to Michael's mother's home in fascist Italy. This Painting, however, remained at Castle Peleş, the magnificent neo-renaissance castle in the Transylvanian foothills, until November 12, 1947. On that night, Michael's staff loaded the Painting, at least one other El Greco, and other valuable items into boxcars attached to the Orient Express for transport to UBS in Switzerland. *See* Complaint [1] at ¶¶ 14-21; Complaint, Ex. 1 [1-7] (telegrams from German ambassador authorizing transport of paintings); Complaint, Ex. 2 [1-8] (UBS Inventory of assets, including "*San Sebastian*").

Romania is correct in one of its assertions: that Michael stole the paintings. This is evident by the conduct of Michael and his father, Carol II, after Michael relocated the paintings to a UBS

---

[3] Romania's motion burdens the Court with hundreds of pages of exhibits, most of which have no relevance to Romania's arguments for dismissal, including a Romanian police webpage showing Paul Philippe as a wanted fugitive and a Romanian media article reporting Paul's April 7, 2025 arrest in France on Romania's third attempt to extradite him. (As reported in the text, France rejected that third extradition attempt on July 11, 2025.) Paul Philippe sees no reason to further burden the court with documents not directly relevant to the legal issues raised by the motion to dismiss. Should the Court want documentary support for the background information set forth in this memorandum, however, Paul Philippe will readily submit it.

vault in Switzerland in 1947. Michael kept the paintings secret and made no effort to display or sell them until Carol II had died and his widow, Princess Elena (born Lupescu), was on her deathbed. Only then did Michael sell *Saint Sébastien* and another El Greco, *Canon Bosio* (now known as *The Portrait of Dr. Francisco Pisa*), to the New York art dealer Wildenstein in 1977. Complaint [1] at ¶¶ 22-25.

Because Michael hid his possession of the paintings from his father, Carol II mistakenly believed that Romania's communist government had stolen them, as they had stolen his other property and assets in Romania. Carol II makes this explicit in correspondence with an American professor of fine arts. Complaint [1] at ¶ 22; Complaint, Ex. 10 [1-10] (December 1949-January 1950 correspondence with Professor Harold E. Wethay).

Even when Michael sold the paintings to Wildenstein in 1977, he kept the transaction secret, knowing that Paul Philippe and his father would have objected had they been aware of the sale. In an April 14, 1977 letter to the Kimbell Art Museum, which purchased *Canon Bosio*, Wildenstein explains:

> On the enclosed invoice, you will note the last owner is described as "private collection, Switzerland" as *we had promised* the wife of King Carol and *Prince Michael that their names would not be mentioned*.

Complaint, Ex. 12 [1-12] (April 14, 1977 letter from Wildenstein to Kimbell) (emphasis added).[4]

Notwithstanding his efforts to conceal the sale, Michael faced a dilemma: he had to provide Wildenstein with an explanation for his authority to sell the paintings, yet he had stolen them from

---

[4] While the letter mentions that the promise was also made to Carol II's widow, Princess Elena, that is undoubtedly another misrepresentation originating with Michael. At the time, Elena was deathly ill, with only two months to live, and Michael had kept his theft of the paintings hidden from her for the prior 30 years. Of course, even if Elena knew about the sale, Michael concealed the sale from Carol II's other heir, Paul's father, who had an equal share of Carol II's property.

his father and had no authority to sell them without the consent of his father's other heirs. Had he owned the paintings in his personal capacity, as Access Delight asserts, he would have had no problem proving that to Wildenstein. Michael solved this problem by falsely representing to Wildenstein that he was selling the paintings on behalf of all Carol II's heirs. Thus, the provenance that Wildenstein provided to the Kimbell Art Museum for *Canon Bosio* falsely states that Wildenstein had purchased *Canon Bosio* from *all of Carol II's heirs*:

> … purchased by King Carol of Romania [1839-1914]…; by descent to his nephew, King Ferdinand [1865-1927]…; by descent to his son King Carol II of Romania [1893-1953]; *his heirs*; (Wildenstein & Co., New York); purchased by Kimbell Art Foundation, 1977.

Complaint, Ex. 13 [1-13] (Kimbell Museum website provenance for *Canon Bosio*, which the Kimbell Museum re-named *Portrait of Dr. Francisco Pisa*) (emphasis added); *see also* Complaint [1] at ¶¶ 26-27; Complaint, Ex. 14 [1-14] (catalogue for the 1982 El Greco exhibition with similar provenance showing that the Kimbell Art Museum purchased *Canon Bosio* from Carol II's heirs).

## B. Romania's 100-year Campaign to Persecute Paul Philippe's Side of the Former Royal Family.

> Dudard:      *I suppose I might as well tell you … it's really rather funny … the fact is, he turned into a rhinoceros.*
>
> Berenger:      *A rhinoceros! Mr. Papillon a rhinoceros, I can't believe it! I don't think it's funny at all! Why didn't you tell me before?*
>
>      -    *Rhinoceros* (1959), Eugene Ionesco

Romania has persecuted Paul Philippe's side of the former royal family for over 100 years. The split in the family occurred in 1919 when Carol II's father, King Ferdinand, insisted that then-Crown Prince Carol abandon his first wife for geopolitical reasons. Carol resisted but was eventually forced to leave his wife and first-born son, Paul Philippe's father. Ferdinand arranged an annulment in which neither Carol nor his first wife participated. However, the purported

annulment led to Paul's father being considered "illegitimate" in the narrow-minded culture of the early 20th Century. *See* Complaint [1] at ¶¶ 37-39.

After Carol II died in exile in Portugal in 1953, however, the Portuguese court presiding over his estate ruled that Paul's father was, in fact, "legitimate" under Romanian, Portuguese, and French law, regardless of whether the purported annulment was valid. Complaint [1] at ¶ 39; Complaint, Ex. 6 [1-6] (Certified English translation of 1955 Portuguese decision). The Portuguese court ruled that Paul's father was entitled to share equally in Carol II's estate with his half-brother, Michael, each of whom received a 37.5% share, with the remaining 25% going to the widow, Princess Elena. *Id*.; *see also* Complaint [1] at ¶ 17. Based on this decision, Paul's father shared equally with Michael in Carol II's European assets from the 1950s through the 1970s. Indeed, every European court that considered the issue held that Paul's father was a legitimate heir of Carol II, entitled to share equally in Carol II's assets with Michael. Complaint [1] at ¶ 39.

Of course, during Romania's communist era, from 1948 through 1989, neither Paul's father nor Michael could attempt to claim Carol II's assets in Romania. After Ceaușescu was deposed in 1989, Paul's father and Michael returned to Romania to reclaim their share of Carol II's properties. Michael and his family recovered hundreds of millions of dollars in property and cash, including the stunning Castle Peleş in the Transylvanian foothills. The parallel efforts of Paul Philippe and his father, however, were unsuccessful. As summarized in the Introduction, even after the 2010 decision of the European Court of Human Rights, which forced Romania to recognize that Paul was Carol II's legitimate heir, Romania continued to deny Paul's efforts to recover his rightful inheritance. Complaint [1] at ¶¶ 40-41.

In 2019, Paul refocused his efforts to reclaim his inheritance outside Romania. After reopening Carol II's Portuguese estate proceedings, he convinced the famous French police

department in charge of recovering stolen art to impound three of the paintings Michael had stolen during World War II, including El Greco's *Holy Family* and *Christ Carrying the Cross*. In October 2020, the Portuguese court appointed Paul Philippe as administrator of Carol II's estate. Three months later, in December 2020, Romania's highest court overturned the acquittals of Paul Philippe and several co-defendants, convicting them based on the absurd finding that Paul had no right to reclaim Carol II's property because Paul is neither a member of the former royal family nor Carol II's heir. Those findings are inconsistent and irreconcilable with binding judicial decisions by courts in Portugal, the United Kingdom, France, *and Romania*. They could only be made by a corrupt, politically influenced court. Complaint [1] at ¶¶ 41-45.[5]

For these reasons, every country that has considered Romania's efforts to extradite Paul or his co-defendants has rejected Romania's extradition request. After INTERPOL withdrew its arrest notice in March 2023, both France and Malta rejected Romania's extradition requests. Notably, France rejected Romania's second extradition attempt just two days ago. Introduction, p. 2. Other countries, including Greece, Cyprus, Italy, and Belgium, have rejected Romania's efforts to extradite Paul Philippe's co-defendants because their convictions are based on the same false and politically driven finding that Paul is not Carol II's heir. No country has extradited any of Paul Philippe's co-defendants because that finding, common to all the convictions, violates fundamental principles of fairness, due process, and the rule of law. Complaint [1] at ¶¶ 46-52.

---

[5] The Romanian court provided an alternative justification for the conviction that is even more shocking: if Paul Philippe is Carol II's legitimate heir, the property he sought to recover had been *validly confiscated by the Nazi-aligned government*, which excluded his claims from the post-communist laws permitting restitution of property *confiscated by the communists*. Of course, Nazi confiscation orders were nullified after World War II and the purported judicial decision used to support this theory was unsigned and could not be found in any official archive. That the highest court of a European Union nation would enforce a nazi expropriation decree should be an international scandal. Complaint [1] at ¶¶ 42, 45.

Romania's conduct is consistent with its reputation for failing to establish an independent judiciary after it joined the European Union in 2004. The Henry Jackson Society, a centrist transatlantic think tank focused on international relations, for example, reported in 2017 that Romania uses its purported "anti-corruption" efforts to settle political scores against the government's enemies, thereby directly assaulting the rule of law. The report's author, David Clark, explained:

> *There is considerable evidence that investigations are used to settle political scores, that prosecutors collude with government, that judges are improperly influenced to maintain high conviction rates*, that the domestic intelligence service plays a covert role in manipulating the criminal justice system and that abuses of due process are routine.
>
> *The result is that basic standards of human rights are being regularly infringed, including the right to a fair trial and the right to a presumption of innocence*.

Henry Jackson Society website, https://henryjacksonsociety.org/publications/fighting-corruption-with-con-tricks-romanias-assault-on-the-rule-of-law/ (emphasis added).

That is precisely what happened to Paul Philippe, who was prosecuted by the Orwellian "anti-corruption directorate" between 2016 and 2020. Complaint [1] at ¶ 43 (Romanian prosecutor manipulated assignment system to assure that the appeal of Paul Philippe's acquittal would be assigned to the appellate court's "black panel," reputed to convict government political enemies).

### C. Romania's Ownership Claim to the Painting was Dismissed with Prejudice in 1986.

In the 1980s and 1990s, Romania commenced four separate lawsuits to recover possession of the paintings Michael stole, including the Painting. Those actions are described in the Complaint [1], ¶¶ 30-35, and in Accent Delight's Opposition Memorandum [49], pp. 2-3.[6]

---

[6] The 30-year lull in Romania's interest in the paintings ended when Romania noticed that

Romania's prior lawsuit with the most significant consequences for this interpleader action is its 1985 lawsuit against the New York art dealer Wildenstein, *Socialist Republic of Romania v. Wildenstein*, 85 Civ. 2435 (DNE) (SDNY) ("Romania's 1985 New York Action"). In that action, Romania asserted the same claim to own *Saint Sébastien* as it does in this action. Romania repeatedly refused to comply with its discovery obligations, however, and on February 20, 1986, the Court dismissed Romania's ownership *with prejudice* pursuant to Federal Rule of Civil Procedure 37(b)(2)(C). In 1993, Romania filed a Rule 60 motion to vacate that dismissal, but Judge Edelstein forcefully denied that motion, explaining:

> *Romania's actions are best characterized as a deliberate litigation strategy.* In spite of the fact that Wildenstein submitted to discovery, Romania chose to impede the discovery of material that might have vindicated defendants. *Although this Court repeatedly admonished Romania to comply with legitimate discovery demands, Romania's response was to promise compliance but to deliver nothing.* When plaintiff realized that this case would not proceed in the United States absent compliance with this Court's discovery orders, Romania sought a more favorable forum—the courts of Romania. Rule 60(b) will not afford plaintiff relief from the consequences of its litigation strategy.

*Socialist Republic of Romania v. Wildenstein*, 147 F.R.D. 62, 65 (S.D.N.Y. 1993) (emphasis added) (citing *Laverty v. Savoy Indus.*, 1992 WL 296413, *1 (S.D.N.Y. Oct. 6, 1992)).

This Court's dismissal of Romania's claim to own the Painting bars Romania from re-litigating that claim in this action under the doctrines of res judicata and collateral estoppel. *See* Argument § III.

---

Paul Philippe had located some of the paintings and was making progress toward their recovery on behalf of Carol II's estate.

### D. Procedural History.

Paul Philippe learned that the Painting was in New York by press reports that Christie's had voluntarily withdrawn the Painting from its "Old Masters" auction on February 5, 2025 after Romania sent a letter asserting an ownership claim. Complaint [1], ¶ 6; Complaint, Ex. 1 [1-1] (February 6, 2025 article in *The Art Newspaper*, "Christie's pulls El Greco work from sale after Romanian government intervenes").

Paul commenced this action on Sunday, February 9, 2025, by filing his complaint for replevin against Christie's, along with an emergency application for an ex parte TRO, which barred Christie's from moving the Painting outside of New York. Complaint [1]; Proposed Order to Show Cause with TRO [7]; Supporting Declaration [9]; Supporting Memorandum [10]. On February 10, 2025, the Court issued the Order to Show Cause with TRO. *See* Order to Show Cause [8].[7]

On February 27, 2025, Christie's filed its Answer, which denied any ownership interest in the Painting and asserted the Interpleader Counterclaim and Third-Party Claim against the three parties claiming ownership of the Painting: Paul Philippe, Romania, and Accent Delight. Christie's Answer [18, pp. 1-10] and Interpleader Counterclaim and Third-Party Claim [18, pp. 10-15].

Later that same day, Romania filed its state court action in the New York Supreme Court, County of New York, asserting the same claim to own the Painting that this Court had dismissed with prejudice in 1986, which is also the same claim raised in Christie's interpleader action. The state action, *Romania v. Saint Sebastian*, Index No. 651058/2025 (Sup. Ct., NY Co.) (the "State Action"), involves precisely the same parties as this action. *See* State Amended Complaint [45-6].

---

[7] Pursuant to the Court's rules, the emergency application was not submitted via ECF and without notice to Christie's. The motion papers were electronically filed on February 11, 2025, after the Court issued the Order to Show Cause on Monday, February 10, 2025.

For the next three months, counsel for the parties negotiated stipulations under which Romania appeared in this action, a briefing schedule for Romania's motion to dismiss was agreed, and the State Action was stayed pending the outcome of the motion to dismiss this action. The parties also entered into a letter agreement under which Christie's will maintain the Painting in New York pending resolution of the ownership claims, eliminating the need for the TRO. *See* Status Reports [36, 37, 40, 41]; Proposed Stipulation and Order [43]: Stipulation and Order [46].

## ARGUMENT

Paul Philippe adopts the legal arguments set forth in Accent Delight's Opposition Memorandum [49, pp. 4-19], as if they were set forth here in their entirety. To avoid duplicating those arguments, Paul Philippe will limit the arguments set forth in this memorandum to additional points or elaboration of points made in Accent Delight's Opposition.

## I. ROMANIA DOES NOT HAVE SOVEREIGN IMMUNITY FROM THIS COURT'S JURISDICTION.

### A. Romania Waived Immunity.

Before Romania agreed to appear in this action and filed its motion to dismiss, Romania attempted to circumvent this Court's procedures by seeking dismissal of the action sua sponte. *See* March 19, 2025 Letter [35] at 3 ("there is sufficient information for this Court to issue an order sua sponte dismissing … this federal court action"). Another example of Romania's audacity, the letter essentially covers the same ground as Romania's subsequently filed motion, with one exception: the letter expressly addresses the waiver issue, whereas the motion omits those points.

After citing in a footnote the uncontroversial point that the FSIA's implied waiver exception is narrowly construed, Romania asserts:

> *Romania filed suit in state court because, in addition to the lack of diversity,*
> *it is immune from the jurisdiction of the courts of the U.S. as a foreign*

> sovereign. *See* 28 U.S.C. § 1604 et seq. *Romania has not waived that*
> *immunity*, and cannot be haled into this Court ...

Letter [35] at 3 (citing *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 201 (2d Cir.), *cert.*

*denied*, 527 U.S. 1022 (1999)).

Two points are worth making. First, during the three months between filing its letter and

its motion to dismiss, Romania's counsel must have taken a closer look at the *Cabiri* case. As

Accent Delight articulately explains, *Cabiri* and the other caselaw it discusses establish the

opposite. By filing repeated lawsuits in U.S. courts asserting *the same ownership claim at issue in*

*this action*, Romania waived its immunity regarding that ownership claim. Accent Delight Opp.

[49] at 8-10. *Cabiri* sensibly held that a landlord-tenant eviction proceeding commenced by the

Republic of Ghana against an employee did not waive immunity for the employee's *unrelated*

claims for false imprisonment and torture because there was no "direct connection" between the

eviction case and the employee's claims. *Id*. at 8 (citing *Cabiri*, 165 F.3d at 202). Here, not only

is there a "direct connection" between Romania's State Action and this interpleader action, but the

claims are identical! No wonder Romania drops any mention of the waiver issue in its motion.

Second, Romania's purported explanation for filing the State Action makes no sense and

underscores Romania's improper attempt at forum shopping. According to the letter, Romania

filed its ownership claim in state court because the FSIA gives it immunity in federal court. *But*

*the FSIA confers immunity on foreign states in both federal and state courts*. 28 U.S.C. § 1604 ("a

foreign state shall be immune from the jurisdiction of the courts of the United States and *of the*

*States* except as provided in sections 1605 to 1607") (emphasis added). Romania has no good

reason for preferring state court, other than its understandable, but improper, goal of asserting its

ownership claim in a court other than the one that dismissed precisely the same claim with

prejudice in 1986. So Romania tries to deceive this Court into believing that the FSIA applies only in federal courts and somehow permits Romania to file an identical claim in state court without waiving immunity. There is, of course, no support for such a position.

A point unrelated to Romania's letter is also germane. *Cabiri* and the other cases that address the circumstances under which a foreign state's commencement of a lawsuit in a U.S. court waives immunity are consistent with Section 456 of the Restatement (Third) of Foreign Relations Law. That section, entitled "Waiver of Immunity," provides in relevant part:

> (2)    Under the law of the United States:
>
>> (a)    Initiation by a state of an action in a court in the United States is a waiver of immunity from jurisdiction to adjudicate.
>>
>>> (i)    any counterclaim *arising out of the transaction or occurrence that is the subject matter of the action*, …

Restatement (Third) of Foreign Relations Law (1987) (the "Restatement"), § 456 (emphasis added). *Accord* 28 U.S.C. § 1607 (in an action brought by a foreign state, "the foreign state shall not be accorded immunity with respect to any counterclaim … *arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state*") (emphasis added).

While these provisions of the Restatement and the FSIA apply to lawsuits brought by a foreign state, the rule they codify as to when a foreign state waives immunity for counterclaims corresponds to how *Cabiri* and its progeny view the effect of a foreign state's commencement of U.S. litigation on that foreign state's immunity in other litigation. Just as the Restatement and the FSIA provide that a foreign state waives immunity for counterclaims "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state," *Cabiri* and its progeny hold that a foreign state's commencement of litigation in the U.S. waives immunity to other lawsuits against the foreign state that bear a "direct connection" with the foreign state's litigation.

Where there is little direct connection between the foreign state's action and the third-party litigation against the foreign state, the case law generally holds that the foreign state has not waived immunity in the other suit. That's why *Cabiri* held that Ghana had not waived its immunity for the employee's torture claims. But where there is a close connection, the cases sensibly hold that immunity has been waived. In *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 558-559 (S.D.N.Y. 2001), for example, this Court held that Vietnam waived claims relating to ownership of the interpleader stake, which consisted of funds from an insurance settlement, but did not waive immunity for claims to recover damages from that fund based on other theories.

As Accent Delight points out, the *Cabiri* court recognized the connection between the FSIA's counterclaim exception in 28 U.S.C. § 1607, which parallels the provisions of Restatement § 456, and the circumstances under which a foreign state's U.S. lawsuit waives immunity in other litigation:

> none of [the federal case] claims [arose] out of *the same transaction or occurrence* as the eviction proceeding. To allow plaintiffs to establish waiver based on a connection between Ghana's eviction proceeding and causes of action that do not come within the counterclaim exception [to FSIA, at 28 U.S.C. § 1607] would in effect broaden the application of the counterclaim exception beyond the parameters intended by Congress.

Accent Delight Opp. [49] at 8-9 (quoting *Cabiri*, 165 F.3d at 203) (emphasis added).

Thus, *Cabiri* suggests that the "direct connection" necessary to establish waiver of immunity based on a foreign state's U.S. litigation is at least established when the third-party litigation against the foreign state "aris[es] out of the transaction or occurrence that is the subject matter of the [the foreign state's] action." Here, Romania's ownership claim asserted in its State Action *is precisely the same ownership claim* that Romania asserted in its 1985 action in this Court and in its currently pending State Action. Thus, there is no question that the "direct connection"

standard has been satisfied, and Romania has waived immunity concerning ownership claims to the Painting.[8]

> **B.** **Romania's Ownership Claim Falls Within the "Successor" Exception.**

Accent Delight establishes that the "successor" exception to sovereign immunity set forth in 28 U.S.C. § 1605(a)(4) also applies and provides an independent ground for why Romania does not have sovereign immunity in this interpleader action. Accent Delight Opp. [49] at pp. 10-13.

## II. THIS COURT HAS SUBJECT MATTER JURISDICTION.

Again, Accent Delight has conclusively established that this Court has diversity jurisdiction over this action. Accent Delight Opp. [49] at pp. 4-7. This memorandum makes two additional points:

> A. Romania's three convoluted sentences dismissing the effect of Christie's interpleader action on this Court's diversity jurisdiction are mistaken; and

> B. Apart from diversity jurisdiction, this Court has jurisdiction over this action under 28 U.S.C. § 1330 because it is an action against a foreign state that is not entitled to immunity under the FSIA.

> **A.** **Diversity Jurisdiction Exists Over This Action.**

Romania essentially ignores how Christie's interpleader action has affected this Court's diversity jurisdiction, except for these three sentences that are unsupported by any authority:

> Christie's interpleader action was *derivative* of Paul Philippe's replevin action, and a *noncompulsory counterclaim*. Christie's is a *nominal party* and disclaims any interest in the Painting. Christie's interpleader action *cannot be used to create jurisdiction* over the case between the necessary and indispensable claimants that did not exist at the outset.

Sup. Mem. [45-1] at 18 (emphasis added).

---

[8] As the *Lord Day & Lord* case observed, *Cabiri* "defined this 'transaction or occurrence' liberally as any claim sharing a 'logical relationship' with the claim of the foreign state." *Lord Day & Lord*, 134 F. Supp. 2d at 557 (citing *Cabiri*, 165 F.3d at 197).

The first sentence asserts that the interpleader action is "derivative" of Paul Philippe's replevin action and a noncompulsory counterclaim. First, it's hard to understand what Romania means by "derivative," other than Christie's asserted its interpleader action as a counterclaim and crossclaim, which is expressly permitted under Rule 22. In fact, Christie's answer, which disclaims any ownership interest in the Painting, essentially concedes that Paul Philippe's replevin claim against Christie's is valid, *i.e.* Paul has a superior claim to own the Painting than Christie's. The only remaining claims to be decided are those raised by Christie's interpleader action, the competing ownership claims among the interpleader claimants to the Painting.

Second, Christie's interpleader counterclaim was, in fact, compulsory since it "arises out of the transaction or occurrence that is the subject matter of [Paul Philippe's replevin] claim" and did "not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1)(A)[9] And regardless of whether the interpleader counterclaim is either "derivative" or "noncompulsory," those labels have no relevance as to whether this Court has jurisdiction over this action.

The second sentence asserts that Christie's is a "nominal party" as a disinterested stakeholder. As Accent Delight established, however, a Rule 22 interpleader plaintiff is not a "disinterested Party," even if it disclaims an ownership interest in the interpleader stake, because it has an interest in resolving competing ownership claims to the stake. Accent Delight Opp. [49] at 5 (citing *Republic of China v. Am. Express Co*., 195 F.2d 230, 234 (2d Cir. 1952) ("The appellants' argument to the contrary [that interpleader destroyed jurisdiction] is based upon the

---

[9] Romania probably justifies its assertion that the interpleader claim was not compulsory due to its assertion that Romania is immune from this Court's jurisdiction. As established, *supra*, at Argument § I, and in Accent Delight's Opposition [49], pp. 7-13, that assertion is mistaken. As a result, Christie's interpleader counterclaim was compulsory.

theory that the order, by discharging the appellee from liability, left no one but aliens as parties to the suit who will then be in litigation with each other in an action separate and distinct from the initial one. We cannot agree."); 7 Fed. Prac. & Proc. Civ. § 1710 (3d ed.) ("In upholding jurisdiction under Rule 22(a) . . . when the claimants are all of the same citizenship but of diverse citizenship from the stakeholder, the lower federal courts have recognized that even a disinterested stakeholder has a very real interest in the first stage of an interpleader action.")). That is precisely why the case law uniformly provides for subject matter jurisdiction over rule interpleader actions provided that the citizenship of the plaintiff (the party Romania calls "nominal") is diverse from all claimants.

The third and final sentence asserts that even though there may be complete diversity jurisdiction over the interpleader action, it "cannot be used to create jurisdiction over the case between the necessary and indispensable claimants that did not exist at the outset." There is no authority for that assertion, which is mistaken for two independent reasons. First, a replevin action need not be asserted against all parties claiming ownership of the item sought to be recovered. *See*, *e.g.*, *Museum of Mod. Art v. Schoeps*, 549 F. Supp. 2d 543, 549 (S.D.N.Y. 2008) ("The Second Circuit repeatedly has explained that where a party seeks simply to adjudicate its rights as against a particular claimant but not finally allocate title, it is not necessary to join other claimants.") (citing, *inter alia*, *MasterCard v. Visa*, 471 F.3d 377, 382–387 (2d Cir. 2006).[10] Thus, neither Romania nor Accent Delight was a necessary or indispensable party to Paul Philippe's replevin

---

[10] *See also, e.g., Moreau v. Oppenheim*, 663 F.2d 1300, 1310 (5th Cir. 1981) (two parties who claimed ownership interest in horses were not necessary or indispensable parties to action to determine right to possess horses); *Bank of Keystone v. Wagensen*, 152 F.R.D. 644, 647 (D. Wyo. 1994) (in claim to determine plaintiff's claim to recover possession of cattle, absent parties with ownership claims to cattle were not necessary or indispensable).

action, notwithstanding their claims to the Painting. A judgment in favor of Paul in the absence of Romania or Accent Delight would not bind them to the judgment or prejudice them from asserting their ownership claims in another proceeding. Of course, that analysis is purely theoretical now, since both Romania and Accent Delight are parties to the interpleader action, which provides the procedural framework for this Court to resolve all the competing ownership claims.

Second, Christie's interpleader action undermines any argument that Romania and Accent Delight are necessary or indispensable parties because they are now parties to the interpleader action, which will resolve their ownership claims. Paul Philippe's replevin action seeks recovery from the only party that has *possession of the Painting*, Christie's, once those competing ownership claims are resolved. "To state a cause of action for replevin, a plaintiff must establish a superior possessory right *to property in a defendant's possession*." *Reif v. Nagy*, 175 A.D.3d 107, 120 (1st Dept. 2019) (emphasis added) (citing *Pivar v. Graduate School of Figurative Art of N.Y. Academy of Art*, 290 A.D.2d 212, 213 (1st Dept. 2002)). Thus, because neither Romania nor Accent Delight has possession of the Painting, they could not be added as defendants to Paul Philippe's replevin action, even if there was some reason to do so.

### B. Alternatively, this Court has Subject Matter Jurisdiction under 28 U.S.C. §§ 1330 and 1367.

While Rule 22 does not provide an independent basis for federal subject matter jurisdiction over a rule interpleader action, *any basis* for federal subject matter jurisdiction, not only diversity of citizenship, is sufficient. *See*, *e.g.*, *Madison Stock Transfer, Inc. v. Exlites Holdings International, Inc.*, 368 F. Supp. 3d 460, 473-474 (E.D.N.Y. 2019) ("plaintiff invoking rule interpleader ... must plead and prove an independent basis for subject-matter jurisdiction because Rule 22 is merely a procedural device.") (citing *Metro. Life Ins. Co. v. Carey*, 2017 WL 4351512,

at *3 (E.D.N.Y. Sept. 29, 2017), and *CF 135 Flat LLC v. Triadou SPV S.A.*, 2016 WL 1109092, at *2 n.1 (S.D.N.Y. Mar. 18, 2016) ("Unlike statutory interpleader, rule interpleader requires a plaintiff to establish subject matter jurisdiction based either upon a general federal question or diversity of citizenship.").

Here, while Romania has mistakenly assumed that the only basis for federal subject matter jurisdiction is diversity jurisdiction, 28 U.S.C. § 1330 provides an alternative basis. That statute provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury *civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity* either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a) (emphasis added).

Because Christie's interpleader action is against Romania, a "foreign state … not entitled to immunity," this Court has subject matter jurisdiction over the claim against Romania. All the other claims in this action, including Christie's claims against the other interpleader Defendants and Paul Philippe's replevin claim against Christie's, are "so related to [the] claim [against Romania] within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). The Court, therefore, has supplemental jurisdiction over those other claims.

## III. THE COURT SHOULD NOT ABSTAIN FROM EXERCISING JURISDICTION.

Accent Delight has again provided a comprehensive and persuasive analysis as to why this Court should not exercise its discretion to abstain from jurisdiction. Accent Delight Opp. [49] at 13-19. This memorandum makes an additional point that Paul Philippe believes is germane: this

Court should not abstain from exercising jurisdiction because it would defeat the Plaintiffs' choice of forum in favor of a state court forum chosen by a party whose ownership claim to the Painting is barred as a matter of law under the doctrines of res judicata and collateral estoppel.

"Under New York law, res judicata (or claim preclusion) provides that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Burton v. Wells Fargo Bank, N.A.*, 738 F. Supp. 3d 272, 290 (E.D.N.Y. 2024) (citing *Haziz-Ramadhan v. Specialized Loan Servicing, LLC*, 2023 WL 8003339, at *3 (E.D.N.Y. Nov. 17, 2023) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286–87 (2d Cir. 2002))). Res judicata applies where:

> (1)    the previous action involved an adjudication on the merits;
>
> (2)    the previous action involved the same adverse parties or those in privity with them; and
>
> (3)    the claims asserted in the subsequent action were, or could have been raised, in the prior action.

*Id*. (citing *Mendez v. Pretium Mortg. Credit Partners I, Loan Acquisition, LP*, 2023 WL 8283148, at *5 (E.D.N.Y. Nov. 30, 2023)).

Each of these elements is satisfied as to the dismissal with prejudice of Romania's 1985 lawsuit asserting ownership of the Painting. First, while the action was dismissed based on discovery violations, that constitutes an adjudication on the merits, where, as Judge Edelstein found, Romania willfully evaded its discovery obligations as a litigation strategy. *See*, *e.g.*, *Jefftex Int'l Ltd. v. JPI Trading Corp*., 369 F. App'x 303, 305 (2d Cir. 2010) ("the New York Court of Appeals has noted that '[a] dismissal 'with prejudice' generally signifies that the court intended to dismiss the action 'on the merits,' that is, to bring the action to a final conclusion against the plaintiff.") (citing *Yonkers Contracting Co., Inc. v. Port Auth. Trans–Hudson Corp*., 93 N.Y.2d

375, 380 (1999)); *Snyder v. Yonkers Pub. Sch. Dist.*, 315 F. Supp. 2d 499, 502 (S.D.N.Y. 2004) ("The Second Circuit has squarely held that when a first action is dismissed for failure to comply with discovery orders and a second action is brought on the same claim, by the same plaintiff that claim should be barred.") (citing *Browning Debenture Holders' Comm. v. DASA Corp.*, 605 F.2d 35 (2d Cir. 1972)). *Nasser v. Isthmian Lines*, 331 F.2d 124, 127 (2d Cir. 1964) (dismissal for failing to answer interrogatories was a final adjudication on the merits even though the order did not expressly state dismissal was with prejudice).

Second, the prior action involved the same adverse party, Romania, as in this case. Whereas in the previous lawsuit, Romania brought its ownership claim against the party who had possession of the Painting at that time, Wildenstein, in this action, Romania brings its claim against parties in possession or claiming ownership of the Painting now.

Third, Romania asserted precisely the same claim in the prior action as it does in this action, its claim to own the Painting.

Thus, the doctrine of res judicata bars Romania from re-litigating its ownership claim.

The doctrine of collateral estoppel, or issue preclusion, yields the same result. Collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same." *Burton*, 738 F. Supp. 3d at 290 (citing *Ferris v. Cuevas*, 118 F.3d 122, 126 n.4 (2d Cir. 1997)). Collateral estoppel applies when

> (1)    the identical issue necessarily was decided in the prior action and is decisive of the present action, and

> (2)    the party to be precluded from re-litigating the issue had a full and fair opportunity to litigate the issue in the prior action.

*Id.* (citing *Yeshiva Imrei Chaim Viznitz of Boro Park, Inc. v. City of N.Y.*, 496 F. App'x 122, 123

(2d Cir. 2012) (quoting *In re Hyman*, 502 F.3d 61, 65 (2d Cir. 2007))).

Both elements are satisfied. First, the issue – whether Romania owns the Painting – was necessarily decided in the prior action since Romania's action was dismissed with prejudice. While default judgments generally do not give rise to collateral estoppel effect for issues raised by the dismissed claim, "[a] limited exception applies 'where the party against whom collateral estoppel is sought to be invoked has appeared in the prior action or proceeding and has, by deliberate action, refused to defend or litigate the charge or allegation that is the subject of the preclusion request.'" *Downtown Acupuncture PC v. State Wide Ins. Co.*, 50 Misc. 3d 461, 467 (N.Y. Civ. Ct. 2015) (citing Mtr. of Abady, 22 A.D.3d 71, 83-84 (1st Dept. 2005); *Kalinka v. St. Francis Hospital*, 34 A.D.3d 742, 744 (2d Dept. 2006)). Romania's intentional violation of discovery orders as part of its litigation strategy in the prior action thus falls squarely within that exception. And the issue of whether Romania owns the Painting is certainly decisive of this action.

Second, Romania had every opportunity to litigate its ownership claim to the Painting in the prior action, especially since, as Judge Edelstein noted, "Wildenstein submitted to discovery." Indeed, as a sovereign state, Romania had virtually unlimited resources to prosecute its claim; yet, it allowed the claim to be dismissed due to its willful misconduct.

Thus, the doctrines of res judicata and collateral estoppel independently bar Romania from relitigating its ownership claim to the Painting in this action (or the State Action). Romania's request that this Court exercise its discretion to abstain from jurisdiction, allowing Romania to choose the forum, is therefore especially inappropriate.

## CONCLUSION

The Court should deny Romania's motion to dismiss.

Dated:   July 11, 2025

THE GRIFFITH FIRM

*/s/ Edward Griffith*
By: _____
        Edward Griffith
77 Sands Street
Brooklyn, New York 11201
(646) 645-3784 (mobile)
eg@thegriffithfirm.com

*Counsel for Plaintiff Prince Paul Philippe of Romania on behalf of the Estate of King Carol II of Romania*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify that the foregoing Opposition Memorandum of Law complies with this Court's word-count limitation because it contains 7,342 words as calculated by the Microsoft WORD software used to prepare it.

Dated: July 11, 2025

*/s/ Edward Griffith*
_____
Edward Griffith
