**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>                Plaintiff,<br><br>  -against-<br><br>CHRISTIE'S, INC.,<br><br>                Defendant. | Case No.: 1:25-cv-01151-LLS<br><br><br><br>**OMNIBUS REPLY IN SUPPORT OF ROMANIA'S MOTION TO DISMISS FOR LACK OF JURISDICTION, OR, ALTERNATIVELY, MOTION TO STAY** |
| CHRISTIE'S, INC.,<br><br>                Counterclaim and Third-Party Plaintiff,<br><br>  -against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA,<br><br>                Counterclaim Defendant, and<br><br>ACCENT DELIGHT INTERNATIONAL LTD. and STATE OF ROMANIA,<br><br>                Third-Party Defendants. | |
| ACCENT DELIGHT INTERNATIONAL LTD.,<br><br>                Interpleader Defendant and Cross-Claim Plaintiff,<br><br>  -against-<br><br>PAUL PHILIPPE OF ROMANIA, on behalf of the ESTATE OF KING CAROL II OF ROMANIA, and STATE OF ROMANIA,<br><br>                Interpleader Defendants and Cross-Claim Defendants. | |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................... 1

II.     ARGUMENT ..................................................................................................... 1

        A.     Romania Did Not Waive Its Foreign Sovereign Immunity ................................ 1

               1.     Romania Did Not Explicitly Waive Its Immunity ..................................... 1

               2.     Romania Did Not Implicitly Waive Its Immunity .................................... 2

                      a.     Romania Did Not Implicitly Waive Its Immunity By Filing
                             Other Actions ................................................................................ 2

                      b.     No Case Cited in the Oppositions Support the Proposed Expansion
                             of the Waiver Exception ................................................................ 5

        B.     The Succession Exception Does Not Apply to Property Stolen from a Foreign
               Sovereign's National Collection and Imported into the U.S. Many Years Later .. 7

        C.     Romania's Claim for the Painting Is Not Barred by Res Judicata or Issue
               Preclusion ......................................................................................................... 9

        D.     Romania is Not Forum Shopping ....................................................................... 10

        E.     Abstention Is Warranted Due to Questions of Foreign Sovereign Immunity ...... 11

III.    CONCLUSION ................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of Abady*,
    22 A.D.3d 71 (2005) ............................................................................................................10

*Ansary v. Cent. Bank of Curacao & Sint Maarten*,
    735 F. Supp. 3d 37 (D.D.C. 2024) ....................................................................................1, 5

*Asociacion De Reclamantes v. United Mexican States*,
    561 F. Supp. 1190 (D.D.C. 1983) ..........................................................................................8

*Blaxland v. Commonwealth Dir. of Pub. Prosecutions*,
    323 F.3d 1198 (9th Cir. 2003) ...............................................................................................7

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    581 U.S. 170 (2017) ...............................................................................................................9

*Cabiri v. Gov't of Republic of Ghana*,
    165 F.3d 193 (2d Cir. 1999) .........................................................................................2, 3, 4, 5

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
    727 F.2d 274 (2d Cir. 1984) ...................................................................................................6

*Cap. Ventures Int'l v. Republic of Argentina*,
    552 F.3d 289 (2d Cir. 2009) ...................................................................................................2

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
    56 F.3d 343 (2d Cir. 1995) ...................................................................................................10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
    126 F.3d 365 (2d Cir. 1997) ...................................................................................................9

*Downtown Acupuncture PC v. State Wide Ins. Co.*,
    50 Misc. 3d 461 (N.Y. Civ. Ct. 2015) ..................................................................................10

*Fontaine v. Permanent Mission of Chile to United Nations*,
    No. 17 CIV. 10086 (AT), 2020 WL 5424156 (S.D.N.Y. Aug. 18, 2020) ...............................2

*Lord Day & Lord v. Socialist Republic of Vietnam*,
    134 F. Supp. 2d 549 (S.D.N.Y. 2001) ....................................................................................6

*Panjiva, Inc. v. United States Customs & Border Prot.*,
    342 F. Supp. 3d 481 (S.D.N.Y. 2018) ....................................................................................5

*Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*,
   760 F.2d 390 (2d Cir. 1985)...............................................................................2

*Republic of Hungary v. Simon*,
   145 S. Ct. 480, 221 L. Ed. 2d 1 (2025) ...........................................................11

*Rojas v. Romanoff*,
   186 A.D.3d 103 (1st Dep't 2020) ......................................................................10

*Shapiro v. v. Republic of Bolivia*,
   930 F.2d 1013 (2d Cir. 1991)..............................................................1, 2, 3, 4, 9

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir.1992) ................................................................................4

*Whitfield v. City of New York*,
   96 F.4th 504 (2d Cir. 2024) ...............................................................................10

**Statutes**

28 U.S.C. § 1607...............................................................................................3, 4

**Other Authorities**

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong.
   & Admin. News 6604, 6617 .............................................................................2, 7

*Hearings on H.R. 3493 Before the Subcomm. on Claims and Gov'tl Relations of
   the House Comm. on the Judiciary*, 93d ................................................................7

I.    **INTRODUCTION**

Romania did not waive its sovereign immunity by filing other lawsuits and the succession exception is not triggered by claims for a painting stolen from Romania's national collection in 1947.  Romania is immune and indispensable; the action must therefore be dismissed.

II.    **ARGUMENT**

A.    **Romania Did Not Waive Its Foreign Sovereign Immunity**

Romania asserted immunity as a foreign sovereign in its early letter to this Court (Dkt. 35), and all other parties were aware of Romania's prior U.S. lawsuits (Dkt. 1, ¶7; Dkt. 17, ¶7; Dkt. 39, ¶¶19-21). A party cannot raise new grounds for subject matter jurisdiction in their opposition brief. *Ansary v. Cent. Bank of Curacao & Sint Maarten*, 735 F. Supp. 3d 37, 46 (D.D.C. 2024).  However, that is precisely what was done has, as no party alleged jurisdiction based on the waiver exception in their complaint, interpleader, answer, or counterclaim.  Paul Philippe ("Philippe") did not even name Romania in his replevin complaint. Christie's alone alleged grounds for jurisdiction over Romania in its interpleader, but relied just on the expropriation and succession exceptions to the Foreign Sovereign Immunity Act ("FSIA").  (Dkt. 17, at 11, ¶8; Dkt. 22, ¶8; Dkt. 39, ¶8).

Now, however, Accent Delight ("Accent"), Philippe and Christie's (collectively "Accent *et al.*"), argue in their oppositions that Romania waived immunity by filing a similar state-court action (after Christie's filed its interpleader) and/or because it filed lawsuits against different parties in 1985 and 1993. Binding precedent confirms that Romania's immunity remains intact. *Shapiro v. v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (noting the Second Circuit has never found that "suit by a foreign sovereign in a United States court with respect to a particular matter constitutes a waiver of immunity from jurisdiction as to associated claims").

1.    **Romania Did Not Explicitly Waive Its Immunity**

No party argues that Romania explicitly waived its sovereign immunity. Nor do any

allegations support explicit waiver, which requires a "clear and unambiguous" statement by the foreign state. *Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 293 (2d Cir. 2009); *see also Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 393 (2d Cir. 1985). Romania has made no such statement.

### 2.    Romania Did Not Implicitly Waive Its Immunity

Claims of implied waiver must be construed narrowly and require proof of intent. *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999); *see also Fontaine v. Permanent Mission of Chile to United Nations*, No. 17 CIV. 10086 (AT), 2020 WL 5424156, at *3 (S.D.N.Y. Aug. 18, 2020). Courts point to three examples of unambiguous, implied waiver in the FSIA's legislative history as evidence the exception must be narrowly construed. *See e.g.*, *Shapiro*, 930 F.2d at 1017. The three examples are: (1) a foreign state has agreed to arbitration in another country, (2) a foreign state has agreed that the law of a particular country should govern a contract, and (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6617 ("FSIA House Report"). The Second Circuit in *Shapiro* noted that "courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous." *Shapiro*, at 1017.

Romania did not take any of the above actions, nor did Romania take similarly unambiguous actions showing an intent to waive its sovereign immunity. To the contrary, Romania asserted its sovereign immunity in each submission in this action. (Dkt. 35, 43, 45).

### a.    Romania Did Not Implicitly Waive Its Immunity By Filing Other Actions

The Second Circuit has not expanded the implicit waiver exception to include filing of other lawsuits, even if the subject matter is the same. In *Shapiro,* Bolivia had previously sued

Bernard Tractman and International Promotions and Ventures, Ltd ("IPVL") in the SDNY for the return of promissory notes. Bolivia also initiated an adversary proceeding in U.S. bankruptcy court after Tractman and IPVL filed petitions for bankruptcy. Shapiro possessed one of the subject promissory notes and sued Bolivia in the SDNY to recover its face value. The district court dismissed for lack of jurisdiction, finding Bolivia had not waived its immunity "by initiating the IPVL suit and the subsequent bankruptcy adversary proceeding[.]" *Shapiro*, at 1015-1016. The plaintiff appealed and asked the court to "extend the implied waiver doctrine and hold that a suit by a foreign sovereign in a United States court with respect to a particular matter constitutes a waiver of immunity from jurisdiction as to associated claims." *Id.*, at 1017. The Second Circuit refused, noting it had never recognized such an extension, and agreed Bolivia had not waived its "sovereign immunity by bringing the actions against Tractman and IPVL." *Id.*

The Second Circuit similarly refused to expand the implied waiver exception in *Cabiri v. Ghana*. There, Ghana had filed an eviction proceeding in New York state court; and the tenant-defendants ("the Cabiris") asserted counterclaims. *Cabiri*, 165 F.3d at 196. The parties settled the eviction case: the Cabiris agreed to vacate the premises and to assert their counterclaims in a new federal action. *Cabiri*, at 196. The Cabiris then sued Ghana in the EDNY, "asserting the same claims they had raised as their counterclaims in the state proceeding." *Id.* The district court dismissed for lack of subject matter jurisdiction under the FSIA. *Id.* On appeal, the Cabiris argued there was jurisdiction under the waiver exception and/or the counterclaim exception, found at 28 U.S.C. § 1607, as a result of Ghana filing the state-court eviction proceeding. *Id.*, at 201. The court rejected this waiver argument, holding that Ghana had "taken no action that can be understood to demonstrate either an objective or a subjective intent to waive immunity with respect

to these claims[.]" *Shapiro*, at 202. The court found it unnecessary to decide the circumstances, *if any*, where filing one action would implicitly waive the sovereign's immunity in another. *Id.*

The court however determined that one of the Cabiris' claims satisfied the counterclaim exception[1] because it arose from the "same transactions as the eviction proceeding." *Id.*, at 198; *see also* 28 U.S.C. § 1607 ("In any action brought by a foreign state . . . in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim . . . (b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state"). The same is not true here. No claims at issue were filed as counterclaims in an action brought by Romania.

When considering the Cabiris' request to expand the waiver doctrine to include a sovereign's filing of related lawsuits (as Accent *et al.* also request here), the court noted the proposed theory "rested entirely, and precariously, on *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir.1992)," in which "an adventurous panel of the Ninth Circuit" found that "Argentina may have waived sovereign immunity by seeking the assistance of a court in the United States in furthering a scheme of persecution from which Siderman's claim arose." *Cabiri*, 165 F.3d at 202. The court held that the "implicit theory of *Siderman* is new and dubious, and seems to be that a foreign state forfeits immunity with respect to matters related to a scheme of persecution if it advances that scheme by bringing suit in the United States." *Id.* The *Cabiri* court rejected this theory and also noted the tension between such an expansive reading of the waiver exception and the limited scope of the counterclaim exception. *Cabiri*, at 203 ("[t]o allow

---

[1] "In any action brought by a foreign state . . . in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim . . . (b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state[.]" 28 U.S.C. 1607.

plaintiffs to establish waiver on the basis of a connection between Ghana's eviction proceeding and causes of action that do not come within the counterclaim exception would in effect broaden the application of the counterclaim exception beyond the parameters intended by Congress.")

The proposed expansion would also render the counterclaim exception redundant and superfluous. There is no need for the separate counterclaim exception if the waiver exception was read to also apply when a foreign state filed suit related to the same subject matter.  Courts are required to "give effect to all of a statute's provisions so that no part will be inoperative or superfluous, void or insignificant." *Panjiva, Inc. v. United States Customs & Border Prot.*, 342 F. Supp. 3d 481, 490 (S.D.N.Y. 2018), *aff'd*, 975 F.3d 171 (2d Cir. 2020) (cleaned up).  If there are competing interpretations, "the rule against superfluities favors that interpretation which avoids surplusage and redundancies." *Panjiva*, 342 F. Supp. at 490 (cleaned up). The expansive interpretation proposed by Accent *et al.* cannot survive the rule against superfluities and must be rejected for that reason as well.

> **b.    No Case Cited in the Oppositions Supports the Proposed Expansion of the Waiver Exception**

In *Ansary*, a series of related cases concerning insurance assets seized by the Central Bank of Curaçao were filed in Curaçao and the U.S., culminating in the U.S. case under review.  *Ansary*, 735 F.Supp.3d at 43.  Although the Central Bank caused the filing of a U.S. bankruptcy petition and separate actions in California and Texas, and although the U.S. actions involved some of the same parties and issues as the case under review, the district court found that such filings did not amount to a waiver of immunity.  *Id.*, at 45-47. There is even less basis for waiver here; the present action was not the culmination of a series of related cases filed within a short four-year time-frame. Romania's two prior cases were filed more than 35 years ago against different and unrelated

defendants (Wildenstein & Co.; and former King Michael I), neither of which is in privity with the modern-day parties.

In *Lord Day & Lord*, Vietnam explicitly waived immunity in its Answer, agreeing to appear "for the sole purpose of asserting its claim to the disputed funds." *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 557 (S.D.N.Y. 2001). Vietnam tried to reserve its immunity as to other competing claims to the funds but the court found that "by its appearance and claim to the funds, Vietnam has impliedly waived immunity to the extent necessary to determine all pre-existing claims relating to legal title to the property[.]" *Lord Day*, 134 F. Supp. 2d at 559. The court refused to extend Vietnam's waiver to claims for other property or other theories of recovery. *Id*. The facts and holding of *Lord Day* are distinguishable, and provide no support for Accent *et al*. Moreover, unlike Vietnam, Romania did not file an Answer, did not expressly waive immunity, and did not agree to appear for the purpose of asserting its claim.

*Canadian Overseas* is also inapposite. The defendant was owned and controlled by the Chilean government and presumptively immune. *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 275 (2d Cir. 1984). After participating in the case for almost three years—filing a motion to remove, exchanging discovery demands, moving to dismiss on other grounds—the defendant moved to dismiss on grounds of sovereign immunity. *Canadian Overseas*, 727 F.2d at 276. The district court rejected the plaintiff's argument that "participation in the litigation" constituted a waiver in that particular case and granted the motion. *Id.*, at 277. The dismissal was affirmed on appeal, with the court also noting plaintiff "had full notice," early in the case, that defendant reserved its immunity defense. *Id.*, at 278. Romania also provided full notice of its immunity defense early in this case. (Dkt. 35). But, unlike the Chilean defendant, Romania has not exchanged discovery or moved to dismiss on other grounds. As the defendant's

litigation conduct in *Canadian Overseas* was insufficient to waive immunity, Romania's "conduct" also falls short.

Finally, in *Blaxland*, the court held that Australia's filing of an extradition request with the U.S. State Department *did not* waive sovereign immunity in a subsequent U.S. action filed by the person who was extradited. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1206 (9th Cir. 2003). Romania has not filed an extradition request. This Ninth Circuit decision has no bearing here.

### B. The Succession Exception Does Not Apply to Property Stolen from a Foreign Sovereign's National Collection and Imported into the U.S. Many Years Later

Accent *et al*. claim the succession exception applies because: (1) in 1914, King Carol I bequeathed the Painting to Romania and, after the Painting was stolen in 1947, (2) the Painting was brought to New York for an auction in 2025. There is no support for this expansive reading. Romania is not stepping into the shoes of a private litigant or otherwise asserting rights to "the property of a deceased person," as the legislative history shows was the purpose of this exception.[2] Rather, Romania received the Painting over 110 years ago, in Romania and through an unchallenged bequest. The Painting was not and is not subject to estate proceedings in this country or any other. The Painting became part of Romania's national art collection and remained in Romania until its theft in 1947. The Painting was, and is, a state public asset. Romania's ownership was not challenged in 1914, in 1947, or at any time before Philippe's 2025 lawsuit. Moreover, Romania is not responsible for the Painting being in the U.S. Accent brought the Painting here for

---

[2] *See Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Gov'tl Relations of the House Comm. on the Judiciary*, 93d Cong. 21, at 34, 42 (1973); *and* FSIA House Report, at 20.

sale, after acquiring it in 2010. Yet, Accent *et al.* claim that Romania must forfeit its sovereign immunity, decades after the Painting was stolen, because the Painting is now in the U.S.

As no Second Circuit authority supports their position, Accent *et al.* turned to a decision from the D.C. Circuit Court, which actually undercuts their argument. In *Asociacion De Reclamantes v. United Mexican States*, the district court stated that this exception was not intended to cover every U.S. dispute involving inherited property:

> If the Court were to adopt plaintiffs expansive reading of the FSIA, any claim or chose in action involving inherited property (real, personal or intangible) would be excepted from the rule of sovereign immunity. Because every dispute with a foreign sovereign necessarily involves these kinds of intangible rights, every dispute in plaintiffs' view would be excepted from sovereign immunity when it passes by gift or succession. This is contrary to the purpose of the FSIA.
>
> The FSIA codified the existing "restrictive" principles of sovereign immunity in section 1605. [Citation omitted]. Congress included the succession clause ("rights in property in the United States acquired by succession or gift") to ensure that real, personal and intangible property rights were justiciable where a foreign sovereign steps into the shoes of a private litigant by obtaining rights in property through a gift or inheritance. [Citation omitted]. It did not intend to open the courts to all suits involving inherited or donated property.

*Asociacion De Reclamantes v. United Mexican States*, 561 F. Supp. 1190, 1197 (D.D.C. 1983), *aff'd*, 735 F.2d 1517 (D.C. Cir. 1984).

While the facts are dissimilar—*Asociacion De Reclamantes* involved a class action suit against Mexico for converting certain land grant related claims—the court's analysis and narrow reading are helpful (and contrary to the expansive reading Accent *et al.* propose). The succession exception was intended for U.S. estate matters and claims for property of a deceased person.[3] That was not the case in *Asociacion*—where the court found the exception did not apply—and is not the case here. *Asociacion De Reclamantes*, 561 F.Supp. at 1197.

---

[3] *See* note 2, *supra*.

Philippe's allegation that he represents his grandfather's estate, who allegedly died in Portugal in 1953 (Dkt. 1, ¶17), likewise does not trigger the succession exception. There is no evidence Philippe has been appointed to represent his grandfather's estate, nor has Philippe presented facts showing (not just arguably showing) his grandfather inherited the Painting. *Cf.*, *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178–79 (2017). Even if Philippe could present such evidence, the succession exception was not intended to cover every claim involving alleged inherited property and should not be expanded to cover claims for property bequeathed to a foreign sovereign, under foreign law, without challenge or dispute, over 110 years ago.

Romania did not waive its immunity and the succession exception does not apply. Romania is immune and indispensable. Thus—regardless which parties were omitted from the initial complaint, and whether Christie's interpleader-counterclaim created diversity jurisdiction— the action must be dismissed.

### C.    Romania's Claim for the Painting Is Not Barred by Res Judicata or Issue Preclusion

Phillippe argues this Court should deny Romania's motion based on the defenses of *res judicata* and issue preclusion. Not only are these affirmative defenses premature and irrelevant to the instant motion, but Phillippe is wrong and misstates the law on these doctrines. *See e.g.*, *Shapiro*, at 1015-1016 (holding that prior litigation does not result in waiver of foreign state's immunity).

Issue preclusion (or collateral estoppel) bars a party from re-litigating an issue of fact or law that was "litigated and actually decided" in a prior proceeding, and where the decision of the issue was "necessary to support a valid and final judgment on the merits." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 371 (2d Cir. 1997). The issue of Romania's ownership was not

"actually decided" nor "necessary to support" the prior dismissal, which was based on discovery violations. The cases cited by Phillippe do not support his argument that issue preclusion applies. In *Downtown Acupuncture PC v. State Wide Ins. Co.*, 50 Misc. 3d 461, 471 (N.Y. Civ. Ct. 2015), the court refused to consider collateral estoppel because there was not an identity of issues and collateral estoppel had not been raised as a defense. In *Matter of Abady*, 22 A.D.3d 71, 78 (2005), collateral estoppel barred re-litigating issues on which prior courts had made "findings" adverse to the defendant.

Claim preclusion (or *res judicata*) does not bar Romania's claims. Under this doctrine, "a valid final judgment bars future actions between the same parties on the same cause of action." *Whitfield v. City of New York*, 96 F.4th 504, 523 (2d Cir. 2024) (citations omitted). The prior dismissal did not address the merits of Romania's claims, and neither Phillippe nor Accent were parties to the prior litigation. Although Phillippe suggests there is "privity" with the parties to the prior action (Dkt. 55, at 22), his contention is unsupported and cannot be resolved at this stage. *Rojas v. Romanoff*, 186 A.D.3d 103, 112 (1st Dep't 2020) ("'the concept of privity requires a flexible analysis of the facts and circumstances of the actual relationship between the party and nonparty in the prior litigation'") (internal citation omitted); *see also Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995) (noting "the federal doctrine uses privity in a way similar to its use under New York law").

### D.    Romania is Not Forum Shopping

The parties have the same claims and affirmative defenses in state and federal courts. As an immune foreign sovereign, however, Romania has discretion on when and where it participates in U.S. litigation. Phillippe is a fugitive convicted of influence peddling who, despite omitting Romania from his replevin action, is using this case to air numerous, and irrelevant, historical

grievances. Romania is not "forum shopping," Romania is exercising its statutorily provided immunity to decline participating in the action initiated by Philippe.

### E.    Abstention Is Warranted Due to Questions of Foreign Sovereign Immunity

The Court can also choose to abstain from jurisdiction and allow the state-court action to proceed.  Abstention would avoid any potential delay caused by disputes regarding foreign sovereign immunity.  The U.S. Supreme Court issued an opinion just this year, in a case that was filed in 2010, regarding jurisdiction under the FSIA.  *Republic of Hungary v. Simon*, 145 S. Ct. 480, 486, 221 L. Ed. 2d 1 (2025).  Not all such disputes linger for fifteen years, but *Simon* demonstrates that jurisdictional disputes under the FSIA can last a decade or more.  Such a dispute is not necessary here. The state-court action provides an alternate forum without disputes over foreign sovereign immunity.

## III.    CONCLUSION

For all the above reasons, Romania respectfully submits that this Court should dismiss this action, or, alternatively, abstain from jurisdiction and stay this case in favor of the parallel state-court action.

Dated: August 4, 2025

NIXON PEABODY LLP

By:   */s/ Thaddeus J. Stauber*
    Thaddeus J. Stauber

    Thaddeus J. Stauber
    Paul F. Downs
    Zachary C. Osinski, *pro hac vice forthcoming*
    Tower 46
    55 West 46th Street
    New York, New York 10036
    (212) 940-3000
    tstauber@nixonpeabody.com
    pdowns@nixonpeabody.com
    zosinski@nixonpeabody.com

    Aaron M. Brian, *pro hac vice forthcoming*
    300 South Grand Avenue, Suite 4100
    Los Angeles, CA 90071-3151
    Tel: (213) 629-6000
    abrian@nixonpeabody.com

LEXTERS LAW FIRM - STANESCU, VASILE
SCA

By:   */s/ Alexandru Stanescu*
    Alexandru Stanescu
    17 Helesteului Street,
    Bucharest, Romania, CP 011986
    alexandru.stanescu@lexters.com

    **Counsel for Interpleader and Third-Party
    Defendant State of Romania**

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this OMNIBUS REPLY IN SUPPORT OF

ROMANIA'S MOTION TO DISMISS FOR LACK OF JURISDICTION, OR,

ALTERNATIVELY, MOTION TO STAY (the "Reply") complies with the word limit of 3,500

words set forth in this Court's Local Rule 7.1(c).  According to the word-processing system used

to prepare the Reply, the total word count for all text in the Reply, including footnotes and

endnotes, but excluding the caption, any index, table of contents, table of authorities, signature

blocks, or any required certificates, is 3,494 words.

*/s/ Thaddeus J. Stauber*
Thaddeus J. Stauber